Original Transcript

EXHIBIT
tabbies®
3

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE


LORRAINE WATSON,

Plaintiff,

-v-                                              Civil Action No. 1:09-cv-00258

EASTERN MAINE MEDICAL CENTER,

Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


**DEPOSITION OF ANNETTE O'BRIEN, RNC, LNC,**

January 8, 2010
9:12 a.m.

170 Hamilton Avenue
White Plains, New York

Leeann Bertorelli


sd setdepo™
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

1    in these two articles?

2        A.    No.

3        Q.    Were you ever provided any information

4    orally in this case that impacted your decisions

5    or opinions which was not reflected in the written

6    materials you were provided?

7        A.    No.

8        Q.    Did you ever ask for any information or

9    any documents to help you form your opinions which

10   you were not provided?

11       A.    No.

12       Q.    In the previous ten cases where you were

13   engaged, were you ever asked to offer opinions on

14   EMTALA issues?

15       A.    No.

16       Q.    In your practice at White Plains

17   Hospital, are you, what we would call, a floor

18   nurse in the OB/GYN department?

19       A.    Staff nurse and labor and delivery.

20       Q.    Okay.  Do you perform services in the

21   emergency department?

22       A.    No.

23       Q.    Have you ever performed services in an

24   emergency department?

25       A.    Sometimes.



1      Q.   When was the last time you performed

2   services in the emergency department?

3      A.   Occasionally we're asked to go down just

4   to see a pregnant patient, so maybe a month ago.

5      Q.   I take it that's not part of your

6   regular routine.

7      A.   No, it is not.

8      Q.   You're called down on a case-by-case

9   basis by an emergency room physician?

10     A.   Correct.

11     Q.   And generally what's the purpose of that

12  call?

13     A.   Usually just to check if there's a fetal

14  heart, if a patient comes in for something other

15  than an obstetrical issue.

16     Q.   Such as what kind of circumstance?

17     A.   Car accident, they broke their leg,

18  things of that nature.

19     Q.   I see.  So you might be asked to

20  determine whether the fetus is still alive?

21     A.   Correct.

22     Q.   In the White Plains Hospital, do you

23  occasionally have obstetrical patients who come in

24  who believe they may be in labor and who are sent

25  home being advised that nothing is essentially


**setdepo**™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   have gotten -- you might have been asked to review

2   a case before you got this certificate.  What's

3   the difference between that and now?

4        A.   I think now I have more of a legal

5   knowledge of how things are worded, how to look

6   things up, what standards you need to show,

7   whether the case has any merit.  In terms of that,

8   I think I know more now than I did prior to having

9   taken the course.

10       Q.   What sort of materials were you -- did

11  you review for that course?

12       A.   There were required books that Kaplan

13  Institute gives you that you get -- that you read.

14  A number of books on different medical/legal

15  terminology, how to write a report up, things of

16  that nature.

17       Q.   Is that K-A-P-L-A-N?

18       A.   Correct.

19       Q.   The same folks who provided courses for

20  people to get into graduate schools?

21       A.   Correct.

22       Q.   In the course of your studies with

23  Kaplan, did you study EMTALA at all?

24       A.   No.

25       Q.   Have you had any exposure to EMTALA in



**setdepo**™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1    your work?

2        A.    No.

3        Q.    Did you ever receive any training

4    through any of the hospitals you went to on

5    EMTALA?

6        A.    No.

7        Q.    When did you first hear of EMTALA?

8        A.    I can't say what date that was.  It was

9    prior to this.

10        Q.    You referenced that you stay up-to-date

11    on OB/GYN nursing; is that right?

12        A.    Correct.

13        Q.    How do you do that?

14        A.    I attend conferences.  I maintain my

15    certification in obstetrical -- in patient

16    obstetrics through the NCC, which is the Nurses

17    Organization for Certification.  And by doing that

18    you have to do x amount -- 45 credits every three

19    years in continuing ed.  I read articles,

20    magazines, regarding OB.

21        Q.    And you mentioned ACOG.  You review ACOG

22    bulletins?

23        A.    Yes, we get them all the time at work.

24        Q.    Do you agree that it's important, both

25    as a nurse and as a legal nurse consultant, to be


**setdepo**™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1      Q.   Now, just going back to some of our

2   earlier discussions.  I take it your license

3   doesn't enable you to make a medical diagnosis;

4   correct?

5      A.   Correct.

6      Q.   It doesn't enable you to write

7   prescriptions?

8      A.   Correct.

9      Q.   You can't separately bill through

10   insurance for your services as a nurse; correct?

11      A.   Correct.

12      Q.   All of these are privileges and

13   abilities that only physicians have; correct?

14      A.   Correct.

15      Q.   The term "false labor" that you've

16   referenced, what -- on what basis -- strike that.

17           You've read the medical records in this

18   case?

19      A.   Yes.

20      Q.   You've noted that no physician has

21   referred to Ms. Watson being in labor; correct?

22      A.   Correct.

23      Q.   That is a determination that physicians

24   make?

25      A.   Correct.


**setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1     Q.    Based upon terminology that they are

2    trained to use?

3     A.    Correct.

4     Q.    Have you done any research to indicate

5    that the term "labor" is appropriate in a case of

6    a nonviable fetus at 16 weeks that is dead?

7     A.    I have not done research.

8     Q.    What would your -- are you maintaining

9    that Ms. Watson was actually in labor at that

10   time?

11    A.    Yes.

12    Q.    On what basis?

13    A.    Based on her contractions.  Based on the

14   fact that she did have a fetal demise in second

15   trimester, and was contracting and subsequently

16   delivered.

17    Q.    Labor is a term of art; is it not?

18    A.    I don't understand.

19    Q.    Labor has a specific meaning in

20   medicine; does it not?

21    A.    Yes.

22    Q.    Can you tell me on what basis you would

23   say that a patient under these circumstances where

24   there is a nonviable fetus is actually in labor?

25    A.    The patient was contracting regularly.



sd setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:   1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   Patients with nonviable fetus eventually do

2   deliver those babies.

3       Q.    They deliver the products of conception

4   and the issue -- one issue in this case, do you

5   understand it to be, as to whether or not that is

6   described as labor?

7           MS. FARR:  Object to the form of that

8       question.  I do not believe that is accurate.

9       To the extent you understand, you can answer.

10      A.    I don't understand.  Just repeat it,

11  please.

12      Q.    Sure.  You understand that one of the

13  issues in this case is whether Lorraine Watson was

14  actually in labor?

15      A.    Yes.

16          MS. FARR:  Objection.

17      Q.    And do you --

18          MS. FARR:  I didn't hear her answer.

19          THE WITNESS:  Yes.

20          MS. FARR:  Okay.

21      Q.    And given that that is an issue, given

22  than you were being asked to look at this as a

23  professional, did you do any research to determine

24  whether the term "labor" would apply to her when

25  there is a 16-week fetus that it was dead?



1      A.    Based on my experience in having

2   patients who have been second trimester and have

3   had a fetal demise and have labored, I feel that I

4   can adequately say that she was in labor when she

5   left.

6      Q.    When you say "have labored," I want to

7   make sure that we're talking about a specific

8   medical term.  I don't mean whether they've

9   experienced pain and whether they've delivered the

10  products of conception, but I mean whether in fact

11  what they did was properly denoted "labor" by

12  medical professionals, by physicians.  Have you

13  done any research on that issue?

14     A.    I have not done research.

15     Q.    So you're simply relying upon your

16  background as a nurse to come to that conclusion?

17     A.    Correct.

18     Q.    I want to show you Exhibit 4, which is a

19  letter to you, dated June 2nd, 2009, from Julie

20  Farr.  Did you accept Ms. Farr's interpretation of

21  the law as you considered your opinions in this

22  case?

23     A.    Yes.

24     Q.    And I'm going to show you O'Brien 3.

25  The first page of that informs you that -- this is


**setdepo**
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   history of whether she's had previous c-sections?

2       A.   I did not.

3       Q.   Would it be important for the doctors to

4   know whether Lorraine had had a previous c-section

5   in order to assess her risk upon discharge?

6           MR. SCHELLING:   Objection; form and

7           foundation.

8       A.   Yes.

9       Q.   Why would that be important to know?

10      A.   It would be important to know that she

11  was at high risk for uterine rupture because she

12  had a previous c-section.

13      Q.   Bear with me for just a minute, please.

14  I wanted to ask you about -- you have the October

15  29th, 2009, letter from attorney Schelling to me

16  with respect to the expert witness designation.

17  Do you have that there?

18      A.   Yes.

19      Q.   You see in the second paragraph on the

20  first page it says Dr. Gimbal will testify that

21  Ms. Morin was not in labor.  That she was

22  experiencing a miscarriage or an abortion?

23      A.   I see that.

24      Q.   Can you tell me whether you agree with

25  that sentence and why?


**setdepo**™
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:     1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

49

```
 1        MR. SCHELLING:  Object to the
 2   foundation.  Go ahead.
 3        A.    I disagree because I feel that she was
 4   in labor and she was obviously going to deliver.
 5        Q.    The fact she was experiencing a
 6   miscarriage -- strike that.
 7        And based on your opinion, she in labor.
 8   She was having regular contractions; is that
 9   correct?
10        MR. SCHELLING:  Objection; form and
11   foundation.
12        A.    Yes.
13        MS. FARR:  I think that's all the
14   questions I have.  Thank you.
15        MR. SCHELLING:  Nothing further.  We're
16   all set.
17        COURT REPORTER:  Are you going to order
18   a copy of the transcript?
19        MS. FARR:  Yes, please.  And I'd also
20   like Annette to read and sign.
21
22
23        (Time noted:  10:35 a.m.)
24
25
```



53

1          C E R T I F I C A T I O N

2

3    STATE OF NEW YORK          )

4                              )   ss.

5    COUNTY OF WESTCHESTER      )

6              I, LEEANN BERTORELLI, Court Reporter

7    and Notary Public within and for the County of

8    Westchester, State of New York, do hereby certify:

9              That I reported the proceedings that

10   are hereinbefore set forth, and that such

11   transcript is a true and accurate record of said

12   proceedings.

13             AND, I further certify that I am not

14   related to any of the parties to this action by

15   blood or marriage, and that I am in no way

16   interested in the outcome of this matter.

17

18             IN WITNESS WHEREOF, I have hereunto

19   set my hand.

20

21

22   

23        LEEANN BERTORELLI

24          Court Reporter

25

setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:        1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com