UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| LORRAINE MORIN, | ) |
| Plaintiff | ) |
| | ) Civil Docket No.: 09-258-B-W |
| v. | ) |
| EASTERN MAINE MEDICAL CENTER, | ) |
| Defendant | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL FACTS**

NOW COMES the Plaintiff, Lorraine Morin, by and through her attorneys, Gilbert & Greif, P.A., and responds to Defendant's statement of material facts as follows:

RESPONSE

1-2.  Admitted.

3.  Qualified. Ms. Morin told the registration clerk that Dr. Gilmore had told Ms. Morin to come in to the hospital if she had any problems due to her high risk pregnancy as a result of previous cervical cancer, a previous miscarriage, and a previous comb biopsy. Plaintiff's Answers to Interrogatories, No. 9. Ms. Morin gave the same information to the triage nurse and to the emergency room doctor, Dr. Paul Reinstein. Id.

4.  Admitted as to the first and second sentences. Qualified as to the third sentence. Ms. Morin told Ms. Burbine that Dr. Gilmore had told Ms. Morin to come in to the hospital if she had any problems due to her high risk pregnancy as a result of previous cervical cancer, a previous miscarriage, and a previous comb biopsy.

1

Plaintiff's Answers to Interrogatories, No. 9. Ms. Morin reported that her pain level was between four and ten on a scale of ten, but Ms. Burbine only wrote down four. Plaintiff's Answers to Interrogatories, Nos. 9, 18.

5. Qualified only to the extent that the cited portion of Dr. Grover's declaration does not support the assertion that a pain level of 10 is associated with active labor contractions.

6. Admitted.

7. Qualified. Dr. Reinstein documented that Ms. Morin was "[a] 33-year old female who is approximately 16 weeks pregnant who for the last 20 hours has been having suprapubic cramps 10 minutes apart." Bethony Declaration, Exhibit A, page 2.

8-13. Admitted.

14. Objection. Paragraph 14 should be stricken, as it sets forth Dr. Grover's medical opinions, which are in the nature of expert testimony. Although Dr. Grover was identified as a potential expert witness in this case, the statements in Paragraph 14 (and in Paragraphs 5, 6 and 8 of Dr. Grover's declaration) express opinions that were not disclosed in Defendant's expert witness disclosure. Dr. Grover's statements go beyond what he observed and what he did; they express opinions (*i.e.*, Ms. Morin did not possess other risk factors, Ms. Morin was not in immediate danger of delivery or miscarriage, performing a dilation and extraction presented increased risks to Ms. Morin) that were not disclosed either in the medical records or the expert witness disclosure. See Farr Affidavit, Paragraph 2 and Exhibit A. As those opinions were not disclosed, they should be excluded from consideration in this case. Without waiver of the foregoing objection,

qualified as to the first sentence. Defendant's expert witness, Dr. Gimbel, testified that there was no way to predict how long it would have taken for Ms. Morin to deliver the fetus. Gimbel Deposition, pages 32-33. Denied as to the second sentence. Dr. Gimbel testified that a qualified physician could have performed a D&E, dilation and extraction. Gimbel Deposition, page 23. The fact that Ms. Morin's cervix was long and closed would not have prevented the doctors from performing a D&E, although they would want to do some type of cervical preparation to dilate the cervix prior to doing the D&E. Gimbel Deposition, pages 33-35.

15. Qualified. Dr. Grover prescribed Tylenol #3, which is a combination of Tylenol and a narcotic pain medication. Gimbel Deposition, page 26.

16. Admitted.

17. Qualified as to the first sentence. The blood for the lab work was not drawn until after Ms. Morin was given her discharge instructions. Morin Deposition, page 39; Plaintiff's Answers to Interrogatories, No. 9. Admitted as to the remaining sentences.

18. Admitted.

19. Objection to the extent that Defendant has cited <u>Dr. Gimbel's</u> testimony for the proposition that <u>Dr. Grover</u> did not believe that Ms. Morin was in active labor. This is improper speculation on the state of mind of another. Further objection on the grounds that Dr. Grover's own declaration uses a definition of "active labor" not found in (and not consistent with) the Emergency Medical Treatment and Active Labor Act (EMTALA). Without waiver of those objections, denied that Ms. Morin was not in labor. Deposition of Annette O'Brien (hereinafter "O'Brien Deposition"), pages 10, 28-30, 38 and Exhibit 4

(6/11/09 O'Brien letter).

20. Objection. Paragraph 20 should be stricken, as it sets forth Dr. Grover's medical opinion, which is in the nature of expert testimony. Although Dr. Grover was identified as a potential expert witness in this case, the statement in Paragraph 20 (and in Paragraph 9 of Dr. Grover's declaration) expresses an opinion that was not disclosed in Defendant's expert witness disclosure. See Farr Affidavit, Paragraph 2 and Exhibit A. As that opinion was not disclosed, it should be excluded from consideration in this case. Without waiver of the foregoing objection, denied. Ms. Morin was having regular contractions every ten minutes upon her presentation to EMMC and she delivered at home that same day. See Plaintiff's statement of additional facts, ¶¶ 33, 42-45.

21-22. Admitted.

23. Objection. Plaintiff objects on grounds of relevance and materiality. Without waiver of the foregoing objection, denied. O'Brien Deposition, pages 10, 28-30, 38 and Exhibit 4 (6/11/09 O'Brien letter).

24. Denied. O'Brien Deposition, pages 10, 28-30, 38 and Exhibit 4 (6/11/09 O'Brien letter).

25. Qualified. Ms. Morin was "stable" in terms of her vital signs; however, she was discharged prior to delivery of the fetus and the placenta. See Plaintiff's statement of additional facts, ¶¶ 42-46.

26-32. Admitted.

## STATEMENT OF ADDITIONAL FACTS

In addition to the responses to Defendant's statement of material facts set forth above, Plaintiff sets forth the following additional statements of fact:

33. Lorraine Morin was having contractions (which are the same thing as suprapubic cramps) ten minutes apart upon presentation to EMMC. Deposition of Gregory Gimbel, M.D. (hereinafter "Gimbel Deposition"), page 24; O'Brien Deposition, pages 41-42; Bethony Declaration, Exhibit A, pages 2, 5.

34. Ms. Morin told the registration clerk that Dr. Gilmore had told Ms. Morin to come in to the hospital if she had any problems due to her high risk pregnancy as a result of previous cervical cancer, a previous miscarriage, and a previous comb biopsy. Plaintiff's Answers to Interrogatories, No. 9. Ms. Morin gave the same information to the triage nurse and to the emergency room doctor, Dr. Paul Reinstein. Id.

35. Ms. Morin continued to have contractions at the time she was seen by Dr. Grover. Gimbel Deposition, page 25; O'Brien Deposition, page 43; Bethony Declaration, Exhibit A, page 10.

36. After Ms. Morin was informed that her baby was dead and was told that she was being discharged to home and should call her doctor on Monday, July 2, she specifically told Dr. Reinstein that she could not go home and deal with this, and that she wanted this taken care of now. Morin Deposition, pages 35-38.

37. Dr. Reinstein told Ms. Morin that if she gave birth at home, to just dispose of it and call her doctor on Monday. Morin Deposition, page 38.

38. Roger Morin was very upset that Dr. Reinstein was discharging Ms. Morin and at Dr. Reinstein's comment that they should throw their baby in the garbage, and told Dr. Reinstein and the nurse, Kim, that they were not leaving until this was taken care of. Morin Deposition, pages 38-39; Plaintiff's Answers to Interrogatories, No. 9.

39. Dr. Reinstein told Roger Morin to calm down or they would call security. Morin Deposition, page 38. When Mr. Morin told the nurse, Kim, that they were not leaving, Kim said they could leave or they would call security. Morin Deposition, page 39.

40. After Ms. Morin signed her discharge papers, someone from the lab came in to draw her blood for the bloodwork ordered by the doctors. Morin Deposition, page 39.

41. At the time Ms. Morin left Eastern Maine Medical Center, she was still in pain and was given a prescription for Tylenol with codeine, a narcotic painkiller. Morin Deposition, pages 41-43; Gimbel Deposition, page 26.

42. Ms. Morin was still having contractions at the time of her discharge from Eastern Maine Medical Center. Gimbel Deposition, pages 25-26; O'Brien Deposition, page 24.

43. Ms. Morin's pain did not improve after she left Eastern Maine Medical Center, but rather, the pains became more intense and closer and closer together. Morin Deposition, pages 48-49. Later the pains became constant. Morin Deposition, pages 49-50.

44. For hours that afternoon, Ms. Morin was in her bathroom on her hands and knees because that was the only position in which she felt she would not pass out, because her head was ringing and the pain was so intense. Morin Deposition, page 55.

45. Finally, around 9:00 P.M. that evening, Ms. Morin started getting the feeling that she wanted to push and fluid came out and her deceased son came out, and the pain started to subside. Morin Deposition, pages 55, 74.

46. Ms. Morin called her doctor, Pamela Gilmore, the next morning, July 2, 2007, at 7:30 A.M., and an emergency D&C was performed that day to remove the retained products of conception. Morin Deposition, pages 43, 47 and Exhibit 2.

47. Dr. Gregory Gimbel has been designated as Defendant's expert witness in this case. Gimbel Deposition, pages 3-4.

48. Dr. Gimbel is not an expert with the Emergency Medical Treatment and Active Labor Act (EMTALA), and has never read that Act front to back. Gimbel Deposition, pages 13-14, 28.

49. Dr. Gimbel's understanding is that EMTALA applies only to more advanced pregnancies where the babies are viable, and does not apply to spontaneous abortions or pregnancies of less than twenty (20) weeks duration. Gimbel Deposition, pages 26-28.

50. When Dr. Gimbel formed the opinion that Lorraine Morin was not unstable at the time she was discharged from Eastern Maine Medical Center on July 1, 2007, he had not reviewed the definition of "stabilize" in EMTALA, and the basis of his opinion that Ms. Morin was not unstable was based upon the appearance of the patient, her vital signs, the physical exam, the medical history, and the diagnosis. Gimbel Deposition, page 15.

51. Dr. Gimbel admits that Ms. Morin would have been at risk for a hemorrhage at the time she was discharged. Gimbel Deposition, page 19.

52. Plaintiff's expert, Annette O'Brien, has been a labor and delivery nurse for 35 years. Deposition of Annette O'Brien, RNC, LNC (hereinafter "O'Brien Deposition"), page 17.

53. Ms. Morin was at significant risk for complications, including a ruptured uterus, because she had previously had a Caesarian section in the past. O'Brien Deposition, pages 10, 40 and Exhibit 4 (6/11/09 O'Brien letter).

54. Lorraine Morin would also have been at risk for postpartum depression and emotional or mental health problems. O'Brien Deposition, pages 10, 44 and Exhibit 4 (6/11/09 letter

from Annette O'Brien to Julie D. Farr, Esq.).

55. If there was an appropriately credentialed physician available, one option for treating Ms. Morin on July 1, 2007 would have been to do a surgical termination of the pregnancy via a dilation and extraction (D&E). Gimbel Deposition, pages 23-24.

56. Two other options for terminating Ms. Morin's pregnancy on July 1, 2007 would have been expectant, *i.e.*, waiting for nature to take its course, and medical, *i.e.*, evacuation of the uterus by the administration of medications. Gimbel Deposition, page 24.

57. The medical records do not reflect that anyone at Eastern Maine Medical Center on July 1, 2007 certified that Lorraine Morin was in false labor. Gimbel Deposition, pages 31-32; Bethony Declaration, Exhibit A.

58. If Ms. Morin had been in false labor, she would not have been sent home with a prescription for a narcotic painkiller. O'Brien Deposition, page 39.

59. The fact that Ms. Morin's cervix was long and closed upon examination does not mean that the doctors at Eastern Maine Medical Center could not have used any one of the three methods (surgical, expectant or medical) for terminating Ms. Morin's pregnancy on July 1, 2007. Gimbel Deposition, pages 33-35.

60. Defendant's expert witness, Dr. Gregory Gimbel, conceded that suprapubic cramps are the same thing as contractions, and Plaintiff's expert agreed that the terms are interchangeable. Gimbel Deposition, page 24; O'Brien Deposition, pages 41-42;

| | |
|---|---|
| Date: <u>March 3, 2010</u> | <u>/s/ Julie D. Farr</u><br>Julie D. Farr, Esq.<br>GILBERT & GREIF, P.A.<br>P.O. Box 2339<br>82 Columbia Street<br>Bangor, ME 04402-2339<br>Attorneys for Plaintiff |

CERTIFICATE OF SERVICE

I, Julie D. Farr, Esq., attorney for Plaintiff, hereby certify that on this date, I electronically filed Plaintiff's response to Defendant's statement of material facts and statement of additional fact with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

> George C. Schelling, Esq.
> Joseph M. Bethony, Esq.
> Gross, Minsky & Mogul, P.A.
> 23 Water St., P.O. Box 917
> Bangor, ME 04402-0917

| | |
|---|---|
| Date: <u>March 3, 2010</u> | <u>/s/ Julie D. Farr</u><br>Julie D. Farr, Esq.<br>Attorney for Plaintiff |