UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

Civil Docket No:
1:09-cv-258

* * * * * * * * * * * * * * * * * *

LORRAINE MORIN,

    Plaintiff

vs.

EASTERN MAINE MEDICAL CENTER

    Defendant

* * * * * * * * * * * * * * * * * *

**ORIGINAL**

**DEPOSITION OF: GREGORY GIMBEL, M.D.**

BEFORE: Melissa L. Thibodeau, RPR, Notary Public, at the offices of Eaton Peabody, 167 Park Row, Brunswick, Maine, on January 12, 2010, beginning at 9:00 a.m.

APPEARANCES

| | |
|---|---|
| Julie D. Farr, Esq. | For the Plaintiff |
| George C. Schelling, Esq. | For the Defendant |

DON THOMPSON & ASSOCIATES
Court Reporting

|   | 3 |
|---|---|
| 1 | (This deposition was taken before Melissa L. |
| 2 | Thibodeau, RPR, Notary Public, at the offices of Eaton |
| 3 | Peabody, 167 Park Row, Brunswick, Maine, on |
| 4 | January 12, 2010, beginning at 9:00 a.m.) |
| 5 | * * * * * |
| 6 | (The deponent was administered the oath by the |
| 7 | Notary Public.) |
| 8 | * * * * * |
| 9 | GREGORY GIMBEL, M.D., called, after having been duly sworn |
| 10 | on his oath, deposes and says as follows: |
| 11 | EXAMINATION |
| 12 | BY MS. FARR: |
| 13 | Q Good morning. |
| 14 | A Good morning. |
| 15 | Q My name is a Julie Farr. We just met. I represent |
| 16 | the plaintiff, Lorraine Morin in this lawsuit. And I |
| 17 | understand you've been designated as an expert witness |
| 18 | on behalf of the defendant, Eastern Maine Medical |
| 19 | Center? |
| 20 | A Yes. |
| 21 | Q Okay. |
| 22 | (Deposition Exhibit Number 1, October 29, 2009, |
| 23 | Letter, was marked for the record.) |
| 24 | BY MS. FARR: |
| 25 | Q Doctor, let me show you what we have marked as Exhibit |

|   | 4 |
|---|---|
| 1 | 1. That is a letter from Mr. Schelling to me dated |
| 2 | October 29, 2009. And in the second paragraph of the |
| 3 | first page, it sets forth what your opinions in this |
| 4 | case are. Would you mind taking just a minute to |
| 5 | review that and tell me when you're finished? And are |
| 6 | those still your opinions in this case? |
| 7 | A Yes. |
| 8 | Q Okay. And that accurately reflects your opinions -- |
| 9 | A Yes. |
| 10 | Q -- that you have in this case. Exhibit 1 in the |
| 11 | second paragraph says that you had reviewed |
| 12 | Ms. Morin's medical records from the Eastern Maine |
| 13 | Medical Center emergency department on July 1, 2007; |
| 14 | is that correct? |
| 15 | A Yes. |
| 16 | Q Have you reviewed any other medical records from any |
| 17 | other dates? |
| 18 | A No. |
| 19 | Q Have you reviewed any other information besides |
| 20 | medical records in forming your opinions in this case? |
| 21 | A Yes. |
| 22 | Q What have you reviewed? |
| 23 | A Just discussions with George. |
| 24 | Q Okay. But as far as documents, have you reviewed any |
| 25 | other documents? |

|   | 5 |
|---|---|
| 1 | A No other documents. |
| 2 | Q For instance, have you reviewed Ms. Morin's deposition |
| 3 | testimony? |
| 4 | A Oh, yes, I did. |
| 5 | MR. SCHELLING: And just for clarification, I |
| 6 | think that was a -- oh, I beg your pardon. Go ahead. |
| 7 | I'm sorry. |
| 8 | BY MS. FARR: |
| 9 | Q Okay. Have you reviewed Ms. Morin's answers to |
| 10 | interrogatories? |
| 11 | A No. |
| 12 | Q Okay. Any other documents that you can think of that |
| 13 | you have reviewed? |
| 14 | A None that I can think of. |
| 15 | Q Okay. On the third page of Exhibit 1, this is the |
| 16 | curriculum vitae for you that was provided to me? |
| 17 | A Yes. |
| 18 | Q Can you tell me, do you have an updated CV? |
| 19 | A No. I can make one. |
| 20 | Q Okay. You have worked at Parkview Hospital since |
| 21 | 1983? |
| 22 | A No. I'm now working at Mid Coast Hospital. I have |
| 23 | been working there since January of 2007. |
| 24 | Q Well, what's your position at Mid Coast Hospital? |
| 25 | A I am an obstetrician/gynecologist. |

|   | 6 |
|---|---|
| 1 | Q And do you have a private practice outside of the |
| 2 | hospital? |
| 3 | A No. |
| 4 | Q Okay. |
| 5 | A It's a practice that -- it's a group practice that's |
| 6 | owned by the hospital. |
| 7 | Q Where is Mid Coast Hospital? |
| 8 | A About eight miles up the road past Cooks Corner. It's |
| 9 | at 123 Medical Center Drive, Brunswick, Maine. |
| 10 | Q And before Mid Coast Hospital, you worked at Parkview |
| 11 | Hospital? |
| 12 | A Yes, since 1983 to 2007. |
| 13 | Q Okay. And other than your move from Parkview to Mid |
| 14 | Coast, is your CV up-to-date? |
| 15 | A Yes. |
| 16 | Q Is Mid Coast Hospital a hospital that participates in |
| 17 | Medicare? |
| 18 | A Yes. |
| 19 | Q And is Parkview Hospital also a hospital that |
| 20 | participates in Medicare? |
| 21 | A Yeah. |
| 22 | Q Okay. So both of those hospitals would be required to |
| 23 | comply with the Emergency Medical Treatment and Active |
| 24 | Labor Act? |
| 25 | A Yes. |

1  first let me ask you, are you generally familiar with
2  the requirements of EMTALA?
3  A  In general terms, yeah.
4  Q  And were you provided with any more specific
5     information about EMTALA by Mr. Schelling's office to
6     review in forming your opinions in this case?
7  A  Yes.
8  Q  What information were you provided?
9  A  I don't have copies of it. It was a pink sheet that
10    had some of the specifics of the EMTALA language in
11    it.
12 Q  You don't have a copy of that?
13 A  I don't, no.
14 Q  Do you have it somewhere other than right here?
15 A  No.
16 Q  Okay. Do you remember what information was on it?
17 A  Just had to do with some of the -- I don't know if it
18    was EMTALA rules or an interpretation of EMTALA rules.
19 Q  And that was provided to you by Mr. Schelling's
20    office?
21 A  Yes.
22    MS. FARR: George, do you have a copy of that?
23    MR. SCHELLING: I probably do.
24    THE WITNESS: That was the only sheet that I saw,
25    that sheet right there.

1     MS. FARR: Okay. Can I mark this or mark a copy?
2     MR. SCHELLING: Yeah, maybe we can mark a copy.
3     But as he said, he only saw that one page there, so
4     the rest of it wouldn't apply, so I am happy to take
5     that out.
6  BY MS. FARR:
7  Q  That's true, Dr. Gimbel, you only saw that one page of
8     this four-page thing?
9  A  Yes.
10 Q  Okay.
11    MS. FARR: Off the record.
12    (There was a brief pause in the deposition.)
13    (Deposition Exhibit Number 3, EMTALA Document,
14    was marked for the record.)
15 BY MS. FARR:
16 Q  So let me show you Exhibit 3 and is that a copy of the
17    information that you reviewed from Mr. Schelling's
18    office?
19 A  I didn't review all of it, but I looked at two or
20    three paragraphs of it, yes, that looks like the sheet
21    that I looked at.
22 Q  Okay. Let me go back to Exhibit 1, which is the
23    designation of your expert opinion in this case. And
24    I want to go through some of the opinions that are
25    expressed.

1     In the second sentence of the second paragraph it
2     says, Dr. Gimbel will testify that the care given to
3     Ms. Morin at the emergency department at EMMC on July
4     1, 2007, was appropriate and reasonable under EMTALA;
5     is that correct?
6  A  Yes.
7  Q  And what is the basis for your opinion as expressed in
8     that sentence?
9     MR. SCHELLING: Do you mean his credentialing
10    basis, experiential, or do you mean a detailed
11    explanation for why he thinks that?
12 BY MS. FARR:
13 Q  If the question was clear to you, you can answer. I
14    know your background, obviously. We have your CV. I
15    am looking for what information causes you to have
16    that opinion in this case.
17 A  Well, I have not held myself out to be an expert with
18    EMTALA. I do hold myself out to be an expert with
19    medical in my specialty. So I guess I could speak
20    more as to that I felt that the care that they gave
21    her was very reasonable medically. And it was my
22    understanding that good medical care was mostly what
23    EMTALA was about and also that EMTALA was about to
24    correct patient dumping issues that hospitals had been
25    accused of.

1     So I hadn't ever read the EMTALA law from front
2     to back, but we deal with EMTALA frequently in my
3     specialty because of -- I work at a hospital that's
4     considered a community hospital and we often have to
5     transfer unstable patients to high-risk centers and so
6     we fill out some EMTALA paperwork with regards to that
7     and in general terms try to be up-to-date with what
8     the requirements of EMTALA are.
9  Q  In your practice, have any EMTALA issues come up with
10    respect to pregnant women?
11 A  Just as I explained, that we must comply with EMTALA
12    when we -- whenever we transport a patient, a pregnant
13    patient, but not in a negative way or in a legal way
14    we haven't dealt with it.
15 Q  So your opinion that the care given to Ms. Morin was
16    appropriate and reasonable, is that essentially an
17    opinion that the doctors at the emergency department
18    didn't violate the standard of care?
19 A  I believe that they -- they did good -- yeah, I
20    believe that they gave good medical care, from what I
21    can determine from their records. I wasn't there. I
22    wasn't witnessing all of the interaction that they
23    had, but what I can determine from their records
24    their -- their actions, medically, seemed appropriate
25    and of good quality.

## Page 15

1. Q Okay. The next sentence says that he will testify
2.   that Ms. Morin was afforded a complete examination,
3.   that neither she nor the fetus, since it was dead, was
4.   in danger, unstable, or otherwise at risk and that she
5.   did not need to be admitted at that time.
6.        When you formed the opinion that Ms. Morin was
7.   not unstable at the time she was discharged, had you
8.   reviewed the definition of stabilize in EMTALA?
9. A Probably not when I told them that, but I have since
10.  then.
11. Q And what's the basis of your opinion that Ms. Morin
12.  was not unstable?
13. A I believe that stability has to do with her medical
14.  condition at the time that -- at that time that she
15.  was evaluated and by any parameters that we use, it
16.  appeared to be that she was stable.
17. Q What parameters do you use in determining if someone
18.  is stable?
19. A Lots of them, but in general just the appearance of
20.  the patient, the vital signs, the physical exam, the
21.  medical history, the diagnosis, those are all the
22.  things I can think of right now that would go into the
23.  decision-making on whether somebody was stable or not.
24. Q You have your opinion in here that Ms. Morin was not
25.  otherwise at risk. Is it your opinion that there was

## Page 16

1.   no risk at all to Ms. Morin's health when she was
2.   discharged from EMMC?
3. A I think doctors are always in the business of
4.   evaluating medical risk and I don't think that you can
5.   say with 100 percent certainty that anybody has zero
6.   risk, so I think they determined from their records,
7.   as I can tell, that a risk was minimal.
8. Q I think you said earlier that you didn't glean from
9.   the medical records that Ms. Morin had previously had
10.  a cesarean section?
11. A I didn't happen to notice that. I looked for it. I
12.  didn't find that in the records that I had with the
13.  emergency department.
14. Q Would that be important information for a doctor to
15.  have in determining whether a patient in Ms. Morin's
16.  condition was at risk?
17. A Not particularly.
18. Q You don't agree with Ms. O'Brien's opinion that a
19.  previous C-section would cause someone in Ms. Morin's
20.  condition to be more at risk for a ruptured uterus?
21. A I think I stated before that I disagree with that.
22. Q And why do you disagree with that?
23. A I -- I can't read her mind, but I suspect that she's
24.  thinking about previous cesarean risk in terms of a
25.  more advanced pregnancy. At term certainly or even

## Page 17

1.   somewhat prior to term, a fully developed pregnancy
2.   there is a small amount of risk in laboring and having
3.   a vaginal delivery. I don't believe that can be
4.   extrapolated to a spontaneous abortion.
5. Q You understand that Ms. Morin was approximately 16
6.   weeks pregnant?
7. A It's unclear to me exactly how far along she was. It
8.   would sound by her history she had had 16 -- the
9.   pregnancy was thought to be about 16 weeks along, but
10.  I suspect was somewhat less than that by the fact that
11.  the baby was determined to be dead.
12. Q I didn't quite understand that.
13. A I haven't done an evaluation of her gestational age.
14.  I can only go by the medical records, but according to
15.  the medical records they had thought that she was 16
16.  weeks or she thought she was 16 weeks, apparently from
17.  previous visits that she had had from her regular
18.  physician. And I suspect that it had to be somewhat
19.  less than that by the fact that the baby was dead. I
20.  mean, it could have been minutes less or hours, but
21.  more likely days or weeks less because of the fact
22.  that the baby was already dead.
23. Q So if I am understanding you correctly, if she were 16
24.  weeks along, there would be a lesser chance of the
25.  baby dying?

## Page 18

1. A No, that's not what I am saying.
2. Q Okay. Then maybe you could clarify for me. I'm
3.   sorry.
4. A The medical records state she was 16 weeks. I suspect
5.   she was somewhat less.
6. Q Because the baby was dead?
7. A Correct. In other words, if somebody calculated that
8.   they were 16 weeks along and the baby's not alive, the
9.   baby must have died at some point before that time.
10. Q Oh, okay.
11. A And so we don't know how long that was, but my
12.  suspicion is it was probably a number of -- possibly
13.  even weeks.
14. Q I understand. So even though she presents at the
15.  hospital on July 1, the baby could have died days
16.  or --
17. A Weeks --
18. Q Or weeks before?
19. A -- before that, yes.
20. Q Okay. I understand.
21.      And however far along Ms. Morin was on July 1,
22.  2007, it's your opinion that she was not at higher
23.  risk for a ruptured uterus --
24. A Correct.
25. Q -- because of the fact that she had a previous

Page 19

1  cesarean section?
2  A  Correct.
3  Q  Okay. Did you understand from the medical records
4     that this was Ms. Morin's fourth pregnancy?
5  A  Yes.
6  Q  That she had two healthy children and a previous
7     miscarriage?
8  A  Yes.
9  Q  At the time Ms. Morin was discharged, would she have
10    been at any risk for a hemorrhage?
11 A  Again, at some point, she would be, as would any
12    pregnant woman would be at risk, but it would appear
13    that the physicians felt that at that point in time
14    she wasn't at risk for a major hemorrhage.
15 Q  You say the physicians must have felt, in reviewing
16    the medical records, do you agree with their
17    conclusion that she wasn't at significant risk for a
18    hemorrhage?
19 A  They -- their exam did not indicate that she was at
20    risk for hemorrhage right then.
21 Q  But with any pregnant woman in Lorraine Morin's
22    condition, there is some risk of hemorrhage; is that
23    correct?
24 A  I would say there is that risk for any pregnant woman
25    at some time in their pregnancy for them to have

Page 20

1     hemorrhage.
2  Q  And in forming your opinion that Ms. Morin was not at
3     risk to her health at the time she was discharged, did
4     you consider her emotional health or just her physical
5     health?
6  A  I've considered that in retrospect as I see that
7     that's been a problem for her, but I didn't see
8     anything in the medical records that indicated that
9     she was at tremendous risk for emotional health.
10 Q  Now, the medical records reflect that Ms. Morin was
11    visibly upset at the time of discharge; is that
12    correct?
13 A  Yes, but I think it would be more -- more ominous if
14    she were not visibly upset given the situation. I
15    think that was appropriate that she was visibly upset,
16    learning that her baby was dead.
17 Q  And you understand that she had expressed to the
18    doctors that she wanted to have this taken care of
19    today?
20 A  I saw that she said that, yes.
21 Q  And that she didn't want to be discharged?
22 A  I saw that -- well, I didn't see that, that she didn't
23    want to be discharged. I saw that she said that she
24    wanted this thing taken care of right now.
25 Q  And --

Page 21

1  A  Is what it said in the records, is my recollection.
2  Q  And you have reviewed Ms. Morin's deposition testimony
3     where she testified that the hospital threatened to
4     call security if she didn't leave?
5  A  I saw that she said that. I didn't see that in the --
6     in the medical records anywhere.
7  Q  Does having that information affect your opinions in
8     any way?
9         MR. SCHELLING: Excuse me, just for
10    clarification, that she made that allegation or
11    assuming that is true?
12        MS. FARR: That's a speaking objection. If you
13    want to object to form, that's fine. But if you
14    understand the question, Doctor, you can answer it.
15 A  I guess I would like you to restate the question
16    please.
17 BY MS. FARR:
18 Q  Does having read Ms. Morin's deposition and having
19    seen her testimony that she was threatened with
20    security if she didn't leave the hospital, does that
21    affect your opinion as to whether she was at any risk
22    to her health, either emotionally or physically?
23        MR. SCHELLING: Objection to form.
24        You can answer.
25 A  I do have some opinions about that.

Page 22

1  BY MS. FARR:
2  Q  What are they?
3  A  That she was very anxious to -- it would appear, if
4     that's true, and I have no way of determining whether
5     it was or not, that she was very adamant about what
6     she wanted to be done at that time. And if it's true
7     that they were ready to call security and threatened
8     her with that, then it would appear that emotions were
9     getting so high that they felt that they needed --
10    they needed some help in dealing with it there.
11 Q  And taking it as true, that Lorraine was threatened
12    with security if she didn't leave, do you still
13    believe it was appropriate and reasonable for them to
14    discharge her at that time?
15 A  I wasn't there, so I don't know. It very well could
16    have been appropriate to call security if she was
17    being very unreasonable in her demands. And in the
18    fashion with which she was doing it, that may have
19    been a reasonable thing to do.
20 Q  In your opinion, was there any reason why they
21    couldn't have done a DNC or some other procedure to
22    take care of the abortion at that time?
23 A  I don't know whether they could have done it or not.
24    Generally speaking, not all OB-GYNs, and I don't know
25    the credentials of the OB-GYN on call, but even

Page 23

1  myself, I would not have the credentials in doing a
2  procedure, a surgical procedure to terminate a
3  pregnancy if she was indeed 16 weeks along and
4  particularly not without further preparation of the
5  cervix and so forth, even if I were qualified to do
6  that. But I have no way to know whether this
7  physician was qualified to even do it, what we would
8  call a D & E procedure, which is extraction --
9  dilation extraction, which is done when a pregnancy is
10 more advanced in the second trimester, but he may have
11 not even had the capability of doing that and
12 shouldn't have done it if he didn't have the
13 experience and training in doing it.
14 Q  Assume for just a moment that the doctor on call did
15    have the experience and training to do a D & E, is
16    there any reason that you can see from reviewing the
17    medical records that they couldn't have kept her at
18    the hospital long enough for her cervix to be further
19    along so they could do a D & E?
20 A  It would likely be an option if the physician had that
21    experience and training. It would be one option for
22    treatment. So I can't think of a reason other than
23    him not being able to do it, that he wouldn't, but if
24    he -- it would at least be an option that he could
25    have if he had -- if he had that experience and

Page 24

1  training to do that.
2  Q  Were there any other options for, I think you said,
3     terminating the pregnancy that the doctor could have
4     done at that time?
5  A  Yes, he could have -- I believe that the options
6     available would be to either expectant, meaning
7     waiting for nature to take its course, versus medical
8     evacuation of the uterus which would involve giving
9     medications or lastly surgical and if he was unable,
10    referring to somebody that did have that experience
11    and training.
12 Q  Ms. Morin was having what's called a missed abortion;
13    is that correct?
14 A  Yes.
15 Q  She was having contractions when she presented to the
16    emergency department; is that right?
17 A  I think she described them as cramps, but whatever,
18    yes.
19 Q  Well, in the medical records, they're described as
20    suprapubic cramps --
21 A  Okay.
22 Q  -- 10 minutes apart. Is that different than
23    contractions?
24 A  I guess they could be termed the same.
25 Q  And by the time Ms. Morin was seen by Dr. Grover,

Page 25

1     Dr. Grover notes in his consultation report that she
2     was having contractions; is that correct?
3  A  I would have to look, but I wouldn't disagree with
4     that.
5  Q  I'm sure you're familiar with the term Braxton Hicks
6     contractions?
7  A  Yes.
8  Q  In reviewing the medical records of Ms. Morin, do you
9     have any opinion on whether she was having Braxton
10    Hicks contractions?
11 A  I have an opinion, yes. I would not diagnose her pain
12    as being due to Braxton Hicks contractions.
13 Q  Why not?
14 A  Because we don't refer to rhythmic pains before 20
15    weeks as Braxton Hicks contractions. We refer to them
16    as pains due to spontaneous abortion.
17 Q  And would you agree that the medical records reflect
18    that Ms. Morin was still having those pains at the
19    time she was discharged?
20 A  Yes.
21 Q  And she was given --
22 A  Actually, I wouldn't say that. I would say that she
23    had those pains when she came in. I'm not -- I'm not
24    recalling in the medical records how -- an assessment
25    of the pain when she left, but it -- I have no reason

Page 26

1     to believe that they changed a lot while she was
2     there.
3  Q  So there's nothing that you saw in the medical records
4     that would indicate that those pains stopped at any
5     point before she was discharged?
6  A  I didn't see that, no, and I would not guess that they
7     had.
8  Q  And when Ms. Morin was discharged, she was discharged
9     with a prescription for Tylenol Number 3?
10 A  Yes.
11 Q  That's a narcotic pain medication, correct?
12 A  A combination of a narcotic and Tylenol.
13 Q  And it would not be appropriate to prescribe Tylenol 3
14    for somebody who was not having pain?
15 A  Correct -- well, I can't say there would never be a
16    reason to, but in this situation it seemed appropriate
17    that she would be getting a prescription for pain.
18 Q  Bear with me for just a minute. Looking at Exhibit
19    Number 3, which is the EMTALA information you were
20    provided by Mr. Schelling's office --
21 A  Yes.
22 Q  -- there's a definition of the term to stabilize and
23    it says it means, with respect to a pregnant woman
24    having contractions to deliver, including the
25    placenta.

**Page 27**

```
 1         would you agree under that definition that
 2    Lorraine Morin had not been stabilized at the time she
 3    was discharged from Eastern Maine Medical Center?
 4         MR. SCHELLING: Objection to form.
 5  A  I believe under that definition that it's referring to
 6    a more advanced pregnancy, viable pregnancies. I
 7    don't believe that that's referring to miscarriages or
 8    spontaneous abortions.
 9  BY MS. FARR:
10  Q  well, reading --
11  A  So the answer is, yeah, I believe that they -- she was
12    stable under that.
13  Q  Reading the definitions it says, the term emergency
14    medical condition means with respect to a pregnant
15    woman who is having contractions, so it doesn't
16    differentiate between viable pregnancies and nonviable
17    pregnancies, does it?
18         MR. SCHELLING: Objection to form.
19  A  I guess I misstated. By viable I mean has reached a
20    stage of viability. I mean, advanced pregnancy that
21    you would anticipate delivery of a baby that could
22    survive as opposed to a spontaneous abortion where
23    there is no hope for that. In other words, at least
24    before 20 weeks or 24 weeks. I would -- I would say
25    that it's referring to that, is my understanding of
```

**Page 28**

```
 1    that.
 2  BY MS. FARR:
 3  Q  So is it your understanding that EMTALA doesn't apply
 4    to a woman who has a nonviable fetus, in other words,
 5    she hasn't reached the 20 or 24 weeks where the baby
 6    could be expected to live?
 7         MR. SCHELLING: Objection to form and foundation.
 8  A  Yeah. Again, I'm not an expert as to what is the fine
 9    print in EMTALA, but as I understand that it applies
10    to my practice is that when we're dealing with babies
11    that are viable, that we have a set of rules that we
12    go by with EMTALA and that this was not designed, at
13    least the pregnancy part of it and the emergency
14    treatment of active labor wasn't designed for how we
15    medically treat spontaneous abortions or before 20
16    weeks at least.
17         So I mean there are things in my understanding of
18    EMTALA that don't apply to pregnancy whatsoever, but
19    the part that you're referring to I believe is
20    referring to the care of pregnant women that are --
21    have a baby that is far enough along that you would
22    expect they would deliver a live baby, not spontaneous
23    abortions.
24  BY MS. FARR:
25  Q  Okay.
```

**Page 29**

```
 1  A  Knowing who I work with, the -- and interprets EMTALA
 2    rules that way, we would have the hospital full of
 3    people that are spontaneously miscarrying, and we
 4    don't do that.
 5  Q  Lorraine Morin was pregnant and having contractions at
 6    the time she presented to Eastern Maine Medical
 7    Center, correct?
 8  A  It would appear that she was.
 9  Q  But it's your understanding that EMTALA wouldn't apply
10    to her because she was only 16 weeks long?
11         MR. SCHELLING: Objection, foundation.
12  BY MS. FARR:
13  Q  Is that what I'm understanding you to say?
14  A  No, I think EMTALA applies to everybody, pregnant or
15    not pregnant. That's not what I'm saying, but my
16    understanding is that part -- having that -- you're
17    referring to that paragraph there, it has to do with
18    pregnant women that are laboring and expected to
19    deliver a viable baby, that it was not intended to
20    apply to people that are spontaneously miscarrying.
21  Q  where did you come up with that understanding? I
22    mean, where does that come from?
23  A  I guess mostly common sense, but just the general
24    practice and we try to -- we try to -- we try to
25    comply with the rules as best as we can and interpret
```

**Page 30**

```
 1    them and that -- no one has ever interpreted EMTALA to
 2    say that we should treat spontaneous miscarriages the
 3    same way that we treat further advanced pregnancies.
 4         (Deposition Exhibit Number 4, EMTALA Documents,
 5    was marked for the record.)
 6  BY MS. FARR:
 7  Q  Let me show you what I have marked as Exhibit 4 and I
 8    will represent to you that that is some of the
 9    regulations under EMTALA. If I could direct your
10    attention to the third page, which has the number 989
11    at the bottom. The last paragraph of the first column
12    defines labor. It says, labor means the process of
13    childbirth beginning with the latent or early phase of
14    labor and continuing through the delivery of the
15    placenta. A woman experiencing contractions is in
16    true labor unless a physician, certified
17    nurse-midwife, or other qualified medical person
18    acting within his or her scope of practice as defined
19    in hospital medical staff bylaws and state law
20    certifies that after a reasonable time of observation
21    the woman is in false labor.
22         Have you seen that definition of labor before?
23  A  Yeah.
24  Q  Is it your opinion that that definition of labor would
25    not have covered someone in Lorraine Morin's
```

```
                                    31
1         situation?
2   A     Absolutely not.
3   Q     Why not?
4   A     It just doesn't. I mean, by definition she wasn't in
5         labor.
6   Q     She was experiencing contractions?
7   A     Well, I mean -- again, I am not prepared to spar with
8         you as an attorney. I am prepared to tell you what
9         doctors think. And doctors don't consider, at least
10        OB-GYN doctors, don't consider labor to be somebody
11        having a spontaneous miscarriage. No doctor -- no
12        OB-GYN doctors would call it labor.
13  Q     And I don't want to spar with you either, but you have
14        been designated as an expert to testify in this case,
15        so I have to get what your opinions are.
16  A     Well, that's my opinion. And I think you -- you will
17        be hard pressed to find another one. It's not labor
18        when somebody's miscarrying. It's not termed that.
19        We don't do it that way. I don't know anyone that
20        does. I don't. And I certainly -- that's my opinion
21        that it shouldn't be called labor, if anyone does.
22  Q     Would you agree that in reviewing Ms. Morin's medical
23        records, there was no reflection in those medical
24        records that any medical professional had certified
25        that Ms. Morin was in false labor?

                                    32
1   A     I see that as being kind of a trick question, but, of
2         course, no one certified that because no one diagnosed
3         that it was labor. They diagnosed that she was -- had
4         a missed abortion. It would not classify her as being
5         in labor. So no one would, in their right mind,
6         certify that she was not in labor because it wasn't
7         something that would be certified.
8             I've never heard of a physician certifying
9         somebody not in labor that is miscarrying or being in
10        labor, the converse, either one. That's a novel
11        definition and not one that would be used medically
12        and I doubt legally.
13  Q     What does the term false labor mean to you?
14  A     We use the term in more advanced pregnancies, again
15        not before -- certainly not before 20 weeks. But in
16        later pregnancies, we use the term to be rhythmic
17        contractions that don't result in the progressive
18        change in the cervix.
19            So I guess just to clarify that -- the paragraph
20        that you pointed out to me I would say I do not think
21        that applies to a spontaneous miscarriage. I think
22        that applies to a more advanced pregnancy probably
23        more than -- well, certainly more than 20 weeks.
24  Q     Would you agree that the fact that Lorraine Morin was
25        having rhythmic contractions meant that she was going

                                    33
1         to deliver the fetus at some point in the near future?
2   A     It meant that she was likely somewhere in that
3         process, but not -- it was not possible by that alone
4         to tell how far along she was in that process.
5   Q     To follow-up on that, at the time Ms. Morin was
6         discharged, is there any way to predict how long it
7         would have taken her to deliver the fetus?
8   A     No, but they did an exam and said that her cervix
9         was -- they misspelled it, there is a typo there, but
10        they said long and closed, which would indicate that
11        it was likely quite early, and also they indicated
12        that this had been going on for quite a number of
13        hours, the pain that she was experiencing.
14  Q     Yeah. And, in fact, in the medical records, when she
15        presented, it indicated that she had been having
16        contractions for the last 20 hours; is that correct?
17  A     My recollection is that's what they said.
18  Q     And does that information -- well, strike that.
19            Do you have an opinion based on that information
20        how long it would have taken her to deliver the fetus
21        after she was discharged?
22  A     I couldn't predict, but I would -- extrapolating you
23        would expect that it would be quite sometime in the
24        future.
25  Q     And the fact that her cervix was -- did you say long

                                    34
1         and closed?
2   A     Yes.
3   Q     Would that have prevented the doctors from utilizing
4         one of the three options that you told me about for
5         terminating the pregnancy?
6   A     Yes, they would -- I mean, they could have used all
7         three, but the one that I think you're referring to,
8         the surgical option of dilation and evacuation, they
9         could not have done immediately or they shouldn't have
10        done immediately because of risk of damaging her
11        cervix, so they would want to do some type of cervical
12        preparation before -- before doing a surgery like
13        that.
14  Q     What would the cervical preparation entail?
15  A     Usually -- again, it's not something that I do, so I
16        would have to describe what I've read and what I've
17        seen done, but they would have to place some devices
18        that swell up and cause cervical dilation to occur
19        slowly. They're called laminaria. And once it's
20        dilated sufficiently, then they might be able to
21        safely do that.
22  Q     Would another option be to simply observe her over a
23        period of hours to see whether the cervix dilates
24        naturally?
25  A     It would -- it would certainly be an option that they
```

Page 35

```
 1      could do that.
 2  Q   And what about the other two options that you
 3      mentioned, one of them was expectant, wait for nature
 4      to take its course.  Is there any reason why they
 5      couldn't have kept Ms. Morin in the hospital and done
 6      that?
 7  A   I don't -- I don't know of any reason why they could
 8      not, but it doesn't seem unreasonable to ask her to do
 9      some of them at home, given the situation.
10  Q   You also mentioned medical evacuation where they give
11      her medicine?
12  A   Right.
13  Q   Would that have been an option for Ms. Morin even
14      considering that her cervix was long and closed?
15  A   Yes.
16  Q   And how long would medical evacuation take?
17  A   Well, again, this is something that could be
18      scheduled, but it's unpredictable.  It could take --
19      it could take hours more than 12 hours.  It could --
20      and it could be unsuccessful.  It may not work.
21  Q   And if they attempted medical evacuation and it was
22      unsuccessful, could they have done -- do surgical
23      evacuation?
24  A   That would be the only option.
25  Q   I think that's all the questions I have.  Thank you.
```

Page 36

```
 1  A   You're welcome.
 2          MR. SCHELLING:  No questions.  We will read and
 3      sign.
 4          (The deposition was concluded at 9:56 a.m.)
 5          (Read and sign was sent to Mr. Schelling.)
```

Page 37

```
                          CERTIFICATE
     I, Melissa L. Thibodeau, RPR, a Notary Public in and
for the State of Maine, hereby certify that the
within-named deponent was sworn to testify to the truth,
the whole truth, and nothing but the truth, in the
aforementioned cause of action.
     I further certify that this deposition was
stenographically reported by me and later reduced to print
through computer-aided transcription, and that the
foregoing is a full and true record of the testimony given
by the deponent.
     I further certify that I am a disinterested
person in the event or outcome of the above-named cause of
action.
     IN WITNESS WHEREOF, I subscribe my hand and affix
my seal this 15th day of January, 2010.


                       [signature]
                       MELISSA L. THIBODEAU, RPR,
                            NOTARY PUBLIC
                            Court Reporter



My commission expires:  February 28, 2015.
```