**Certified Copy**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LORRAINE WATSON,

Plaintiff,

-v-                                      Civil Action No. 1:09-cv-00258

EASTERN MAINE MEDICAL CENTER,

Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF ANNETTE O'BRIEN, RNC, LNC,**

January 8, 2010
9:12 a.m.

170 Hamilton Avenue
White Plains, New York

Leeann Bertorelli



**setdepo**
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

1   A.   Yes.
2   Q.   Part of Exhibit 4 is a letter of
3   June 11th, 2009, which summarizes your opinions;
4   correct?
5   A.   Correct.
6   Q.   Have you written down your opinions
7   anywhere other than in that letter?
8   A.   No.
9   Q.   Was that letter redrafted by you at any
10  time?
11  A.   I don't think so.
12  Q.   Just to be clear:  Did you ever submit
13  to plaintiff's counsel a draft letter which they
14  either remarked upon or edited and sent back to
15  you?
16  A.   No.
17  Q.   And do the opinions expressed in that
18  letter still represent your opinions in this case?
19  A.   Correct.
20  Q.   I've asked you to bring all treatises,
21  text and other resources that you consulted in
22  forming your opinions in this case.  And we have
23  O'Brien 5 with two articles; correct?
24  A.   Correct.
25  Q.   Did you do any other research other than



1  physician breached the standard of care?
2       A.   In the cases I reviewed, the question of
3  the standard of care did come up, yes.
4       Q.   But is it fair to say you were asked to
5  determine whether or not the nurses involved
6  breached the standard of care?
7       A.   Both.  Physicians and nurses.
8       Q.   Did you ever advise an attorney that you
9  felt a physician breached the standard of care?
10      A.   In reviewing these cases that I have
11 previously done in here, I did recommend that the
12 standard of care was not met on some of those
13 cases.
14      Q.   And is it fair to say at that time
15 attorneys never asked you to testify to that?
16      A.   Correct.
17      Q.   Okay.  And tell me, what is your basis
18 for believing you have the necessary
19 qualifications to testify that a physician
20 breached the standard of care?
21      A.   My experience as being a labor and
22 delivery nurse for 35 years.  I read up -- well
23 read on what's custom and standard in a labor and
24 delivery unit.  There are certain guidelines,
25 ACOG, A1, all of those standards that we have to



```
 1   of the patient and to make an -- write an opinion
 2   on what I thought regarding the events of
 3   July 1st, 2007.
 4        Q.   What did you understand the
 5   medical/legal issues were that you were being
 6   asked to address?
 7        A.   The fact that the patient was sent home.
 8        Q.   Did you understand at that time you were
 9   being asked to address it from a malpractice
10   viewpoint or an EMTALA issue or some other issue?
11        A.   EMTALA.
12        Q.   So what do you understand the issues are
13   under EMTALA for the discharge of Ms. Watson from
14   the ED that day?
15        A.   I understand that she was sent home
16   after having been there for two or three hours,
17   basically, and she was still contracting when she
18   was sent home.  And was given pain medication to
19   take care of those contractions.  So it was my
20   understanding that was sent home still
21   uncomfortable.
22        Q.   And can you tell me -- you've brought in
23   these two articles in O'Brien 5 on EMTALA.  When
24   did you recover those?
25        A.   I don't recall when exactly.  Back when
```



28

1  Q. Based upon terminology that they are
2  trained to use?
3  A. Correct.
4  Q. Have you done any research to indicate
5  that the term "labor" is appropriate in a case of
6  a nonviable fetus at 16 weeks that is dead?
7  A. I have not done research.
8  Q. What would your -- are you maintaining
9  that Ms. Watson was actually in labor at that
10 time?
11 A. Yes.
12 Q. On what basis?
13 A. Based on her contractions. Based on the
14 fact that she did have a fetal demise in second
15 trimester, and was contracting and subsequently
16 delivered.
17 Q. Labor is a term of art; is it not?
18 A. I don't understand.
19 Q. Labor has a specific meaning in
20 medicine; does it not?
21 A. Yes.
22 Q. Can you tell me on what basis you would
23 say that a patient under these circumstances where
24 there is a nonviable fetus is actually in labor?
25 A. The patient was contracting regularly.


setdepo℠
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:     1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

1  Patients with nonviable fetus eventually do
2  deliver those babies.
3       Q.   They deliver the products of conception
4  and the issue -- one issue in this case, do you
5  understand it to be, as to whether or not that is
6  described as labor?
7            MS. FARR:  Object to the form of that
8       question.  I do not believe that is accurate.
9       To the extent you understand, you can answer.
10      A.   I don't understand.  Just repeat it,
11 please.
12      Q.   Sure.  You understand that one of the
13 issues in this case is whether Lorraine Watson was
14 actually in labor?
15      A.   Yes.
16           MS. FARR:  Objection.
17      Q.   And do you --
18           MS. FARR:  I didn't hear her answer.
19           THE WITNESS:  Yes.
20           MS. FARR:  Okay.
21      Q.   And given that that is an issue, given
22 than you were being asked to look at this as a
23 professional, did you do any research to determine
24 whether the term "labor" would apply to her when
25 there is a 16-week fetus that it was dead?



setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:     1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

30

1  A.  Based on my experience in having
2  patients who have been second trimester and have
3  had a fetal demise and have labored, I feel that I
4  can adequately say that she was in labor when she
5  left.
6  Q.  When you say "have labored," I want to
7  make sure that we're talking about a specific
8  medical term.  I don't mean whether they've
9  experienced pain and whether they've delivered the
10  products of conception, but I mean whether in fact
11  what they did was properly denoted "labor" by
12  medical professionals, by physicians.  Have you
13  done any research on that issue?
14  A.  I have not done research.
15  Q.  So you're simply relying upon your
16  background as a nurse to come to that conclusion?
17  A.  Correct.
18  Q.  I want to show you Exhibit 4, which is a
19  letter to you, dated June 2nd, 2009, from Julie
20  Farr.  Did you accept Ms. Farr's interpretation of
21  the law as you considered your opinions in this
22  case?
23  A.  Yes.
24  Q.  And I'm going to show you O'Brien 3.
25  The first page of that informs you that -- this is



1  you made to Ms. Farr or any of her colleagues?
2       A.   I've never spoken to any of her
3  colleagues.  I think we just discussed that I was
4  asked to do this.  That was it.
5       Q.   Excuse me.  This is where I'm
6  designating Dr. Gimbal (ph.) to provide testimony.
7       A.   Oh, okay.  I'm sorry.
8       Q.   So my question is really directed to
9  that part of that letter.
10      A.   We did discuss this.  I just -- when I
11 spoke with Julie that this -- I didn't agree with
12 what he said, because he felt it was reasonable
13 under EMTALA that she was discharged.  So I don't
14 agree with that.  And the wording of this was all
15 off.  That she was not in labor.  That she was
16 experiencing miscarriage or an abortion.  It said
17 she wasn't in labor, so I didn't agree with that.
18      Q.   I'm going to go back to number five
19 briefly.  You would identify that we were talking
20 about the second page, dealing with false labor.
21 Can you tell me why you focused on that section
22 there?
23      A.   At the bottom of this page, the last
24 paragraph?
25      Q.   Yes.


setdepo℠
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   A.   Because I felt how it's determined if a
2   patient is in false labor and the criteria that
3   are needed to be met in order to discharge a
4   patient.  And I felt that one of those things, the
5   labor contractions ceasing was not met.  And the
6   patient left contracting in pain, and with a
7   prescription for pain medication, which is never
8   given to a patient in false labor, sent home with
9   pain medication.
10  Q.   Was there anything else about this
11  article, this first article in Exhibit 5, that you
12  felt was helpful or relevant to the issues in this
13  case?
14  A.   No, that was basically the most
15  important piece of it.
16  Q.   And how about the second article in --
17  second document in Exhibit 5, what was the -- what
18  did you draw from that that was significant to the
19  issues in this case as you see them?
20  A.   I read this just to refresh myself about
21  what EMTALA was, basically, the basic standard.
22  But this didn't have anything specific regarding
23  obstetrical patients, and that's why I went to the
24  other article.
25  Q.   Do you anticipate doing any further



1  research in this case?
2      A.   Not at this time.
3      Q.   You feel as though you have addressed
4  the issues as you see them completely?
5      A.   Correct.
6      Q.   There is a sentence in your letter of
7  June 11th, quote, the incident for a ruptured
8  uterus is higher in these patients. And I take it
9  that's because of her -- she had a c-section in
10 the past?
11     A.   Correct.
12     Q.   Is it your opinion based upon your
13 experience and your review of the literature that
14 that is a significant risk for a patient with a
15 16-week dead fetus?
16     A.   Correct.
17     Q.   And where would you refer us for
18 corroboration of that opinion?
19     A.   I would look probably previous cesarean
20 sections, previous cesarean sections with second
21 trimester miscarriage or second trimester loss in
22 labor.
23     Q.   Is there any particular document that
24 you would reference?
25     A.   I would probably look at what ACOG has


setdepo℠
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1  to say about it.
2      Q.   In your field, does ACOG pretty well
3  define expectations and terminology?
4      A.   Correct.
5           MR. SCHELLING:  That's all I have.
6      Thank you.
7           MS. FARR:  I'm going to try to do this
8      as smoothly as possible.  I want to go back
9      and cover some of the previous testimony that
10     she gave.
11
12 EXAMINATION BY
13 MS. FARR:
14     Q.   I believe Mr. Schelling asked you
15 whether in your review of the medical records you
16 saw where any doctor referred to the patient as
17 being in labor.  And I believe your answer to that
18 was no; is that right?
19     A.   Correct.
20     Q.   In the medical records that you
21 reviewed, did you see references to the patient
22 having contractions?
23     A.   Yes.
24     Q.   Specifically, in the nurses note when
25 Ms. Morin first presented to the hospital, it said


setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com

1   that within the last 20 hours, she had been having
2   suprapubic cramps?
3       A.   Correct.
4       Q.   Are suprapubic cramps the same thing as
5   contractions?
6       A.   Cramps and contractions are
7   interchangeable, so it would be considered the
8   same.
9       Q.   Okay.  And the record referenced that
10  her contractions were ten minutes apart?
11      A.   Correct.
12      Q.   Are you familiar with Braxton Hicks
13  contractions?
14      A.   Yes.
15      Q.   Can you tell us what Braxton Hicks
16  contractions are?
17      A.   Braxton Hicks contractions usually occur
18  in the third trimester.  They are not regular.
19  They usually are not perceived as painful.  And
20  they usually do not change the patient's cervix,
21  so that usually a patient is considered false
22  labor at that point and nothing much happens with
23  that.
24      Q.   Okay.  Let me explore upon that.  You
25  said Braxton Hicks are usually not regular?


setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
                www.setdepo.com

1   A.   Correct.

2   Q.   What did you mean by that?

3   A.   You cannot time them.  They're not every

4   five minutes.  They are sporadic.  They can be 15,

5   20, a half hour.  They will stop of their own

6   accord.

7   Q.   Would it be unusual for Braxton Hicks

8   contractions to continue for 20 hours?

9   A.   It would be.

10  Q.   And it would be unusual for Braxton

11  Hicks contractions to be painful?

12  A.   Correct.

13  Q.   Do you have an opinion whether or not

14  Lorraine Morin was having Braxton Hicks

15  contractions when she presented to the hospital?

16  A.   She was second trimester.  She wouldn't

17  be having Braxton Hicks contractions.

18  Q.   And did you see in the medical record

19  when Ms. Morin was seen by Dr. Grover, Dr. Grover

20  stated that she was still having contractions?

21  A.   Yes.

22  Q.   I believe you also mentioned earlier

23  that it was unusual that if they believed Lorraine

24  Morin was in false labor that they would have

25  given her pain medication?


setdepo
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:     1.800.451.3376
Toll Free Fax: 1.888.451.3376
www.setdepo.com

44

1  A.   Correct.
2  Q.   Can you explain what you meant by that?
3  A.   She was sent home with Tylenol with
4  codeine, which is not usual to send any laboring
5  patient home with pain medication for
6  contractions.  If a patient needs pain medication,
7  they would stay at the hospital.
8  Q.   You also said in your letter of
9  June 11th, 2009, that Ms. Morin was at a high risk
10 of complications since she previously had a
11 cesarean section?
12 A.   Correct.
13 Q.   And the complications that she would be
14 at risk for would include a ruptured uterus?
15 A.   Correct.
16 Q.   Would she also be at risk for
17 hemorrhage?
18 A.   She could be.
19 Q.   And would her emotional or mental health
20 be at risk by being sent home to deliver a baby at
21 home?
22      MR. SCHELLING:  Objection to form.
23 Q.   You can answer.
24 A.   Yes.
25 Q.   Bear with me just a minute.  I want to



setdepo℠
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free:      1.800.451.3376
Toll Free Fax:  1.888.451.3376
www.setdepo.com