**Page 1**

```
09:24:40                UNITED STATES DISTRICT COURT
                           DISTRICT OF MAINE


LORRAINE WATSON,              )
                              )
            Plaintiff,        )
                              )
      vs.                     )   Civil Action
                              )   No. 1:09-cv-00258
EASTERN MAINE MEDICAL CENTER, )
                              )
            Defendant.        )
```

DEPOSITION of LORRAINE (WATSON) MORIN, taken pursuant to Notice, at the offices of Gross, Minsky & Mogul, P.A., 23 Water Street, Bangor, Maine, beginning at 9:25 a.m., November 24, 2009, before Rebecca M. Pearson, a Notary Public in and for the State of Maine.

APPEARANCES:

For the Plaintiff:      JULIE D. FARR, ESQ.

For the Defendant:      GEORGE C. SCHELLING, ESQ.

---

Rebecca M. Pearson, RPR
PEARSON REPORTING, INC.
P.O. Box 1538
Bangor, Maine 04402-1538
(207) 945-6880

**Page 2**

WITNESS INDEX

| WITNESS: LORRAINE (WATSON) MORIN | Page |
|---|---|
| Examination by: Mr. Schelling | 3 |

INDEX OF EXHIBITS

| No. | Description | Marked |
|---|---|---|
| 1 | Emergency Department record | 41 |
| 2 | Let. from Ms. Watson to Dr. Gilmore, dated 7/16/07 | 46 |

**Page 3**

1  (This deposition was taken before Rebecca
2  M. Pearson, RPR, a Notary Public for the state of
3  Maine, at the offices of Gross, Minsky & Mogul, P.A.,
4  23 Water Street, Bangor, Maine, on November 24, 2009,
5  beginning at 9:25 a.m.)
6  (The deponent was administered the oath by
7  the Notary Public.)
8  **LORRAINE (WATSON) MORIN**, having been duly sworn by the
9  Notary Public, was examined and deposed as follows:
10                 DIRECT EXAMINATION
11 BY MR. SCHELLING:
12 Q  Mrs. Morin, as you know, my name is George Schelling.
13 A  I didn't, but now I do.
14 Q  Okay. That's fine.
15     As you know, I'm here representing Eastern Maine
16     Medical Center. We are going to take your deposition
17     this morning, and I'm sure you've had an opportunity
18     to talk to Miss Farr about that, but I just want to
19     put a few requests on the record to make sure we're
20     clear.
21     Do you understand that everything we say today is
22     going to be taken down in a transcript and will be
23     available later on, as the case moves forward?
24 A  Yes, yeah.
25 Q  Do you understand that you're under oath, and the oath

**Page 4**

1     that you've taken is the same that you would take if
2     this case goes to trial?
3  A  Yes.
4  Q  Because we're trying to create an accurate written
5     record, there are a few very important rules.
6     A couple of just basic structural type requests
7     are if you will please make sure that all your answers
8     are in words --
9  A  Okay.
10 Q  -- rather than nods and sounds that aren't clear on a
11    written record.
12    I would also ask that you try to make sure you
13    don't answer my question until I finish asking it,
14    even though you may know what's going to happen
15    because we're both talking at the same time, and again
16    we have trouble with a clear record. Okay?
17 A  Okay.
18 Q  More substantively, it's very important that you give
19    me answers to questions you understand and that
20    they're the best answers you can provide.
21    So to that end, will you tell me if my questions
22    are unclear so I have a chance to rephrase them?
23 A  Absolutely.
24 Q  Okay. So it would be fair, if you answer a question,
25    for me to assume that you've understood it?

## Page 33

1 Q Okay. And that was the first time?
2 A That was the first time I discovered blood, yeah.
3 Q But just to try to keep this complete and
4    sequential --
5 A Right.
6 Q -- before you went in to get -- to get the urine
7    catch, did you -- do you recall anything else that you
8    said to Kim?
9 A I don't.
10 Q Okay. And as far as you recall, is Kim the first
11    person you spoke to after you were triaged?
12 A I don't remember.
13 Q Okay. Do you recall what was said or done after you
14    came back from getting the urine sample?
15 A Laid on the bed.
16 Q Okay.
17 A My husband was there with me. I was very upset
18    because I knew that I was bleeding; I was in a lot of
19    pain.
20    Doctor came in, spoke to us. I really don't
21    remember -- I didn't say a lot at that point. I don't
22    remember anything he said because I was just lost in
23    my own mind. I was so -- just trying to concentrate
24    on what was going on.
25    He did some exam. I know he had a machine there

## Page 34

1    also that he brought in afterwards.
2 Q Excuse me, let me just cut you off. You say he
3    brought it in afterwards.
4 A He had a small machine.
5 Q Let me just try to focus this. He comes in for the
6    first time --
7 A Mm-hmm.
8 Q -- and does he have a machine there with him then?
9 A No, no, no.
10 Q Okay.
11 A I explained to him why I was there.
12 Q Yes.
13 A What was going on.
14 Q Okay.
15 A And he left for a short time and came back with an
16    ultrasound machine.
17 Q Did you tell him anything that day that you haven't
18    told us today?
19 A I don't remember.
20 Q Okay. Is it fair to say you probably would have told
21    him that you were concerned because you hadn't felt
22    any movement?
23 A I don't remember.
24 Q Okay.
25 A I really don't remember.

## Page 35

1 Q Okay. And do I understand that this was Dr.
2    Reinstein?
3 A Yes.
4 Q Okay. And so Dr. Reinstein came back with an
5    ultrasound machine?
6 A Yes, I believe so, yes.
7 Q Was that after you discussed -- you had your initial
8    discussion with Dr. Reinstein, did he -- is the next
9    thing that you recall him coming back into the room?
10 A I believe so.
11 Q Okay. And when he came back, he had the ultrasound
12    machine?
13 A Mm-hmm.
14 Q And he performed an ultrasound, correct?
15 A Mm-hmm -- yes.
16 Q Do you recall what he told you?
17 A He didn't -- I don't think he told us anything, that I
18    remember. I don't think he said anything to us. He
19    just -- he said that he needed to get someone from
20    upstairs to come down.
21 Q Okay. What's the next thing that you recall?
22 A Dr. Grover came downstairs, and he did the same
23    ultrasound and told us that the baby was dead, and he
24    did his exam.
25 Q He did an internal exam?

## Page 36

1 A He did do an internal exam, yes.
2 Q I take it from midnight on you'd been concerned about
3    whether --
4 A Absolutely.
5 Q -- the baby was dead?
6 A Yeah, yeah.
7 Q And Dr. Grover confirmed that?
8 A Yes.
9 Q And I take it that was very upsetting?
10 A Oh, yes, yeah.
11 Q But your recollection is that Dr. Reinstein didn't,
12    didn't say that to you?
13 A I don't remember if he did or not.
14 Q Okay.
15 A Most of the conversations that Dr. Reinstein had were
16    with my husband. I wasn't saying much of anything.
17 Q Okay. Do you recall any of the conversation that
18    occurred in the room when Dr. Grover was there?
19 A He told us the baby was dead.
20 Q Okay.
21 A And he explained the ultrasound, what he was looking
22    at, and I don't remember after that. I remember him
23    leaving.
24 Q Is it fair to say that when Dr. Grover told you the
25    baby was dead, you accepted that as a fact?

**Page 37**

1 A Yes, yes.
2 Q Did you have any discussions or did anybody have any
3     discussions with Dr. Grover at that time or did he say
4     anything to you about what would happen next?
5 A With Dr. Grover?
6 Q Yes.
7 A I don't remember exactly. I really don't remember
8     with Dr. Grover. It took me a little while to absorb
9     everything that had just happened.
10 Q Okay. Did you have any discussion with Dr. Grover
11     about whether you were in labor?
12 A Did I discuss that with him?
13 Q Yes. Was there any mention of that while Dr. Grover
14     was there?
15 A I don't remember.
16 Q What's -- what is the next thing that you recall?
17 A The next thing that I personally remember --
18 Q Yes.
19 A -- after I finally brought myself back together?
20 Q Yes.
21 A The nurse came back in the room, and I asked her to
22     call --
23 Q Was this Kim again?
24 A Yeah. I asked her to call the doctor back in because
25     I had a lot of questions on what I was supposed to do.

**Page 38**

1 Q And did he come back in?
2 A Yeah. Dr. Reinstein came back in, and I remember my
3     husband and him having some sort of conversation.
4         And then I came right out and asked him, okay,
5     what am I supposed to do? I want this taken care of
6     now. I can't go home. Take care of this. I told him
7     very specifically I could not go home and deal with
8     this.
9 Q Do you recall getting any instructions about what
10     would happen if you went home?
11 A Oh, yes.
12 Q Okay. What I'm trying to do is make sure you tell me
13     everything you can remember about that.
14 A Yes, yeah. I was told that if I was to give birth at
15     home, to just dispose of it and call my doctor on
16     Monday.
17 Q And who told you this?
18 A Dr. Reinstein told me that.
19 Q Do you recall anything else?
20 A I recall my husband yelling, because he took that the
21     same way I took that. When you say just dispose of
22     it, we're talking about a baby. You don't throw a
23     baby in the garbage.
24         And then I remember Dr. Reinstein saying
25     something to my husband about calming down or he'll

**Page 39**

1     call security. And then he left, and the nurse came
2     in.
3 Q And was it again Kim?
4 A I think it was, yeah. Actually it was --
5 Q And --
6 A -- because my husband pretty much gave her the same
7     spiel, and he told her we weren't leaving.
8         And she said, you can leave or we'll call
9     security.
10 Q And then what happened?
11 A She had my discharge instructions there. I signed
12     them, and then someone from the lab came in after I
13     signed the discharge instructions, drew my blood and
14     we left.
15 Q Do you recall any conversations that you haven't
16     recounted for us?
17 A I don't know.
18 Q I'm sorry?
19 A Do I recall any conversations? I don't know. With
20     whom, where, I don't know.
21 Q I mean, what I want to do is make sure I understand
22     everything that you can remember that occurred that
23     day at the medical center. And is there anything you
24     can recall --
25 A What I remember that day --

**Page 40**

1 Q Yeah.
2 A -- basically comes in pieces in between the pain that
3     I was having.
4 Q Yes.
5 A That's what I remember from that day.
6 Q Okay. You understand I'm not criticizing you for what
7     you can or can't remember.
8 A Right.
9 Q I simply want to make sure -- this is my opportunity
10     to learn everything --
11 A Right.
12 Q -- that you can recall.
13 A I know.
14 Q So I just want to make sure that, however good or
15     imperfect that memory is, that I've gotten everything
16     on this transcript.
17 A Okay.
18 Q And is there anything that you can recall from your
19     time there at Eastern Maine that day that you haven't
20     told us about yet?
21 A As far as conversations? I -- no.
22 Q Okay. Is there anything you recall about procedures
23     that you haven't told us about?
24 A Not that I remember.
25 Q Do you recall how long Dr. Grover was with you?

**41**

1 A No.
2 Q Do you recall how long Dr. Reinstein was with you on
3    either of the two times he was there?
4 A No.
5    (A recess was taken from 10:21 a.m. to 10:27 a.m.)
6    (Deposition Exhibit 1 was marked for
7    identification.)
8 BY MR. SCHELLING:
9 Q I've marked the record, what I believe to be the
10   complete record, from the 7/1 visit as Exhibit 1.
11      Let me just turn your attention to page 28. You
12   earlier indicated that you signed a consent form.
13      Is that your signature on page 28?
14 A (Examining document) Yes, it is.
15 Q I take it you were -- you were frustrated with the
16   information you were getting from the -- from the
17   caregivers at Eastern Maine?
18 A At that moment?
19 Q Yes.
20 A I was in pain.
21 Q During the course of that admission though or that
22   visit, is it fair to say that you felt more urgency
23   about your circumstances than they seemed to feel?
24 A Yes.
25 Q Basically what they were saying and what they were

**42**

1    doing suggested there wasn't an urgency, but you felt
2    there was?
3 A Yes.
4 Q They felt -- from what they said and what they did,
5    you got the sense that they thought everything was
6    okay, was stable, but you felt it wasn't?
7       MS. FARR: I'm going to object to the form
8    of the question.
9       You can answer.
10 A Ask that question again.
11 BY MR. SCHELLING:
12 Q Yeah. Is it fair to say that from what you drew from
13   what they were saying, they thought everything was
14   essentially okay; it was predictable; it was under
15   control; it was stable, but --
16 A I can't assume that.
17      MS. FARR: Wait. Same objection.
18      But go ahead.
19 BY MR. SCHELLING:
20 Q I'm not asking you to assume anything. I'm asking
21   from your impression.
22 A You want my impression of what I thought they thought?
23 Q Yeah. The message they were giving to you. You were
24   frustrated, you told us --
25 A I was frustrated because I felt they didn't want to

**43**

1    deal with me.
2 Q Okay.
3 A And I was in pain, and it was 6:30 in the morning.
4    Time for change of shift.
5 Q Did they convey to you that they thought the situation
6    would be under control, and you could handle it
7    appropriately if you went home?
8 A No, no, they did not.
9 Q Okay. What were they telling you?
10 A To call my doctor on Monday, and if anything happens
11   in between, if I was to give birth, just dispose of
12   it, meaning -- it meaning the baby and call my doctor
13   on Monday.
14 Q Okay. Now, on page 28, the instructions you got said
15   to call your doctor if you get worse instead of
16   better, if you have any new symptoms.
17      So you understood if anything changed, you
18   should --
19 A Call my doctor.
20 Q Call your doctor?
21 A Yeah.
22 Q Did you ever call your doctor?
23 A Absolutely.
24 Q And when did you call?
25 A At 7:30 Monday morning after everything had

**44**

1    transpired, yeah.
2 Q You did not call your doctor until 7:30 Monday
3    morning?
4 A Her office wasn't open. No, I did not call my doctor
5    until 7:30 the next morning.
6 Q You knew though that your doctor had an on-call
7    after-hours service, correct?
8 A Yes.
9 Q And you did not call that service, correct?
10 A I wasn't told to call them. I was told to call my
11   doctor's office.
12 Q When you call your doctor's office after hours, you
13   got a --
14 A Service.
15 Q -- a service --
16 A Yeah.
17 Q -- that paged your doctor, and the doctor could -- or
18   the on-call doctor could call you back, correct?
19 A I knew about the service, yes.
20 Q Okay. And so you knew that on that Sunday evening if
21   you called your doctor's office, you could expect to
22   get a call back from the doctor on call, correct?
23 A Yes.
24 Q But I just want to be clear, you did not call?
25 A No, I did not call them back.

## 45

1 Q Okay. At page 10 Dr. Grover, at the bottom of the
2   last large paragraph, said that I also recommended to
3   Mrs. Watson -- to her being you -- that should she
4   have increased pain, discomfort or significant
5   bleeding to present back to the emergency room for
6   further care. I explained -- I explained to her that
7   we remain on call over this weekend, and certainly she
8   can re-call us if she has any questions or issues.
9       Did you ever think about returning to the
10  emergency room that night?
11 A No.
12 Q You don't dispute that Dr. Grover told you this, do
13  you?
14 A Actually I do.
15 Q Are you saying that this is incorrect?
16 A I do not remember him explaining that to me no more
17  than me expressing gratitude for his services. I do
18  dispute that because I do not recall that
19  conversation.
20 Q But you've told us that there are parts of that --
21 A That's right.
22 Q -- that morning that you simply don't recall, correct?
23 A That's right.
24 Q So you can't tell us that didn't occur; you can only
25  tell us you don't remember it occurring?

## 46

1 A I don't remember it occurring.
2 Q Okay.
3       (Deposition Exhibit 2 was marked for
4       identification.)
5 BY MR. SCHELLING:
6 Q Did any care provider at Eastern Maine Medical Center
7   tell you that they thought you were in labor?
8 A I don't remember.
9 Q Sitting here today can you recall anyone saying that
10  they thought you were in labor?
11 A I don't remember, no.
12 Q Did -- do you recall anyone at Eastern Maine Medical
13  Center telling you that your cervix was dilated?
14 A Dr. Grover mentioned something about my cervix not
15  being dilated enough.
16 Q And do you recall anyone at Eastern Maine -- I'm
17  sorry, let me go back to that.
18      Did anybody other than Dr. Grover talk to you
19  about whether or not you were dilated?
20 A I don't remember anyone talking to me about it.
21 Q Did anybody at Eastern Maine that day tell you whether
22  or not you were effaced?
23 A I don't remember, no.
24 Q Have you ever been told by any medical professional
25  that your cervix was dilated that morning of July 7th

## 47

1   at Eastern Maine Medical Center?
2 A I don't -- I don't remember anyone ever telling me
3   that.
4 Q Has any medical professional ever told you that your
5   cervix was effaced that morning at Eastern Maine
6   Medical Center?
7 A I really don't remember. The only part that I
8   specifically remember when it came to dilation was him
9   mentioning to my husband that I'm not dilated enough.
10 Q Okay. Were those the exact words, as best you can
11  recall?
12 A Yes.
13 Q Do you recognize Exhibit 2?
14 A (Examining document) Yeah.
15 Q When did you write this?
16 A It actually took me a couple days to write it. It was
17  the week after it happened that I wrote it because
18  everything was still fresh in my head.
19 Q Fresher than it is today?
20 A Oh, absolutely.
21 Q Why did you write it?
22 A Because I felt at that point what had happened was an
23  absolute wrong. I couldn't even fathom something like
24  that happening to my daughter and having them explain
25  to me -- well, the entire circumstance.

## 48

1 Q Okay.
2 A The reason I wrote this was to get the attention of
3   those in charge of that facility, for them to
4   recognize that it was a wrong, number one, and that
5   they needed to change their policy, that this was not
6   an appropriate way to treat people ever.
7 Q Did you attempt to be as accurate as you could in your
8   letter?
9 A As accurate as my emotions would let me, yes.
10 Q And as complete as you could recall at that time?
11 A Yes.
12 Q Okay. I had a couple of questions about that I wanted
13  to ask you. I'm looking at page 2.
14 A (Examining document) Mm-hmm.
15 Q There's a large paragraph in the center of the page,
16  and then the next paragraph starts, later on in the
17  afternoon my labor pains became more intense.
18 A Mm-hmm.
19 Q You left around 6:30 approximately; is that about
20  right?
21 A Right.
22 Q A.m. And so when was it -- can you recall, as you sit
23  here today, when the pain started getting more
24  intense?
25 A It was in the afternoon because I had gone home and

## Page 49

1 had my friends go to -- had my kids go to their
2 friends' house because I didn't want them in the
3 house. So by the time -- they had left and it was
4 later on in the afternoon. It was past noontime,
5 yeah.
6 Q Is it fair to say that from the time you showed up at
7 Eastern Maine until the time you left, things didn't
8 get any better, your pain?
9 A The pain?
10 Q Yes.
11 A You say that and I'm thinking it couldn't have gotten
12 any worse. I don't know what you mean.
13 Q Well, you say the labor pains become more intense --
14 A Right.
15 Q -- later on in the afternoon. So what I'm trying to
16 find out is just over the course of that two, two to
17 three hours at Eastern Maine --
18 A They got closer and closer.
19 Q Excuse me.
20 A I'm sorry.
21 Q During the course of that two to three hours at
22 Eastern Maine Medical Center, did your pain get any,
23 any better?
24 A No.
25 Q Did it change significantly?

## Page 50

1 A It just kept getting closer and closer together.
2 Q Okay. So what happened later on in the afternoon
3 where things got -- became more intense? What was --
4 how did things change at that point?
5 A There was no receding of this pain. It was just
6 constant.
7 Q Okay.
8 A It was -- the intensity would escalate, but it was
9 always there instead of going away at some point to
10 give me that breather. It just became more and more
11 and more to the point where everything was starting to
12 come together.
13 Q So I take it -- I mean, you've described pretty
14 intense pain when you left your home --
15 A Right.
16 Q -- early that morning to go to Eastern Maine.
17 A Yeah.
18 Q And from that time up until that -- until later on in
19 the afternoon, were things pretty much the same, but
20 the contractions or whatever, they were, were
21 getting -- the pains were getting closer?
22 A Yes.
23 Q And then later on in the afternoon the pain started
24 getting more intense and more continuous?
25 A There was, like I said, there was no break in the

## Page 51

1 pain.
2 Q Yeah.
3 A At that point, I mean, I would look forward to just,
4 just five seconds of the pain easing up just a little
5 bit when -- it's almost like my body was ripping
6 itself apart, morphing into something you couldn't
7 even fathom. It's that kind of pain.
8 Q And that pain that you experienced later on in the
9 afternoon, was that different from the pain that you
10 associated with your -- the birth of your two
11 children?
12 A No. That's exactly the same feeling.
13 Q Was it different from the pain, if any, you
14 experienced when you had your earlier miscarriage?
15 A My earlier miscarriage I wasn't sent home. They
16 had -- I had that pain, but it never got to that
17 nonstop point. They actually did an emergency D and C
18 with that miscarriage.
19 Q And where was that?
20 A At Eastern Maine.
21 Q How many weeks pregnant were you on that earlier
22 miscarriage?
23 A I don't remember. I was not very far along.
24 Q But as you recall, it was a D and C and not a D and E?
25 A I don't know what a D and E is. What is a D and E?

## Page 52

1 Q It's dilatation and evacuation.
2 A I don't --
3 Q Okay. Is part of your concern about how you were
4 treated in 2007 the difference between that treatment
5 and the treatment you received at the time of the
6 earlier miscarriage?
7 A I don't understand that question. What do you mean?
8 Q Do you feel you were -- you received better care the
9 first time you went to Eastern Maine with your first
10 miscarriage than you did with the one in 2007?
11 A Yes.
12 Q And that -- Is that part of your anger or annoyance at
13 the care you received in 2007; you're comparing it to
14 the care you received earlier?
15 A I compare it to the care you would give anyone who
16 walked through the door.
17 Does that make any sense?
18 Q Well, I'm trying to -- my question is --
19 A My care shouldn't change from anyone else's --
20 Q -- very specific.
21 A Yeah.
22 Q Is part of your anger --
23 A Experience the first time -- it's not an anger.
24 Q Okay. What do you call it?
25 A Disappointment.

## Page 53

1. Q Is part of your disappointment at the care in 2007
2.    your comparison of it with the care you received at
3.    the earlier miscarriage?
4. A Do I use that as a comparison?
5. Q Yes.
6. A Absolutely.
7. Q Do you use anything else as a comparison?
8. A Every birth that I've had.
9. Q With the -- are you considering this a birth?
10. A Yes.
11. Q Are you comparing the disappointment that you received
12.    here at Eastern Maine in 2007 with any policy at St.
13.    Joseph's Hospital?
14. A No.
15. Q Why didn't you go to -- that night go to the hospital
16.    in Millinocket or the hospital in Lincoln?
17. A They don't do OB in Millinocket, and I did not know
18.    whether they did OB in Lincoln. I assumed critical
19.    access you don't do OB.
20. Q But I think you just told us you were expecting to
21.    give birth at Lincoln.
22. A Mm-hmm. Yeah.
23. Q So they must do OB.
24. A Yes, they do, but I did not know that at the time, no,
25.    because I would have gone to Lincoln.

## Page 54

1. Q I take it you didn't call Lincoln either to find out?
2. A No, no.
3. Q At what time in the afternoon did the pains become
4.    continuous?
5. A After, after my kids left. Sometime in the afternoon.
6.    I don't know the exact time. When I say afternoon, I
7.    mean after noontime sometime. Could have been one,
8.    could have been two.
9. Q Well, it says later on in the afternoon.
10. A Mm-hmm.
11. Q That doesn't suggest that you meant three, four, five
12.    o'clock?
13.    MS. FARR: I object to the form of the
14.    question.
15. BY MR. SCHELLING:
16. Q You don't remember at this time?
17. A I really don't remember.
18. Q Please describe what happened.
19. A What happened --
20. Q Well, you started --
21. A -- in the afternoon?
22. Q You started getting intense pain.
23. A Okay. It just became worse and worse. There's no
24.    time between any of it. It just -- it was constant
25.    the entire time, and I basically spent, I would say,

## Page 55

1.    pretty much the entire time in my bathroom on my hands
2.    and knees, because it was the only position -- the
3.    only thing that even made me not want to pass out
4.    basically because my head started ringing. It just --
5.    it was so intense I just wanted to stay awake, stay
6.    aware.
7. Q How long did that process go on?
8. A Hours, hours.
9. Q Can you give me any idea?
10. A Hours.
11. Q How many hours?
12. A I can't even tell you how many hours, but hours. And
13.    then I finally started getting that feeling that I
14.    wanted to push, and fluid came out, and my son came
15.    out, and the pain started subsiding.
16. Q Do you have any recollection of the -- of how your
17.    pain was treated in your previous pregnancies?
18. A I don't remember with my son. My daughter I had an
19.    epidural after a few hours. I know I had pain
20.    medicine with the second pregnancy because I know I
21.    didn't go through this.
22. Q Have you had any subsequent interactions of any kind
23.    with Dr. Reinstein?
24. A Dr. Reinstein, no.
25. Q With Dr. Grover?

## Page 56

1. A No, no.
2. Q With Kim?
3. A No.
4. Q With anyone at Eastern Maine Medical Center?
5. A With anyone at Eastern Maine Medical Center since it
6.    happened?
7. Q Yes. About these events.
8. A Yes.
9. Q What --
10. A Dr. Gilmore when I went into her office the next
11.    morning.
12. Q Have you spoken about these events with anyone, other
13.    than Dr. Gilmore at Eastern Maine?
14. A The nurse practitioner that works in her office.
15. Q And her name is?
16. A Lois Bergman.
17. Q Have you discussed it with anyone other than those
18.    two?
19. A At Eastern Maine?
20. Q Yes.
21. A The nurse that works in their office, the OB office.
22. Q Do you know her name?
23. A I don't remember her name.
24. Q Anyone else?
25. A Not that I remember, no.

73

1 Q Did you treat with Dr. Nash just while you lived in
2   Porter --
3 A No. When I lived in Limington and Standish also.
4       MR. SCHELLING: Off the record.
5       (Colloquy off the record)
6 BY MR. SCHELLING:
7 Q And just so I understand, the disappointment, the term
8   you used, at the care you received at Eastern Maine
9   Medical Center is basically that -- that's the result
10  of the care you were provided, correct?
11      Let me -- strike that and let me start again.
12      What you are claiming as a result of the care
13  provided at Eastern Maine Medical Center is the
14  disappointment you've described, correct; it's the
15  emotional damage and --
16 A Did what happened at Eastern Maine cause this; is that
17  what you're --
18 Q No. I'm sorry. I just want to make sure I've got all
19  of those kinds of damages that you're looking for. I
20  know that you're not looking for lost wages, and I
21  take it you're not looking for medical expenses.
22 A No.
23 Q You're looking for the emotional distress that you
24  endured as a result of the care. And that's it,
25  correct?

74

1 A Yes. I believe so, yes.
2 Q Yeah. Okay. In this letter it says -- I'm looking
3   towards the bottom of page 2 -- at around 2100 on July
4   1st, I had then given birth at my home.
5 A Yeah.
6 Q Is that -- should I understand that that's about the
7   time that you gave birth, around nine o'clock that
8   night?
9 A Yes.
10      MR. SCHELLING: Good. I'm all set. Thank
11  you.
12      MS. FARR: No questions. Thank you.
13  She will read and sign.
14      (The deposition concluded at 11:26 a.m.)
15
16
17
18
19
20
21
22
23
24
25

75

CERTIFICATE

I, Rebecca M. Pearson, RPR, a Notary Public in
and for the State of Maine, hereby certify that on the
24th day of November, 2009, personally appeared before
me at the offices of Gross, Minsky & Mogul, P.A., 23
Water Street, Bangor, Maine, the within-named
deponent, LORRAINE (WATSON) MORIN, who was sworn to
testify the truth, the whole truth, and nothing but
the truth in the cause of action LORRAINE WATSON v.
EASTERN MAINE MEDICAL CENTER.

I further certify that this deposition was
stenographically reported by me and later reduced to
computerized transcription, and that the foregoing is
a full and true record of the testimony given by the
deponent.

I further certify that I am a disinterested
person in the event or outcome of the above-named
cause of action.

IN WITNESS WHEREOF, I subscribe my hand and affix
my seal this 8th day of December, 2009.

*Rebecca M. Pearson*
Rebecca M. Pearson, RPR
Notary Public
My commission expires:
February 22, 2016