UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LORRAINE MORIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-09-258-B-W |
| | ) | |
| EASTERN MAINE MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO
EXCLUDE OR LIMIT THE PROPOSED EXPERT TESTIMONY OF
PLAINTIFF'S EXPERT WITNESS ANNETTE O'BRIEN**

In the early morning hours of July 1, 2007, Loraine Watson Morin,[1] who was sixteen-weeks pregnant and experiencing contractions, arrived at Eastern Maine Medical Center (EMMC)'s Emergency Room (ER) seeking treatment. EMMC performed diagnostic tests which determined that Ms. Morin's fetus was dead, and against her wishes and while she was still in contractions, it discharged her home. Later that evening, Ms. Morin delivered her dead fetus in her bathroom. Ms. Morin sued EMMC for violating Emergency Medical Treatment and Active Labor Act (EMTALA), which prevents a hospital from discharging a patient who is in an emergency medical condition. EMMC moves for summary judgment because it says that in the unique circumstances of her case, the law does not apply to her. Contrary to EMMC's contentions, the Court concludes that EMTALA's protections

---

[1] When she filed suit, the Plaintiff's name was Lorraine Watson. She has since married and changed her name to Lorraine Watson Morin. The docket was revised to reflect the change and the Court refers to Ms. Morin by her married name.

extend to pregnant women regardless of the fetus' viability and that the extent of EMMC's knowledge of the risk to Ms. Morin's health is a question of fact for jury resolution. The Court denies EMMC's motion for summary judgment. EMMC has also moved *in limine* to exclude the testimony of a registered nurse on the ground that she is not an expert. Concluding that the Plaintiff's nursing expert is an expert as a nurse and not as a physician, the Court grants the motion in part and denies it in part.

## I. STATEMENT OF FACTS

At approximately 4:30 a.m. on July 1, 2007, Ms. Morin went to the emergency department at EMMC with Roger Morin, her then-fiancé. *Defendant's Statement of Material Facts* ¶ 1 (Docket # 19) (*DSMF*). She told the registration clerk that she was sixteen-weeks pregnant and was having abdominal cramping. *Id.* ¶¶ 2-3. Ms. Morin also informed the clerk that Pamela Gilmore, M.D., her primary care doctor, had told her to go to the hospital if she had any problems due to her high risk pregnancy; Ms. Morin explained that her pregnancy was high risk as a result of her having previously had cervical cancer, a miscarriage, and a cone[2] biopsy. *Plaintiff's Statement of Material Facts* ¶ 3, 34 (Docket # 37) (*PSMF*). Ms. Morin gave the same information to the triage nurse and Paul R. Reinstein, M.D., the emergency room doctor. *Id.* Ms. Morin saw Dr. Reinstein at approximately 5:00 a.m. and his notes reflect that "for the last 20 hours [Ms. Morin] has been having suprapubic cramps

---

[2] Ms. Morin refers to the procedure as a "comb biopsy." *Pl.'s Resp. to Mot. for Summ. J. and Resp. to Mot. to Exclude or Limit the Proposed Expert Testimony of Pl.'s Expert Witness Annette O'Brien* at 2 (Docket # 36) (*Pl.'s Resp.*). The Court assumes that Ms. Morin means a "cone biopsy."

10 minutes apart." *Medical Records* at 2 (Docket # 22).[3] Dr. Reinstein also reports that Ms. Morin informed him that she had had one previous miscarriage, had given birth to two healthy children, and had pregnancy-induced hypertension.  *Id.*  Dr. Reinstein further noted that although Ms. Morin had not noticed any bleeding, the nurse found some blood in her urine specimen.  *Id.*  After an ultrasound revealed a nonviable fetus, Dr. Reinstein referred Ms. Morin to Robert Grover, D.O., an obstetrical/gynecological doctor.

At 5:25 a.m., Dr. Grover met with Ms. Morin.  He noted that Ms. Morin complained of "lower abdominal pain and discomfort like Braxton-Hicks contractions."  *Id.* at 9.  Dr. Grover further noted that "[Ms. Morin] states that she has been seen Dr. Gilmore's office.  She also states that she had a first-trimester ultra screen and denies any knowledge of any abnormality with that.  She has not had any previous complications with her pregnancy; she has had a previous miscarriage."  *Id.*  After a routine check-up, Dr. Grover conducted a second ultrasound.  Like Dr. Reinstein, Dr. Grover detected no fetal cardiac activity or movement, and he concluded that the pregnancy was nonviable.  *Id.* at 10.  Dr. Grover noted that Ms. Morin was not leaking fluids and that her cervix was not dilated or effaced.  *DSMF* ¶ 20.  He noted that Ms. Morin was "having some contractions" and recommended that she go home, take Tylenol No. 3 (a prescription narcotic painkiller), and call Dr. Gilmore's office in the morning for follow-up.  *Id.*

---

[3] Suprapubic cramps "could be termed the same" as contractions.  *Dep. of Gregory Gimbel, M.D.* Attach. 2 at 24:19-24 (Docket # 37) (*Gimbel Dep.*).

He also told Ms. Morin she should come back to the ER if she experienced any increase in pain or symptoms. *Id.*

Ms. Morin met again with Dr. Reinstein and told him that she wanted to have the fetus delivered that morning. *PSMF* ¶ 36. Dr. Reinstein consulted with Dr. Grover, who told him that Ms. Morin's cervix was not ready for delivery. *Medical Records* at 3. Dr. Reinstein discharged Ms. Morin over her and her financé's vehement protests. *PSMF* ¶¶ 38-39. Ms. Morin understood that as part of her discharge instructions she was to call her doctor should her condition worsen. *DSMF* ¶ 28; *PSMF* ¶ 28. That evening at approximately 9:00 p.m., Ms. Morin delivered the dead fetus at home. *PSMF* ¶ 45.

On June 19, 2009, Ms. Morin filed a Complaint against EMMC, seeking damages under EMTALA for EMMC's failure to stabilize her before discharge. *Compl.* (Docket # 1). On February 19, 2010, EMMC moved for summary judgment and moved to exclude or limit the expert testimony of Annette O'Brien, Ms. Morin's expert witness. *Mot. for Summ. J. and Mot. to Exclude or Limit the Proposed Expert Testimony of Pl.'s Expert Witness Annette O'Brien* (Docket # 18) (*Def.'s Mot.*). On March 3, 2010, Ms. Morin filed a response to both motions. *Pl.'s Resp.* On March 17, 2010, EMMC replied. *Reply to Resp. to Mot. for Summ. J. and Reply to Resp. to Mot. to Exclude or Limit the Proposed Expert Testimony of Pl.'s Expert Witness Annette O'Brien* (Docket # 41) (*Def.'s Reply*). On March 19, 2010, Ms. Morin moved for oral argument and the Court granted the request on June 29, 2010. *Mot.*

*for Oral Argument/Hearing* (Docket # 46); *Order* (Docket # 47). The Court held oral argument on July 26, 2010.

## II.   DISCUSSION

### A.   Motion to Exclude or Limit the Expert Testimony of Annette O'Brien

#### 1.   Legal Standard

The trial court must determine that the proffered expert witness is "qualified as an expert by knowledge, skill, experience, training, or education" before permitting her testimony to be presented to the jury. Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court gave federal judges the "gatekeeping role" of screening expert testimony to determine whether, although relevant, it is based on unreliable scientific methodologies. 509 U.S. 579, 597 (1993). Although the "gatekeeping function requires the trial court to determine, given the proffered expert's background, whether the scientific, technical, or other specialized knowledge [she] offers will assist the trier better to understand a fact in issue," *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003) (quotation marks and citation omitted), this function is "a flexible one" that "depends upon the particular circumstances of the particular case at issue." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

#### 2.   Annette O'Brien, RNC, LNC

Annette O'Brien graduated from Queens Hospital Center School of Nursing with a Registered Nurse diploma in 1974. *Resume of Annette O'Brien, RNC, LNC* (Docket # 28). Since 1974, Ms. O'Brien has worked as a staff nurse in labor and

delivery at three hospitals in the New York area. *Id*. From 2005 to 2007, Ms. O'Brien served as acting manager of a labor and delivery department. *Id*. Ms. O'Brien states that her duties as staff nurse include caring for women with both high and low risk pregnancies and working as a bereavement counselor. *Id*. Ms. O'Brien is certified in Basic Life Support, in Neonatal Resuscitation Program, in Inpatient Obstetrics, as a Legal Nurse Consultant, and as a Bereavement Counselor. *Id*. She is a member of the Association of Women's Health, Obstetric and Neonatal Nurses and the American Association of Legal Nurse Consultants. *Id*. As Ms. Morin's expert witness, Ms. O'Brien reviewed EMMC's treatment records and a case summary Ms. Morin's legal counsel prepared. *Ex. 4 to O'Brien Deposition* Attach. 6 at 1. (Docket # 37). In a letter dated June 11, 2009, Ms. O'Brien stated that in her opinion, Ms. Morin was "having cramps upon arrival to the ER." *Letter from Ms. O'Brien* (Docket # 27). She further asserted that

> [t]his patient was a high risk for complications since she had previously had a caesarean section in the past and was in labor. The incidence for a ruptured uterus is higher in these patients. Emotionally Ms. [Morin] was also at risk for postpartum depression because she had this condition with a previous pregnancy.

*Id*.

EMMC argues that Ms. O'Brien is unqualified to testify as an expert regarding whether EMMC met EMTALA standards in treating Ms. Morin, to opine as to whether Ms. Morin was in "labor" at EMMC, and to state whether Ms. Morin was at risk of complications. *Def.'s Mot*. at 16. EMMC argues that because Ms. O'Brien "cannot make a diagnosis," she cannot give "an expert medical diagnosis

6

that Plaintiff was in labor" and cannot give testimony "concerning any potential threat to Plaintiff's health and safety." *Id.* at 17-18.  Furthermore, EMMC argues that as a labor and delivery nurse, Ms. O'Brien has experience only with "the labor and delivery of viable newborns": "There is no evidence that Ms. O'Brien has the knowledge, experience, training, or education, to qualify her to testify as to a missed abortion after 16-weeks when the woman presents at a hospital's emergency department." *Id.* at 18.  Even if Ms. O'Brien is allowed to opine about whether Ms. Morin was having contractions, EMMC argues that such testimony is irrelevant to the EMTALA analysis. *Def.'s Reply* at 9-10.[4]

Ms. Morin agrees that Ms. O'Brien is not qualified to express legal conclusions about "whether EMMC violated EMTALA," but she does intend to ask her questions "about the factual predicates for an EMTALA violation, including whether Plaintiff was pregnant, having contractions, and faced a risk to her health or safety." *Pl.'s Resp.* at 14.  Although EMMC moved to prevent Ms. O'Brien from testifying about whether Ms. Morin was in labor when she presented to EMMC, Ms. Morin replies that "such definition is rendered irrelevant by the statutory language of EMTALA." *Id.*[5]  Furthermore, Ms. Morin asserts that as a registered nurse with 35 years of labor and delivery experience, she is qualified to "testify about potential complications that a woman in Ms. Morin's condition may have faced."  *Id.*

---

[4] EMMC's Reply seems to be directed to whether Ms. O'Brien's expert testimony can sustain Ms. Morin's burden of proof, a different question than whether Ms. O'Brien has the expertise to testify in the first place.

[5] The Court does not reach Ms. Morin's contention that none of the witnesses should be allowed to testify about the "medical definition of labor" because the definition is irrelevant to EMTALA.  *Pl.'s Resp.* at 14.  The admissibility of the testimony of other witnesses is not before the Court.

Although Ms. O'Brien is not a medical doctor, Ms. Morin says that Maine law allows nurses to assess a patient's medical condition and, as a result, the patient's risk of complications. *Id.* at 17. As narrowed, Ms. Morin intends to present Ms. O'Brien for the limited purpose of expressing her expert opinion that Ms. Morin was "having contractions at various timeframes" and to testify "about potential complications that a woman in Ms. Morin's condition may have faced." *Id.*[6]

**3. Discussion**

Maine law defines the practice of professional nursing to include:

> **A.** Diagnosis and treatment of human responses to actual or potential physical and emotional health problems through such services as case finding, health teaching, health counseling and provision of care supportive to or restorative of life and well-being and execution of the medical regimen as prescribed by a licensed physician, podiatrist or dentist or otherwise legally authorized individual acting under the delegated authority of a physician, podiatrist or dentist:
>
> > **(1)** "Diagnosis" in the context of nursing practice means that identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen. This diagnostic privilege is distinct from medical diagnosis;

---

[6] At least on the contractions issue, the Court wonders whether there is a real dispute for summary judgment purposes. EMMC's ER medical record states that when Ms. Morin arrived at EMMC on July 1, 2007, she said that "for the last 20 hours, [she] has been experiencing suprapubic cramps 10 minutes apart." *Medical Records* at 2. Dr. Gimbel testified that suprapubic cramps "could be termed the same" as contractions. *Gimbel Dep.* at 24:25. EMMC makes no claim that Dr. Gimbel is not competent to express the opinion that Ms. Morin's suprapubic cramps were contractions, but it objects to Ms. O'Brien saying the same thing. Moreover, the EMMC medical record reveals that Dr. Grover described Ms. Morin as having "abdominal pain and discomfort like Braxton-Hicks contractions" and that he wrote Ms. Morin is "having some contractions." *Medical Record* at 9-10. Since Ms. O'Brien's opinion as a nurse echoes Dr. Gimbel's opinion as a doctor and Dr. Grover's own descriptions, this issue hardly seems worth fighting about. Even if EMMC physicians now disagree with Dr. Gimbel and with their own descriptions in the medical record, the evidence in one form or other will be before the jury.

> **(2)** "Human responses" means those signs, symptoms and processes that denote the individual's health needs or reaction to an actual or potential health problem; and
> **(3)** "Treatment" means selection and performance of those therapeutic measures essential to the effective management and execution of the nursing regimen.

32 M.R.S. § 2102(2)(A)(1)-(3).

As Maine law makes clear, a nurse is authorized to arrive at a diagnosis but a nursing diagnosis, not a medical one.  Under Maine law, a nursing diagnosis broadly differentiates "between physical and psychosocial signs and symptoms." *Id.* § 2102(2)(A)(1).  A nurse is also allowed to evaluate "human responses" and to select and perform "therapeutic measures essential to the effective management and execution of the nursing regimen." *Id.* § 2102(2)(A)(2)(3).[7]

Because Ms. O'Brien is a nurse does not mean she is not an expert. *Santos v. Posadas De P.R. Assocs.*, 452 F.3d 59, 63 (1st Cir. 2006) (stating that experts "come in various shapes and sizes" and there "is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field"); *Akerson v. Falcon Transp. Co.*, CV-06-36-B-W, 2006 WL 3377940, at*5 (D. Me. Nov. 21, 2006) (concluding that a physician's assistant may express expert opinions). The test under Rule 702 is whether the proposed expert has "scientific, technical, or other specialized knowledge" that will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *Pagés-Ramírez v.*

---

[7] By contrast, the practice of medicine is defined in Maine to include "diagnosing, relieving in any degree or curing, or professing or attempting to diagnose, relieve or cure a human disease, ailment, defect or complaint, whether of physical or mental origin, by attendance or by advice, or by prescribing or furnishing a drug, medicine, manipulation, method or a therapeutic agent . . . ."  32 M.R.S. § 3270.

9

*Ramírez-González*, 605 F.3d 109, 113-14 (1st Cir. 2010) (describing the principles underlying the admissibility of expert medical testimony).

After thirty-five years as an experienced labor and delivery nurse, Ms. O'Brien presumably knows a contraction when she sees it and based on her review of the medical records, Ms. O'Brien is qualified to give expert testimony as a nurse about whether Ms. Morin was having contractions.[8]  Ms. O'Brien may also testify as a nurse about "potential complications that a woman in Ms. Morin's condition may have faced." *Pl.'s Resp.* at 14.  But her testimony must be limited to a nurse's view of "signs, symptoms and processes that denote [Ms. Morin's] health needs or reaction to an actual or potential health problem."  32 M.R.S. § 2102(2)(A)(2). Permissible testimony would include her view as to whether Ms. Morin was suffering from contractions, since this observation falls within the practice of nursing for an experienced labor room nurse, and her assessment from a nursing perspective about the "potential health problem[s]" Ms. Morin faced upon discharge. *Id.*

At the same time, Nurse O'Brien cannot testify as a doctor.  Because Ms. O'Brien is not licensed to arrive at a medical diagnosis, she cannot opine about the correctness of Drs. Reinstein and Grover's diagnoses, since such testimony is outside her expertise.  Further, as she acknowledges, Ms. O'Brien is not an expert in EMTALA and cannot give expert testimony about EMTALA's legal standards or

---

[8] If Ms. O'Brien is inexperienced with early term pregnancies, it goes to weight, not admissibility, and "may be exposed through cross-examination or competing expert testimony." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002).

whether EMMC complied with EMTALA in treating Ms. Morin.[9]  The Court grants EMMC's motion in part to the extent it requests an order excluding her expression of expert opinions about EMMC's EMTALA compliance and to the extent it requests an order excluding her expression of expert opinions about Ms. Morin's medical diagnoses; the Court denies EMMC's motion for the wholesale exclusion of her proposed expert testimony.

### B.    Motion for Summary Judgment

#### 1.    Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a summary judgment motion, "[a] genuine issue exists where a 'reasonable jury could resolve the point in favor of the nonmoving party.'"  *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (quoting *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotations omitted) (quoting *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997)).

#### 2.    EMTALA

EMTALA is designed to prevent hospital emergency rooms from "refusing to accept or treat patients with emergency conditions if the patient does not have

---

[9] If EMMC wishes to reassert its objections at trial, the Court will take Ms. O'Brien's testimony outside the presence of the jury and determine whether the proposed testimony should be excluded under *Daubert*.

medical insurance." *Alvarez-Torres v. Ryder Memorial Hosp., Inc.*, 582 F.3d 47, 51 (1st Cir. 2009) (quoting *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1189 (1st Cir. 1995)).  "To this end, EMTALA imposes duties on covered facilities to: (a) provide an 'appropriate medical screening examination' for those who come to an emergency room seeking treatment, and (b) provide, in certain situations, 'such further medical examination and such treatment as may be required to stabilize the medical condition.'" *Alvarez-Torres*, 582 F.3d at 51 (quoting 42 U.S.C. § 1395dd(a), (b)(1)(A)).

To establish a violation of the stabilization provision of EMTALA, a plaintiff must prove that:

> (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital . . . . bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.

*Alvarez-Torres*, 582 F.3d at 51 (quoting *Correa*, 69 F.3d at 1190).  The parties agree that EMMC is a participating hospital covered by EMTALA and that Ms. Morin arrived at its emergency room seeking treatment.

EMTALA has special provisions for pregnant women.  First, it specifically defines "emergency medical condition":

> **(B)** with respect to a pregnant woman who is having contractions--
> . . .
> > **(ii)** that [discharge] may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1)(B)(ii).[10]  If the patient is a "pregnant woman who is having contractions," EMTALA defines "to stabilize" to mean "to deliver (including the placenta)."  *Id.* § 1395dd(e)(3)(A).  The Department of Health and Human Services has promulgated EMTALA regulations that further illuminate the statute; one regulation addresses the meaning of "labor":

> Labor means the process of childbirth beginning with the latent or early phase of labor and continuing through the delivery of the placenta.  A woman experiencing contractions is in true labor unless a physician, certified nurse-midwife, or other qualified medical person acting within his or her scope of practice as defined in hospital medical staff bylaws and State law, certifies that, after a reasonable time of observation, the woman is in false labor.

42 C.F.R. § 489.24(b).

EMMC concedes that "[i]f Plaintiff had an 'emergency medical condition' as defined above, then EMMC would have been required, under EMTALA 'to stabilize' her, which, under the circumstances, would have required delivery, including of the placenta."  *Def.'s Mot.* at 5.  Thus, the sole remaining issue is whether EMMC determined that Ms. Morin was suffering from an "emergency medical condition" that required stabilization.  *Heimlicher v. Steele*, 615 F. Supp. 2d 884, 902-03 (N.D.

---

[10] Subsection (i) is limited to situations in which a hospital transferred a pregnant woman to another hospital.  42 U.S.C. § 1395dd(e)(1)(B)(i) (providing that a pregnant woman having contractions is suffering from an emergency medical condition when "there is inadequate time to effect a safe transfer to another hospital before delivery").

> Furthermore, Ms. Morin does not argue that she had an emergency medical condition under subsection (A), which provides:

>> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

>>> **(i)** placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>>> **(ii)** serious impairment to bodily functions, or
>>> **(iii)** serious dysfunction of any bodily organ or part.

*Id.* § 1395dd(e)(1)(A).

Iowa 2009) (stating that hospitals do not have a duty to stabilize patients suffering from an emergency medical condition, including pregnant woman in labor, absent knowledge of the emergency medical condition).

### 3.    The Parties' Positions

#### a.    EMMC

EMMC gives three arguments for why Ms. Morin was not suffering an "emergency medical condition," despite being a pregnant woman with contractions. First, EMMC argues that "EMTALA requires that a hospital stabilize a patient <u>only</u> if the hospital determines that an emergency medical condition exists." *Def.'s Mot.* at 5. Here, EMMC diagnosed Ms. Morin as having suffered a "missed abortion," which it says is not an "emergency medical condition" as a matter of law. *Id.* at 6-7. Because Ms. Morin was not diagnosed as being in labor, EMMC contends that EMTALA's obligation to stabilize never attached. *Id.* at 7.

Second, EMMC contends that "whether a pregnant woman is experiencing an 'emergency medical condition' is not simply a legal determination, divorced from how physicians define terms like 'labor' and 'contractions.'" *Id.* at 9. EMMC parses EMTALA's regulation, which states that "[a] woman experiencing contractions is in true labor unless a physician, certified nurse-midwife, or other qualified medical person . . .  certified that, after a reasonable time of observation, the woman is in false labor." *Id.* (quoting 42 C.F.R. § 489.24(b)). By not defining "false labor" and leaving the term's definition "up to physicians," EMMC argues that Congress intended EMTALA to "account for how those terms are used in the medical

14

profession by those physicians trained to use the term." *Id*. at 8-9. EMMC concludes that "viewing the statutory scheme and its regulations as a whole, the protections of (e)(1)(B) apply to pregnant women who are experiencing contractions related to labor and childbirth, rather than cramping associated with a missed abortion." *Id*. at 9. To hold otherwise, EMMC warns, "hospitals would be filled with pregnant women who experience some cramping." *Id*.

Third, EMMC argues that Ms. Morin cannot establish that it knew her discharge posed a threat to her health and safety. EMMC argues that the burden is on Ms. Morin to prove that "EMMC was aware that Plaintiff's miscarriage posed some threat to her in particular." *Id*. at 12. At oral argument, EMMC pressed that there is no record that the hospital knew of Ms. Morin's prior Caesarean section. EMMC argues there was no "determination here that Plaintiff was at risk if she were discharged" or "any indication in the medical records that EMMC was aware that Plaintiff posed any unique risk of hemorrhage, ruptured uterus, or any other complications, if discharged." *Id*. at 13.

### b.   Ms. Morin

Ms. Morin responds that "[t]here is no question here that EMMC was aware of Lorraine Morin's emergency medical condition." *Pl.'s Resp*. at 5. Ms. Morin contends that the hospital knew she was pregnant, knew she was having contractions, and knew that discharge might have proved a threat to her health. *Id*. at 5-6. Ms. Morin contends that these three facts overcome summary judgment. *Id*. at 6-7.

Ms. Morin argues that EMTALA does not track the medical definition of "labor" because EMTALA does not define an emergency medical condition in terms of labor. *Id.* at 7-8. Instead, Ms. Morin argues that its plain language applies to all pregnant women having contractions, regardless of whether the baby is viable or non-viable. *Id.* at 8. Furthermore, even if the definition of "labor" was applicable, Ms. Morin argues that the regulations assume that "a pregnant woman having contractions is in true labor, unless a doctor or other medical professional certifies that she is in false labor." *Id.* at 9. Because "there is no certification in the medical record," Ms. Morin argues that she was in true labor. *Id.*

Finally, Ms. Morin concludes that she easily fits within EMTALA's protections because she must only show "the presence of a <u>possible</u> threat of harm." *Id.* at 6-7 (quoting *Hongsathavij v. Queen of Angels/Hollywood Presbyterian Med. Ctr.*, 73 Cal. Rptr. 2d 695, 705 (Cal. Ct. App. 1998)) (emphasis added by Ms. Morin). She argues that she was "at significant risk for complications, including a ruptured uterus, because she had previously had a Caesarean section in the past." *Id.* at 6.

### 4. Ms. Morin and EMTALA's Protection of Pregnant Women

EMTALA extends protection to "a pregnant woman who is having contractions." 42 U.S.C. § 1395dd(e)(1)(B). Nothing in this requirement depends on the viability of the fetus and courts have extended EMTALA protections regardless of viability. *See, e.g.*, *Barrios v. Sherman Hosp.*, No. 06 C 2853, 2006 WL 3754922, at *4 (N.D. Ill. 2006) (denying motion to dismiss EMTALA claim from a woman who was discharged after a miscarriage but prior to the delivery of the placenta);

16

*Thompson v. St. Anne's Hosp.*, 716 F. Supp. 8, 9 (N.D. Ill. 1989) (denying motion to dismiss EMTALA claim from a woman who alleged the she was not stabilized when she arrived at the emergency room sixteen-weeks pregnant and in active labor). Ms. Morin was sixteen-weeks pregnant when she arrived at the emergency room. EMMC's medical records indicate that she was experiencing "suprapubic cramps" while at EMMC and "having some contractions" when discharged. *Medical Records* at 2, 10. Ms. Morin appears to fit within the plain language of EMTALA.

EMMC seeks to avoid this clear language by arguing that EMMC diagnosed Ms. Morin as having suffered a "missed abortion," not "as being in labor." *Def.'s Mot*. at 7. Because stabilization is required "only if the hospital determines that an emergency medical condition exists," EMMC argues that the relevant inquiry is its diagnosis, not Ms. Morin's objective condition. *Id*. at 5-6. EMTALA, however, turns on a determination, not a diagnosis: whether a patient is a pregnant woman having contractions is a fact, not a diagnosis. EMMC is correct that EMTALA would not apply if EMMC had not known either that Ms. Morin was pregnant or that she was having contractions. *Brenord v. Catholic Med. Ctr. of Brooklyn and Queens, Inc.*, 133 F. Supp. 2d 179, 191-92 (E.D.N.Y. 2001) (granting summary judgment on EMTALA stabilization claim because hospital was unaware that pregnant woman was in labor). But having determined that Ms. Morin was pregnant and having contractions, EMMC cannot avoid EMTALA by assigning her a different diagnosis.

EMMC's medical judgment does not trump the statute. If transfer of "a pregnant woman who is having contractions . . . may pose a threat to the health or

safety of the woman or the unborn child," she has an "emergency medical condition" by law regardless of whether she has one by medicine.[11]   EMMC is correct in pointing out that there may be tension between its determination and the statute's reach.   The statute generally defines "emergency medical condition" in a fashion congruent with a common sense definition of the phrase.   *See*, *e.g.*, 42 U.S.C. § 1395dd(e)(1)(A)(i) (defining "emergency medical condition" as *inter alia* "a medical condition . . . such that the absence of immediate medical attention could reasonably be expected to result in the placing of the individual . . . in serious jeopardy").   However, the statute treats pregnant women differently and imposes a specific definition of "emergency medical condition," which may or may not comport with what a physician would determine.   § 1395dd(e)(1)(B)(ii).   Here, in the context of this motion, Ms. Morin has produced evidence that if believed by a jury would confirm she was pregnant when she presented to EMMC ER and was experiencing contractions.   These facts, if proven, are sufficient to trigger the protections of EMTALA.

EMMC responds that EMTALA's implementing regulations make distinctions on the basis of the viability of the fetus.   *Def.'s Mot.* at 8 (citing 42 C.F.R. § 489.24(b)).[12]   The regulations define "labor" as

---

[11] To be clear, the statute and the regulation do not tell physicians how to practice medicine.   The question here is legal—whether EMTALA applies to a patient—not medical.   If it does, legal consequences ensue; if it does not, they do not.   The legal definitions do not direct the physicians or the hospital how to treat the woman medically, but they do direct the courts how she is to be treated legally.

[12] The Court is uncertain and does not decide whether the regulation, which defines "labor," pertains to this portion of EMTALA.   *Compare* 42 U.S.C. § 1395dd(e)(1)(B) (defining "emergency medical condition" as it applies to "a pregnant woman who is having contractions"), *with* 42 C.F.R. §

> the process of childbirth beginning with the latent or early phase of labor and continuing through the delivery of the placenta. A woman experiencing contractions is in true labor unless a physician, certified nurse-midwife, or other qualified medical person acting within his or her scope of practice as defined in hospital medical staff bylaws and State law, certifies that, after a reasonable time of observation, the woman is in false labor.

42 C.F.R. § 489.24(b). EMMC argues that "'labor' refers to 'the process of childbirth,' rather than defining it in a more general manner that could refer to missed abortions." *Def.'s Mot.* at 9 (quoting 42 C.F.R. § 489.24(b)). "In other words," says EMMC, "although section (e)(1)(B) refers to 'contractions,' it is clear that viewing the statutory scheme and its regulations as a whole, the protections of (e)(1)(B) apply to pregnant women who are experiencing contractions related to labor and childbirth, rather than cramping associated with a missed abortion." *Id.*

A straightforward reading of the regulation simply does not begin to support EMMC's questionable interpretation; there is no express or implicit requirement of viability. The regulation does not mention live birth. It focuses instead on the end result of the childbirth—the "delivery of the placenta," a phrase that encompasses both viable and nonviable fetuses.

---

489.24(b) (defining "labor" as "the process of childbirth beginning with the latent or early phase of labor and continuing through the delivery of the placenta").

   The Court is manifestly dubious about EMMC's stated fears that it will be inundated with pregnant women claiming that they are experiencing cramps and that EMTALA will require EMMC to stabilize them through delivery. Although EMMC argues that "[t]o avoid this absurd result," the Court must define labor to exclude missed abortions, EMMC never explains how doing so allows hospitals to discharge cramping pregnant women who "are not dilated enough to deliver." *Def.'s Mot.* at 9.

   Moreover, the solution to EMMC's asserted dilemma is found in the implementing regulations, which allow hospitals to avoid EMTALA liability by certifying that a pregnant woman is in false labor. If a pregnant woman is having contractions, the regulations require that the hospital see her through delivery unless it concludes and certifies she is in false labor.

EMMC further argues that because doctors certify when a patient is "in false labor," "Congress intended that, in application of EMTALA's requirements, physicians would be required to make certain medical judgments based on their medical education and experience." *Def.'s Mot.* at 9. Because medical doctors do not define contractions at early stages of pregnancy as "labor," EMMC argues "there could have been no certification by a physician that Plaintiff was 'in false labor' because, medically, she would not have been considered by a physician to be in 'false labor' (much less labor)." *Id.* at 10.

The Court disagrees. Even though "false labor is not defined," "labor" is. Regardless of what the physician may diagnose, the regulation says that a pregnant woman who is experiencing contractions is in true labor unless the hospital certifies that she is in false labor. Medical professionals are presumably expected to certify "false labor" in reference to the regulation's definition of "labor," not an external medical definition. *See Burditt v. U.S. Dep't of Health and Human Services*, 934 F.2d 1362, 1369 (5th Cir. 1991) (stating that EMTALA's statutory definition "renders irrelevant any medical definition of active labor").[13]

---

[13] EMMC argues that *Burditt* is inapplicable because it was written under an earlier version of EMTALA in which "the threshold question was whether the woman was 'in labor.'" *Def.'s Reply* at 5. However, subsequent amendments strengthen, rather than undermine, *Burditt*'s conclusion. In the pre-1991 version of EMTALA, "active labor" was defined as "labor at a time when (B) there is inadequate time to effect safe transfer . . . or (C) a transfer may pose a threat to the health and safety of the patient." *Burditt*, 934 F.2d at 1369. Because "labor" was not defined, the Fifth Circuit specified that "[a]ll agree that labor begins with the onset of uterine contractions." *Id.* at 1369 n.5. The Court found further support for its definition in the fact that "Congress explicitly recognized this definition of 'labor' in revising EMTALA." *Id.* (citing 42 U.S.C.A. § 1395dd(e)(1)(B) (West Supp. 1991)). In other words, *Burditt* concluded that Congress gave "labor" a non-medical statutory definition despite the fact Congress left the term undefined. As *Burditt* recognized, its conclusion was affirmed by subsequent revisions to EMTALA, which redefined coverage of pregnant women in relation to contractions, not labor. Other cases have since applied *Burditt*'s conclusion to the current version of EMTALA. *Torretti v. Paoli Mem'l Hosp.*, Civil Action No. 06-3003, 2008 WL 268066, at *4

Regarding EMMC's argument as a whole, the Court could not disagree more with EMMC at a most fundamental level.  EMMC contends that the protections of the portion of EMTALA specific to pregnant women obtain only to women who seek medical assistance for pregnancies that result in the birth of a live infant and that the protections of the statute are unavailable for pregnant women who end up aborting.  The Court is nonplussed at EMMC's disquieting notion that EMTALA and its regulations authorize hospital emergency rooms to treat women who do not deliver a live infant differently than women who do.  EMMC's contention is not justified by the language of the statute or its implementing regulations and has disturbing policy implications.  There is simply no suggestion that Congress ever intended such a harsh and callous result for women who, like Ms. Morin, are carrying a non-viable fetus.

### 5.    Whether Ms. Morin was at an Increased Risk of Complications

EMTALA applies to pregnant women with contractions to whom "[discharge from the hospital] may pose a threat to the health or safety of the woman or the unborn child."  42 U.S.C. 1395dd(e)(1)(B)(ii).  *Burditt*, the only federal court to interpret the "may pose a threat" language, viewed the requirement as a low hurdle. 934 F.2d at 1370.  Because other sections of EMTALA already afforded protection to "those with conditions that would *seriously* impair the patient's health absent immediate medical care," the Fifth Circuit reasoned that Congress intended the "may pose a threat" language to "require[] less of a showing of probability and

---

(E.D. Pa. Jan. 29, 2008) (quoting *Burditt* for the conclusion that EMTALA's statutory definition "renders irrelevant any medical definition of active labor").

severity of harm for women in labor than the general population." *Id*. Absent First Circuit authority, the Court applies *Burditt*. The Court interprets the "may pose a threat" requirement to require only a "showing of possible threat" to the health or safety or mother or unborn child. *Id*.

Again, the focus of the inquiry is on the determination of EMMC. Ms. Morin suggests that the test is objective, arguing that discharge may have posed a threat to Ms. Morin's health because "Ms. Morin was at significant risk for complications." *Pl.'s Resp.* at 6. However, EMTALA is clear that a hospital has a duty to stabilize only if "the hospital determines that the individual has an emergency condition." 42 U.S.C. § 1395dd(b)(1). Because only a subset of pregnant women with contractions has an emergency condition—those for whom discharge may pose a threat to the safety of the woman of the unborn child—the hospital must have determined both that Ms. Morin was having contractions and that her discharge may have posed a threat to her safety.

Even so, EMMC's motion for summary judgment is doomed because it is a question of fact whether EMMC knew that Ms. Morin's discharge posed a possible threat to her safety. EMMC argues that it was not "aware that Plaintiff posed any unique risk of hemorrhage, ruptured uterus, or any other complications, if discharged." *Def.'s Mot.* at 13. However, Ms. Morin informed the reception clerk, the triage nurse, and Dr. Reinstein that her primary care doctor had warned her of a heightened risk of complications. *DSMF* ¶ 3, 34. Furthermore, although Drs. Reinstein and Grover's notes do not mention Ms. Morin's previous Caesarean

section, the operation scar was presumably evident during their examinations, and Ms. O'Brien states that "the incidence for a ruptured uterus is higher" in such patients. *Letter from Ms. O'Brien.*

Buttressed by the expert testimony of Ms. O'Brien, Ms. Morin's statement of additional material facts creates a jury-worthy issue about whether there was a threat to her physical or emotional health from EMMC's discharge. *Cruz-Vázquez v. Mennonite Gen. Hosp., Inc.*, ___F.3d___, No. 09-1758, 2010 U.S. App. LEXIS 15263, at *3-4 (1st Cir. Jul. 26, 2010) (stating that "expert testimony is generally required to assess certain elements of an EMTALA claim").[14]  Ms. Morin states that after EMMC told her that her fetus was dead and that she had to leave, she protested and asked the physician to take care of her situation. *PSMF* ¶ 36.  She says Dr. Reinstein told her that "if she gave birth at home, to just dispose of it and call her doctor on Monday morning." *Id.* ¶ 37.  She says that at this point, her fiancé became upset at the discharge and "Dr. Reinstein's comment that they should throw their baby in the garbage, and told Dr. Reinstein and the nurse, Kim, that they were not leaving until this was taken care of." *Id.* ¶ 38.[15]  Dr. Reinstein and the nurse Kim told Ms. Morin and her fiancé that if they did not calm down and leave, the hospital would call security. *Id.* ¶ 39.  Ms. Morin was still in pain and

---

[14] Even though the First Circuit says that expert testimony is generally required to assess certain elements of an EMTALA claim, in the unusual circumstances of this case, it may be that Ms. Morin is not required to present expert testimony on the question of a threat to her emotional health from the discharge.  It would not seem to be a matter of expert testimony that telling a woman who has just learned that her fetus is dead to go home and if she delivered just dispose of the fetus, may pose a threat to her emotional health.

[15] As the Court understands it, Ms. Morin does not claim that Dr. Reinstein told her to throw the fetus in the garbage.  She alleges that he told her to dispose of it and her financé accused the doctor of telling them to throw the fetus in the garbage.

still having contractions when she left EMMC.  *Id.* ¶¶ 41-42.  After arriving home, Ms. Morin says that she continued to experience intense and more frequent contractions.  *Id.* ¶ 43.  She says that she spent hours that afternoon on her hands and knees in her bathroom until that evening, when she finally miscarried.  *Id.* ¶¶ 43-45.  Based on this evidence, Ms. Morin has presented a genuine issue of material fact as to whether discharging her without resolving her pregnancy may have posed a threat to her health.[16]

Summary judgment is inappropriate because whether EMMC knew that Ms. Morin was a pregnant woman having contractions and that her discharge posed a risk to her health are questions of material fact.

## III.   CONCLUSION

The Court GRANTS in part and DENIES in part Eastern Maine Medical Center's Motion to Exclude the Expert Testimony of Ms. O'Brien pursuant to Federal Rule of Evidence 702 and *Daubert/Kumho* (Docket # 18).  The Court DENIES Eastern Maine Medical Center's Motion for Summary Judgment (Docket # 18).[17]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of July, 2010

---

[16] The Court does not suggest that the discharge of every pregnant woman who is having contractions "may pose a threat to [her] health."  42 U.S.C. 1395dd(e)(1)(B)(ii).  Instead, here, where the hospital discharged a woman who is sixteen-weeks pregnant, who has just been informed her fetus is dead, who is having ongoing contractions, and who is in an extreme state of agitation and distress, the Court readily concludes that the Plaintiff presents sufficient evidence to allow the matter to proceed to trial.

[17] The Court DENIES EMMC's and Ms. Morin's requests to strike (Docket # 37); (Docket # 42).