UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| LORRAINE MORIN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CV-09-258-B-W |
| EASTERN MAINE MEDICAL CENTER, | ) ) ) ) |
| Defendant. | ) |

**ORDER ON MOTIONS *IN LIMINE*** 

With trial looming in this Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd *et seq.*, law suit, Lorraine Morin and Eastern Maine Medical Center (EMMC) filed multiple motions *in limine* to narrow the scope of permissible evidence. *Pl.'s Mot.* in Limine *to Limit Expert Test.* (Docket # 68) (*Pl.'s In Labor Mot.*); *Def. Eastern Me. Med. Ctr.'s Mot.* in Limine *to Exclude or Limit the Test. of Annette O'Brien, Pl.'s Designated Expert Witness* (Docket # 69) (*Def.'s O'Brien Mot.*); *Def. Eastern Me. Med. Ctr.'s Mot.* in Limine *Regarding Pl.'s Claim for Punitive Damages* (Docket # 70) (*Def.'s Punitive Damages Mot.*); *Pl.'s Mot.* in Limine *to Prevent Def.'s Expert, Dr. Gregory Gimbel, From Testifying That Pl. Was "Stable" When She Left EMMC* (Docket # 76) (*Pl.'s Gimbel Mot.*); *Pl.'s Mot. to Resolve Editing Issues Regarding Dep. of Dr. Gregory Gimbel* (Docket # 84) (*Pl.'s Editing Mot.*). They have responded.[1] *Pl.'s Mem. in Opp'n to Def.'s Mot.* in Limine *to Exclude or Limit the Test. of Annette O'Brien* (Docket # 73) (*Pl.'s O'Brien Resp.*);

---

[1] EMMC failed to respond to the Plaintiff's motion to edit Dr. Gimbel's deposition but nearly all the editing issues are foreshadowed by the substance of other motions and resolved by this Order.

*Pl.'s Mem. in Opp'n to Def.'s Mot.* in Limine *Regarding Pl.'s Claim for Punitive Damages* (Docket # 74) (*Pl.'s Punitive Damages Resp.*); *Def. Eastern Me. Med. Ctr.'s Opp'n to Pl.'s Mot.* in Limine *to Limit Expert Test.* (Docket # 77) (*Def.'s In Labor Resp.*); *Def. Eastern Me. Med. Ctr.'s Opp'n to Pl.'s Mot.* in Limine *to Prevent Def.'s Expert, Dr. Gregory Gimbel, From Testifying That Pl. Was "Stable" When She Left EMMC* (Docket # 92).

I. **PLAINTIFF'S "IN LABOR" MOTION (DOCKET # 68)**

   A. **Plaintiff's Contentions**

EMMC designated two treating physicians, Drs. Reinstein and Grover, and one non-treating physician as expert witnesses. *Pl.'s In Labor Mot.* at 1. The Medical Center has stated that Drs. Reinstein and Grover "are expected to testify about the course of treatment that each provided to Ms. Morin (and why) when they saw her at the emergency department of EMMC on July 1, 2007." *Id.* at 2. EMMC states that "[i]n particular, Drs. Reinstein and Grover will testify that Ms. Morin was not in labor at the time, that a fetal demise (miscarriage or abortion) had occurred. Drs. Reinstein and Grover will testify that Ms. Morin was stable at the time of her discharge and that because the fetus was dead, it was neither unstable nor at risk." *Id.* EMMC has designated Dr. Gimbel to testify that Ms. Morin "was not in labor, that she was experiencing a miscarriage or an abortion." *Id.*

Ms. Morin moves to exclude the anticipated testimony of all three physicians that she was not "in labor." *Id.* She explains that the word "labor" is effectively defined by the statute and therefore the physicians should not be allowed to replace

2

the statutory definition with their own. *Id.* Acknowledging that the Code of Federal Regulations contains a specific definition of "labor," she contends that the statute trumps the regulation. *Id.* at 3. However, if the regulation applies, she says that the regulation's definition must control the physician's view of the term and to allow the physicians to testify will confuse the jury. *Id.* Finally, she says that the "statutory definition [of active labor] renders irrelevant any medical definition of active labor." *Pl.'s in Labor Mot.* at 2 (quoting *Burditt v. U.S. Dep't of Health and Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991)).

EMMC has designated Dr. Gimbel to testify "that the care given to Ms. Morin at the emergency department at EMMC on July 1, 2007 was appropriate and reasonable under EMTALA." *Id.* at 4. Ms. Morin says that this proposed testimony is inappropriate because Dr. Gimbel is not an expert in EMTALA, because the issue in this case is not whether Ms. Morin's care was reasonable medically, but whether EMMC violated EMTALA, and because such testimony would invade the province of the jury and instruct the jury on the applicable law. *Id.* at 4-5.

### B.   Defendant's Response

EMMC responds that the testimony of the physicians about whether Ms. Morin was "in labor" from a medical viewpoint is directly relevant to the issue of threat of harm. *Def.'s In Labor Resp.* at 2. EMMC analyzes EMTALA by breaking down its requirements. To apply, the patient must come to the hospital in an "emergency medical condition," 42 U.S.C. § 1395dd(b)(1), and there is a specific definition of "emergency medical condition" for pregnant women:

3

> The term "emergency medical condition" means . . . with respect to a pregnant woman who is having contractions . . . that the transfer may pose a threat to the health or safety of the woman or unborn child.

42 U.S.C. § 1395dd(e)(B)(ii).[2] To fit within EMTALA, Ms. Morin must demonstrate that she was a pregnant woman, that she was having contractions, and that her transfer (including discharge) may have posed a threat to her health and safety or the health and safety of the unborn child. In EMMC's view, the proposed testimony of Drs. Reinstein and Grover is relevant to this last issue – health and safety. *Id.* at 2.

EMMC says that the resolution of this issue depends on whether EMMC subjectively determined that Ms. Morin's discharge may have posed a threat to her health or safety. *Id.* Indeed, EMMC contends that its medical assessment of her condition, including whether she was medically, as opposed to legally, in labor, is relevant to this determination. *Id.* EMMC distinguishes *Burditt* by saying that it was based on an earlier version of EMTALA, which has since been repealed, which contained a statutory definition of "active labor" and furthermore, the issue here is not whether she was in labor, but whether there was a threat to her health and safety if she was discharged. *Id.* at 3-4.

Turning to Ms. Morin's objection to Dr. Gimbel's proposed testimony, EMMC protests that Ms. Morin's objection is "terribly vague and conclusory." *Id.* at 5. Acknowledging that it designated Dr. Gimbel to testify about whether Ms. Morin was unstable or at risk of harm when she was discharged, EMMC says that Dr.

---

[2] The statutory definition under § 1395dd(e)(B)(i) also refers to a safe transfer to another hospital before delivery, but this part of the definition is not relevant to the facts in this case.

4

Gimbel should also be allowed to testify that EMMC complied with EMTALA. *Id.* It contends that Rule 704(a) allows an expert to testify about an "ultimate issue," *id.* (quoting Fed. R. Evid. 704(a)), and dismisses the concern that Dr. Gimbel's testimony would confuse the jury. *Id.* at 5-6. To the extent Ms. Morin is claiming that Dr. Gimbel is not qualified to express this opinion, EMMC disagrees, noting that as an experienced practicing obstetrician/gynecologist, Dr. Gimbel regularly deals with EMTALA's requirements for pregnant women. *Id.* at 6.

    C.    **Discussion**

Regarding the proposed testimony of Drs. Reinstein and Grover, the Court agrees with EMMC. EMTALA provides that if a patient comes into a hospital and the hospital determines that she has an emergency medical condition, the hospital has an obligation to stabilize her. 42 U.S.C. § 1395dd(b)(1)(A). For pregnant women, the statute defines an "emergency medical condition" in two ways. For a pregnant woman not having contractions, the standard definition of "emergency medical condition" applies:

> The term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A)(i-iii). For pregnant women having contractions, there is a separate definition:

> The term "emergency medical condition" means . . . with respect to a pregnant woman who is having contractions . . . (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1)(B)(ii). If the pregnant woman is not having contractions, the obligation to stabilize means that "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A). If the woman is "having contractions," the obligation to stabilize means "to deliver (including the placenta)." *Id.*

Piecing all these provisions together, the Court earlier concluded that if Ms. Morin was pregnant and having contractions, EMMC was obligated to allow her to remain at the hospital until she delivered unless her discharge would not pose a threat to her health or safety or the health or safety of the unborn child. *Morin v. Eastern Me. Med. Ctr.*, No. CV-09-258-B-W, 2010 U.S. Dist. LEXIS 76292, *33-34 (D. Me. Jul. 28, 2010). Consistent with *Burditt*, the Court has also ruled that the statutory language, "may pose a threat," requires only a "showing of possible threat." *Id.* *33 (quoting *Burditt*, 934 F.2d at 1370). At the same time, the language of the statute clarifies that the focus of this determination is on the hospital. *Id.*; 42 U.S.C. § 1395dd(b)(1) (stating that a hospital has a duty to stabilize only if "the hospital determines that the individual has an emergency condition").

The Court readily concludes that the proposed testimony of Drs. Reinstein and Grover is relevant to these inquiries. As a practical matter, it is likely that the

6

doctors who encountered Ms. Morin on July 1, 2010 followed a standard medical protocol: documenting a patient history, performing a physical examination, ordering tests and reviewing the results, arriving at a diagnosis, and establishing a treatment plan. In effect the testimony that EMMC proffers from these physicians reflects their professional knowledge of the event, and it would be artificial to substantially constrain their recollection. It is difficult to image how these doctors could testify at the upcoming trial without referencing their professional contact with Ms. Morin on July 1, 2007.

As Ms. Morin points out, however, this is not a medical malpractice case. Ms. Morin and EMMC will have the opportunity to place the testimony of Drs. Reinstein and Grover in proper legal context and the Court will instruct the jury on the elements of an EMTALA cause of action. In the end, it will be the jury's obligation to determine whether Ms. Morin has sustained her burden to prove an EMTALA violation based on all the evidence at trial.

Dr. Gimbel's proposed testimony presents a different issue. He was not Ms. Morin's treating physician. The Court easily concludes that Dr. Gimbel should be allowed to testify about his professional opinion as to whether Ms. Morin was stable or whether her discharge posed a risk of harm. These are matters well within his professional competence and, as just noted, his professional opinions will be cabined by instructions on the applicable law.

The Court is chary, however, about EMMC's proposal to ask Dr. Gimbel whether EMMC complied with EMTALA. It is true that Rule 704(a) provides that

"testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). But "the general rule is that it is the judge's role, not a witness's, to instruct the jury on the law." *Pelletier v. Main St. Textiles, LP*, 470 F.3d 48, 54 (1st Cir. 2006). To this end, a "district court has broad discretion to exclude expert opinion evidence about the law that would impinge on the roles of the judge and jury." *Id.*; *N. Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 468 (1st Cir. 1988).

Further, the Court is unconvinced that Dr. Gimbel, though certainly an expert in medicine, is an expert in EMTALA. *Crowe v. Marchand*, 506 F.3d 13, 17 (1st Cir. 2007) (stating that to supply opinion testimony, an expert must be "qualified . . . by knowledge, skill, experience, training, or education" and must possess specialized knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue") (quoting Fed. R. Evid. 702).

Pretrial, the Court will not exclude Dr. Gimbel's proferred testimony but before EMMC questions him about whether it complied with EMTALA, counsel for EMMC must alert the Court and obtain a trial ruling.

## II.  DEFENDANT'S O'BRIEN TESTIMONY (DOCKET # 69)

### A.  Defendant's Contentions

Following the Court's July 28, 2010 Order granting in part and denying in part EMMC's motion *in limine* regarding the expert testimony of Nurse Annette O'Brien, EMMC moves a second time to further limit Nurse O'Brien's testimony.

*Def.'s O'Brien Mot.* EMMC is concerned about a single sentence in the Court's prior order. *Id.* at 3-4. The sentence is:

> Ms. O'Brien may also testify as a nurse about "potential complications that a woman in Ms. Morin's condition may have faced."

*Morin*, 2010 U.S. Dist. LEXIS 76292 at *14; *see Def.'s O'Brien Mot.* at 3-4. EMMC protests that "may have faced" is "unduly speculative" and that "a woman in Ms. Morin's condition" implies testimony about a hypothetical person, not Ms. Morin. *Def.'s O'Brien Mot.* at 4-5. EMMC reiterates its earlier objection to Nurse O'Brien's testimony "that any testimony from her concerning risks to [Ms. Morin] upon discharge is beyond her expertise." *Id.* at 5.

EMMC next contends that Nurse O'Brien should not be allowed to testify about "complications that Plaintiff faced as a result of her being in labor," about her "risk of postpartum depression," or about alternative medical treatments. *Id.* at 6-10. Essentially, EMMC argues that because Nurse O'Brien is not a physician, these medical issues are beyond her expertise. *Id.*

### B. Plaintiff's Response

Ms. Morin agrees that Nurse O'Brien cannot testify about whether Ms. Morin was "in labor," but for a different reason. *Pl.'s O'Brien Resp.* Ms. Morin contends that the statutory definition of "labor" controls and that whether she was in labor is not properly the subject of any testimony. *Id.* at 2. Regarding EMMC's concern about Nurse O'Brien's hypothetical testimony, Ms. Morin reassures the Court that Nurse O'Brien does not intend to testify about hypothetical patients; she intends to testify about Ms. Morin. *Id.* at 2-3. She responds to EMMC's "may have faced"

9

contentions by referring to the *Burditt* standard that the Court earlier adopted, requiring only a "showing of possible threat." *Id.* at 3. Ms. Morin contends that Nurse O'Brien is competent to testify as a nurse about postpartum depression, but agrees that she is not competent to testify about alternative medical treatments. *Id.* at 4-5.

### C. Discussion[3]

Although the parties appear to agree about whether Nurse O'Brien should be allowed to testify about whether Ms. Morin was "in labor," they do not. EMMC contends that Nurse O'Brien is not competent to testify that Ms. Morin was "in labor"; in her response, Ms. Morin omitted the issue of competency and used the response to reiterate her separately-expressed position that there should be no testimony at all on this issue because the issue is resolved by the statutory definition of labor. The Court concludes that Nurse O'Brien may testify about whether Ms. Morin was "in labor" since such testimony fits within the scope of a nurse's diagnostic authority in the state of Maine. 32 M.R.S. § 2102(2)(A)(1)-(3). However, a nurse's "diagnostic privilege is distinct from medical diagnosis," *id.* at § 2102(2)(A)(1) so Nurse O'Brien's testimony must be limited accordingly

The parties truly agree that Nurse O'Brien will testify about Ms. Morin and not about a hypothetical patient and they agree that she will not testify about treatment alternatives. The Court accepts the parties' agreement on these limitations of Nurse O'Brien's testimony.

---

[3] To the extent the Court allows Nurse O'Brien – or the other experts – to testify, it is on the assumption that proffering counsel will properly qualify the witness and will establish an appropriate foundation for their expert testimony.

10

This leaves whether Nurse O'Brien may testify about potential complications and postpartum depression. Assuming a proper foundation is laid for these opinions, the Court will allow Nurse O'Brien to testify as a nurse on these areas. As to a nurse's competency, the Maine nursing statute expressly authorizes nurses to arrive at diagnoses and to treat "human responses," which include "signs, symptoms and processes that denote the individual's health needs or reaction to an actual or potential health problem." *Id.* at § 2102(2)(A)(2). Second, under *Burditt*, the standard for "may pose a threat" under 42 U.S.C. § 1395dd(e)(1)(B)(ii) "does not require proof of a reasonable medical probability that any threat will come to fruition." *Burditt*, 934 F.2d at 1370. It is sufficient that the Plaintiff demonstrate that she faced a "possible threat." *Id.* "Congress rationally required less of a showing of probability and severity of harm for women in labor than the general population under its definition of emergency medical condition." *Id.*

Except to the extent agreed upon by the parties, the Court denies EMMC's motion *in limine* to limit Nurse Annette O'Brien's testimony.

## III.  DEFENDANT'S PUNITIVE DAMAGES MOTION (DOCKET # 70).

### A.  Defendant's Contentions

Under 42 U.S.C. § 1395dd((d)(2)(A), EMTALA provides:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

11

EMMC contends that this provision adopts the law of the state of Maine on damages, including punitive damages. *Def.'s Punitive Damages Mot.* at 6. To obtain punitive damages in Maine, a plaintiff bears the burden to prove express or implied malice by clear and convincing evidence. *Id.* at 6-7 (citing *Batchelder v. Realty Res. Hospitality, LLC*, 2007 ME 17, ¶ 13, 914 A.2d 1116, 1121-22). EMMC seeks to prohibit Ms. Morin, "through testimony or argument, from referring to or mentioning punitive damages other than as the standard for punitive damages has been articulated by the Maine Law Court." *Id.* at 7.

EMMC also seeks an order prohibiting Ms. Morin from mentioning punitive damages in her opening statement to allow the Court to determine whether at the close of her evidence, she should be allowed to proceed with a punitive damages claim. *Id.* at 7-8. EMMC is concerned that the jury will confuse the EMTALA standard with the punitive damages standard. *Id.* at 8.

### B. Plaintiff's Response

Ms. Morin agrees that state of Maine law on punitive damages applies to her claim. *Pl.'s Punitive Damages Resp.* at 1-2. She objects to a prohibition against referring to punitive damages in her opening statement, contending that she might be entitled to punitive damages based on EMMC's outrageous conduct in this case. *Id.* at 2. Acknowledging that there is no evidence of actual malice, she argues that the evidence of outrageous conduct from which malice may be implied, will be sufficient to generate a jury question. *Id.* Ms. Morin concedes that there is a risk the Court will grant a directed verdict on the issue of punitive damages and she

must make a tactical decision as to whether to press the issue in her case in chief; however, she argues that such a tactical decision "should be made by Plaintiff's counsel, not the Court." *Id.* at 2-3.

### C. Discussion

The Court agrees that state of Maine law on damages, including punitive damages, applies to Ms. Morin's EMTALA claim, 42 U.S.C. § 1395dd((d)(2)(A), and that under the Maine standard, a plaintiff must prove actual or implied malice by clear and convincing evidence in order to sustain a claim for punitive damages. *Batchelder*, 2007 ME ¶ 13, 914 A.2d at 1121-1122.

The remaining question is whether Ms. Morin should be allowed to press her claim for punitive damages in her case in chief. The Court will defer ruling on this issue until it has had an opportunity to discuss the matter with counsel. At this point, the Court is inclined to order the trial bifurcated with the question of liability and compensatory damages tried first and, if the jury finds liability, punitive damages tried second. Doing so would benefit Ms. Morin since she would not be forced to make the "tactical decision" as to whether to press punitive damages at the outset and run the risk that the Court might countermand this portion of her claim and thereby undercut her credibility before the jury. It would also benefit EMMC since the hospital could focus its defense on liability and compensatory damages without the cloud of actual or implied malice. It would enhance efficiency since if the jury renders a verdict for EMMC on liability in the initial phase, there will be

no need to expend the efforts of counsel, juror time and judicial resources on a moot issue.

The benefits are not unalloyed. The jury will not know about the claim for punitive damages until after it issues its first verdict and learning that their job is not done may cause juror irritation. Whether the parties would be given a limited opportunity to introduce further evidence remains to be seen. Nevertheless, if the issue of punitive damages is reached, the Court will instruct the jury on the law applicable to punitive damages claim and allow counsel to make brief closing arguments on the question of punitive damages.

As EMMC did not request bifurcation and Ms. Morin has not formally stated her position on the issue, the Court will hear from counsel before making a final decision.

## IV.    PLAINTIFF'S GIMBEL MOTION (DOCKET # 76)

### A.    Plaintiff's Contention

In its designation of Dr. Gregory Gimbel as its non-treating expert, EMMC has stated that he will testify that "neither [Ms. Morin nor the fetus, since it was dead, was in danger, unstable, or otherwise at risk and that she did not need to be admitted at that time." *Pl.'s Gimbel Mot.* at 1. In his deposition, Dr. Gimbel testified: "I believe that stability has to do with her medical condition at the time that - - at that time that she was evaluated and by any parameters that we use, it appeared to be that she was stable." *Id.* Under EMTALA, "to stabilize" means as to a pregnant woman who is having contractions, "to deliver (including the placenta)."

42 U.S.C. § 1395dd(e)(3)(A). Ms. Morin says that Dr. Gimbel's medical definition of "stable" is at odds with EMTALA's definition of "stable" and seeks to exclude his testimony on stability as contrary to the law.

### B. Defendant's Response

EMMC responds that Ms. Morin's position ignores the provision in EMTALA that says that its obligations under EMTALA arise only if a patient is pregnant, having contractions, and its discharge of the woman would "pose a threat to the health or safety of the woman or the unborn child." 42 U.S.C. § 1395dd(e)(1)(B)(ii). It contends that Dr. Gimbel's testimony is relevant to determining whether those conditions existed. *Def.'s Gimbel Resp.* at 1-3.

### C. Discussion

The Court has addressed this contention in a slightly different context in its discussion of the "in labor" argument. *See* Part I(C). For the reasons previously discussed, the Court denies Plaintiff's motion *in limine* to exclude or limit Dr. Gimbel's testimony.

## V. PLAINTIFF'S EDITING MOTION (DOCKET # 84)

EMMC designated Dr. Gimbel's entire deposition transcript to be read to the jury during trial. *Pl.'s Editing Mot.* at 1. Ms. Morin objects to portions of the deposition. *Id.* Consistent with her position on the "in labor" and "Gimbel" motions, she asks the Court to strike five areas of Dr. Gimbel's testimony. *Id.* Attach. 1. As the Court has resolved those motions against Ms. Morin, the Court denies her motion on those grounds.

She has also objected to a speaking objection and an improper objection. Placed in context, the two objections occur in this line of questioning:

> Q. And you have reviewed Ms. Morin's deposition testimony where she testified that the hospital threatened to call security if she didn't leave?
> A. I saw that she said that. I didn't see that in the - - in the medical records anywhere.
> Q. Does having that information affect your opinions in any way?
> Mr. Schelling: Excuse me, just for clarification, that she made that allegation or assuming that it is true?
> Ms. Farr: That's a speaking objection. If you want to object to form, that's fine. But if you understand the question, Doctor, you can answer it.
> A. I guess I would like you to restate the question please.
> Q. Does having read Ms. Morin's deposition and having seen her testimony that she was threatened with security if she didn't leave the hospital, does that affect your opinion as to whether she was at any risk to her health, either emotionally or physically?
> Mr. Schelling: Objection to form. You can answer.
> A. I do have some opinions about that.

*Def. Eastern Me. Med. Ctr.'s Resp. to Pl.'s Req. to Strike Certain of EMMC's Statements of Material Facts and EMMC's Reply Statement of Material Facts*, Attach. 1 *Dep. of Dr. Gimbel* 21:2-25 (Docket # 42).

What occurred is that Plaintiff's counsel asked a question and after a defense objection, the witness asked Plaintiff's counsel to rephrase the question and Plaintiff's counsel rephrased it. In doing so, any objection to the earlier-asked question became moot. Accordingly, the Court overrules counsel's objection to the so-called speaking objection and strikes the interchange from line 7 through line 17 (from "Does that information affect your opinions in any way?" through "I guess I would like you to restate the question please.").

The Court reserves ruling on Mr. Schelling's objection. The question as phrased is problematic. Presumably Mr. Schelling's objection to form is based on his contention that the question is in part vague and in other part assumes facts not in evidence. By the time Dr. Gimbel's deposition testimony is read, however, the Court assumes there will be evidence that Ms. Morin was threatened with security if she did not leave the building so that the evidentiary predicate for the second part of the question will probably be before the jury. Regarding whether Dr. Gimbel read Ms. Morin's deposition, it is highly unlikely the entire Morin deposition will be before the jury. The Doctor's response, however, is relevant since it addresses one of the key issues in the case – namely whether Ms. Morin's physical or emotional health was at risk from the discharge. The Court urges counsel to consult with each other and attempt to resolve this issue either by eliminating the first part of the question or by substituting an admissible substitute by agreement, and to inform the Court as soon as possible as to whether a final ruling will be necessary.

## VI.   CONCLUSION

The Court DENIES the Plaintiff's Motion *in Limine* to Limit Expert Testimony, except that the Court DEFERS ruling until trial on whether Dr. Gimbel will be allowed to testify about compliance with EMTALA (Docket # 68). Except to the extent agreed to by the parties, the Court DENIES Defendant's Motion *in Limine* to Exclude or Limit the Test. of Annette O'Brien, Pl.'s Designated Expert Witness (Docket # 69). The Court GRANTS in part and DEFERS ruling in part on Defendant's Motion *in Limine* Regarding Plaintiff's Claim for Punitive Damages

(Docket # 70). The Court DENIES Plaintiff's Motion *in Limine* to Prevent Defendant's Expert, Dr. Gregory Gimbel, From Testifying That Plaintiff Was "Stable" When She Left EMMC (Docket # 76). The Court DENIES in part, and DEFERS in part Plaintiff's Motion to Resolve Editing Issues Regarding Deposition of Dr. Gregory Gimbel (Docket # 84); the Court STRIKES lines 7 through 17 from page 21 of Dr. Gregory Gimbel's deposition and DEFERS ruling on the objection to form on lines 23-24.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 12th day of October, 2010