# Exhibit 1

**1**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LORRAINE WATSON,       )
                       )
        Plaintiff,     )
                       )
vs.                    )    Civil Action
                       )    No.1:09-cv-00258
EASTERN MAINE MEDICAL CENTER,   )
                       )
        Defendant.     )

DEPOSITION of LORRAINE (WATSON) MORIN,
taken pursuant to Notice, at the offices of Gross,
Minsky & Mogul, P.A., 23 Water Street, Bangor, Maine,
beginning at 9:25 a.m., November 24, 2009, before
Rebecca M. Pearson, a Notary Public in and for the
State of Maine.

APPEARANCES:

For the Plaintiff:      JULIE D. FARR, ESQ.

For the Defendant:      GEORGE C. SCHELLING, ESQ.

Rebecca M. Pearson, RPR
PEARSON REPORTING, INC.
P.O. Box 1538
Bangor, Maine 04402-1538
(207) 945-6880

---

**2**

WITNESS INDEX

WITNESS: LORRAINE (WATSON) MORIN          Page
    Examination by: Mr. Schelling          3

INDEX OF EXHIBITS

| No. | Description | Marked |
|-----|------------|--------|
| 1 | Emergency Department record | 41 |
| 2 | Let. from Ms. Watson to Dr. Gilmore, dated 7/16/07 | 46 |

---

**3**

1      (This deposition was taken before Rebecca

2   M. Pearson, RPR, a Notary Public for the state of

3   Maine, at the offices of Gross, Minsky & Mogul, P.A.,

4   23 Water Street, Bangor, Maine, on November 24, 2009,

5   beginning at 9:25 a.m.)

6      (The deponent was administered the oath by

7   the Notary Public.)

8   **LORRAINE (WATSON) MORIN**, having been duly sworn by the

9   Notary Public, was examined and deposed as follows:

10              DIRECT EXAMINATION

11  BY MR. SCHELLING:

12  Q   Mrs. Morin, as you know, my name is George Schelling.

13  A   I didn't, but now I do.

14  Q   Okay.  That's fine.

15      As you know, I'm here representing Eastern Maine

16  Medical Center.  We are going to take your deposition

17  this morning, and I'm sure you've had an opportunity

18  to talk to Miss Farr about that, but I just want to

19  put a few requests on the record to make sure we're

20  clear.

21      Do you understand that everything we say today is

22  going to be taken down in a transcript and will be

23  available later on, as the case moves forward?

24  A   Yes, yeah.

25  Q   Do you understand that you're under oath, and the oath

---

**4**

1   that you've taken is the same that you would take if

2   this case goes to trial?

3   A   Yes.

4   Q   Because we're trying to create an accurate written

5   record, there are a few very important rules.

6      A couple of just basic structural type requests

7   are if you will please make sure that all your answers

8   are in words --

9   A   Okay.

10  Q   -- rather than nods and sounds that aren't clear on a

11  written record.

12      I would also ask that you try to make sure you

13  don't answer my question until I finish asking it,

14  even though you may know what's going to happen

15  because we're both talking at the same time, and again

16  we have trouble with a clear record.  Okay?

17  A   Okay.

18  Q   More substantively, it's very important that you give

19  me answers to questions you understand and that

20  they're the best answers you can provide.

21      So to that end, will you tell me if my questions

22  are unclear so I have a chance to rephrase them?

23  A   Absolutely.

24  Q   Okay.  So it would be fair, if you answer a question,

25  for me to assume that you've understood it?

41

1   A   No.
2   Q   Do you recall how long Dr. Reinstein was with you on
3       either of the two times he was there?
4   A   No.
5       (A recess was taken from 10:21 a.m. to 10:27 a.m.)
6       (Deposition Exhibit 1 was marked for
7       identification.)
8   BY MR. SCHELLING:
9   Q   I've marked the record, what I believe to be the
10      complete record, from the 7/1 visit as Exhibit 1.
11      Let me just turn your attention to page 28.  You
12      earlier indicated that you signed a consent form.
13      Is that your signature on page 28?
14  A   (Examining document) Yes, it is.
15  Q   I take it you were -- you were frustrated with the
16      information you were getting from the -- from the
17      caregivers at Eastern Maine?
18  A   At that moment?
19  Q   Yes.
20  A   I was in pain.
21  Q   During the course of that admission though or that
22      visit, is it fair to say that you felt more urgency
23      about your circumstances than they seemed to feel?
24  A   Yes.
25  Q   Basically what they were saying and what they were

42

1       doing suggested there wasn't an urgency, but you felt
2       there was?
3   A   Yes.
4   Q   They felt -- from what they said and what they did,
5       you got the sense that they thought everything was
6       okay, was stable, but you felt it wasn't?
7       MS. FARR:  I'm going to object to the form
8       of the question.
9       You can answer.
10  A   Ask that question again.
11  BY MR. SCHELLING:
12  Q   Yeah.  Is it fair to say that from what you drew from
13      what they were saying, they thought everything was
14      essentially okay; it was predictable; it was under
15      control; it was stable, but --
16  A   I can't assume that.
17      MS. FARR:  Wait.  Same objection.
18      But go ahead.
19  BY MR. SCHELLING:
20  Q   I'm not asking you to assume anything.  I'm asking
21      from your impression.
22  A   You want my impression of what I thought they thought?
23  Q   Yeah.  The message they were giving to you.  You were
24      frustrated, you told us --
25  A   I was frustrated because I felt they didn't want to

43

1       deal with me.
2   Q   Okay.
3   A   And I was in pain, and it was 6:30 in the morning.
4       Time for change of shift.
5   Q   Did they convey to you that they thought the situation
6       would be under control, and you could handle it
7       appropriately if you went home?
8   A   No, no, they did not.
9   Q   Okay.  What were they telling you?
10  A   To call my doctor on Monday, and if anything happens
11      in between, if I was to give birth, just dispose of
12      it, meaning -- it meaning the baby and call my doctor
13      on Monday.
14  Q   Okay.  Now, on page 28, the instructions you got said
15      to call your doctor if you get worse instead of
16      better, if you have any new symptoms.
17      So you understood if anything changed, you
18      should --
19  A   Call my doctor.
20  Q   Call your doctor?
21  A   Yeah.
22  Q   Did you ever call your doctor?
23  A   Absolutely.
24  Q   And when did you call?
25  A   At 7:30 Monday morning after everything had

44

1       transpired, yeah.
2   Q   You did not call your doctor until 7:30 Monday
3       morning?
4   A   Her office wasn't open.  No, I did not call my doctor
5       until 7:30 the next morning.
6   Q   You knew though that your doctor had an on-call
7       after-hours service, correct?
8   A   Yes.
9   Q   And you did not call that service, correct?
10  A   I wasn't told to call them.  I was told to call my
11      doctor's office.
12  Q   When you call your doctor's office after hours, you
13      got a --
14  A   Service.
15  Q   -- a service --
16  A   Yeah.
17  Q   -- that paged your doctor, and the doctor could -- or
18      the on-call doctor could call you back, correct?
19  A   I knew about the service, yes.
20  Q   Okay.  And so you knew that on that Sunday evening if
21      you called your doctor's office, you could expect to
22      get a call back from the doctor on call, correct?
23  A   Yes.
24  Q   But I just want to be clear, you did not call?
25  A   No, I did not call them back.

**53**

1 Q  Is part of your disappointment at the care in 2007
2    your comparison of it with the care you received at
3    the earlier miscarriage?
4 A  Do I use that as a comparison?
5 A  Yes.
6 A  Absolutely.
7 Q  Do you use anything else as a comparison?
8 A  Every birth that I've had.
9 Q  With the -- are you considering this a birth?
10 A  Yes.
11 Q  Are you comparing the disappointment that you received
12    here at Eastern Maine in 2007 with any policy at St.
13    Joseph's Hospital?
14 A  No.
15 Q  Why didn't you go to -- that night go to the hospital
16    in Millinocket or the hospital in Lincoln?
17 A  They don't do OB in Millinocket, and I did not know
18    whether they did OB in Lincoln.  I assumed critical
19    access you don't do OB.
20 Q  But I think you just told us you were expecting to
21    give birth at Lincoln.
22 A  Mm-hmm.  Yeah.
23 Q  So they must do OB.
24 A  Yes, they do, but I did not know that at the time, no,
25    because I would have gone to Lincoln.

**54**

1 Q  I take it you didn't call Lincoln either to find out?
2 A  No, no.
3 Q  At what time in the afternoon did the pains become
4    continuous?
5 A  After, after my kids left.  Sometime in the afternoon.
6    I don't know the exact time.  When I say afternoon, I
7    mean after noontime sometime.  Could have been one,
8    could have been two.
9 Q  Well, it says later on in the afternoon.
10 A  Mm-hmm.
11 Q  That doesn't suggest that you meant three, four, five
12    o'clock?
13       MS. FARR:  I object to the form of the
14    question.
15 BY MR. SCHELLING:
16 Q  You don't remember at this time?
17 A  I really don't remember.
18 Q  Please describe what happened.
19 A  What happened --
20 Q  Well, you started --
21 A  -- in the afternoon?
22 Q  You started getting intense pain.
23 A  Okay.  It just became worse and worse.  There's no
24    time between any of it.  It just -- it was constant
25    the entire time, and I basically spent, I would say,

**55**

1    pretty much the entire time in my bathroom on my hands
2    and knees, because it was the only position -- the
3    only thing that even made me not want to pass out
4    basically because my head started ringing.  It just --
5    it was so intense I just wanted to stay awake, stay
6    aware.
7 Q  How long did that process go on?
8 A  Hours, hours.
9 Q  Can you give me any idea?
10 A  Hours.
11 Q  How many hours?
12 A  I can't even tell you how many hours, but hours.  And
13    then I finally started getting that feeling that I
14    wanted to push, and fluid came out, and my son came
15    out, and the pain started subsiding.
16 Q  Do you have any recollection of the -- of how your
17    pain was treated in your previous pregnancies?
18 A  I don't remember with my son.  My daughter I had an
19    epidural after a few hours.  I know I had pain
20    medicine with the second pregnancy because I know I
21    didn't go through this.
22 Q  Have you had any subsequent interactions of any kind
23    with Dr. Reinstein?
24 A  Dr. Reinstein, no.
25 Q  With Dr. Grover?

**56**

1 A  No, no.
2 Q  With Kim?
3 A  No.
4 Q  With anyone at Eastern Maine Medical Center?
5 A  With anyone at Eastern Maine Medical Center since it
6    happened?
7 Q  Yes.  About these events.
8 A  Yes.
9 Q  What --
10 A  Dr. Gilmore when I went into her office the next
11    morning.
12 Q  Have you spoken about these events with anyone, other
13    than Dr. Gilmore at Eastern Maine?
14 A  The nurse practitioner that works in her office.
15 Q  And her name is?
16 A  Lois Bergman.
17 Q  Have you discussed it with anyone other than those
18    two?
19 A  At Eastern Maine?
20 Q  Yes.
21 A  The nurse that works in their office, the OB office.
22 Q  Do you know her name?
23 A  I don't remember her name.
24 Q  Anyone else?
25 A  Not that I remember, no.

**65**

1 postpartum depression. This -- I didn't want to speak
2 to anyone after this happened, so it was very hard for
3 me because every time I'd talk about it, I'd relive
4 it.
5 Q So it was a period of weeks or months after --
6 A Yes.
7 Q -- after July 1st, 2007, before you first actually
8 received counseling?
9 A Right.
10 Q And then you say -- I think you told me that you
11 received it for about a month and a half?
12 A Somewhere around there, yeah.
13 Q The -- what were the symptoms of your postpartum
14 depression with your earlier three pregnancies?
15 A Not wanting to do anything but becoming obsessed on
16 certain things being taken care of. I would fixate on
17 one thing, like reading or work or something,
18 housework, but not wanting to -- just not wanting to
19 do anything. I don't want to talk to anyone. I don't
20 want to do anything. I just -- I was trapped in my
21 own world.
22 Q Did you have similar problems after the fourth
23 pregnancy?
24 A Yeah.
25 Q Were they different in any way?

**66**

1 A Similar characteristics.
2 Q Was the duration about the same?
3 A For a few months, yeah.
4 Q And, I'm sorry, you started to tell me about some
5 medication you received through Dr. Gilmore's office.
6 That was Wellbutrin?
7 A Right.
8 Q How long did you receive that?
9 A It was that one-time prescription that she gave me. I
10 had taken Wellbutrin before for helping me to quit
11 smoking. She assumed it would work -- would help me
12 through this also because what it does is it keeps me
13 calmer so I can rationally work through things,
14 stressful situations when they happen.
15 Q And how long did you take the Wellbutrin?
16 A Oh, God, maybe a month and a half and I stopped.
17 Q And did you take it according to the --
18 A Yes.
19 Q -- instructions --
20 A Yeah.
21 Q -- from Dr. Gilmore's office?
22 A I did.
23 Q Other than that one period of a month and a half in
24 Lincoln, have you ever received any counseling?
25 A Formal counseling?

**67**

1 Q Yes.
2 A Only from my doctors. Only from my primary care
3 provider. Dr. Nash and I talked quite a bit. I did
4 not go to a counselor, so to speak.
5 Q And what did you talk to Dr. Nash about?
6 MS. FARR: I'll object to that. That's
7 physician-patient privilege.
8 MR. SCHELLING: Well, once she makes a claim
9 for emotional distress, her -- any prior record of
10 emotional distress becomes relevant.
11 MS. FARR: I disagree. Judge Kravchuk has
12 ruled that garden-variety emotional distress you don't
13 get counseling records.
14 MR. SCHELLING: I'm simply -- I'm simply
15 asking what she was talking about. I don't know
16 whether it's garden-variety.
17 MS. FARR: Well, it's privileged.
18 MR. SCHELLING: Do you really want to take
19 that to the judge?
20 MS. FARR: Absolutely.
21 THE WITNESS: Mm-hmm.
22 MR. SCHELLING: Okay. You're instructing
23 her not to answer?
24 MS. FARR: That's right.
25 //

**68**

1 BY MR. SCHELLING:
2 Q Just to be clear, I am trying to find out what it was
3 that you spoke to Dr. Nash about that was -- on a
4 number of occasions, I understand, that caused you
5 some emotional distress; and on the advice of your
6 attorney, you refuse to answer that question, correct?
7 A Absolutely, yes.
8 Q When you had your prior miscarriage, your second -- in
9 your second pregnancy --
10 A Mm-hmm.
11 Q -- I understand that at the time you didn't realize
12 you were pregnant at all?
13 A Right.
14 Q Nonetheless, as I understand it, that was also Mr.
15 Morin's child?
16 A No.
17 Q That was Mr. Watson's child?
18 A Yes.
19 Q Was that -- when you -- was there remorse at losing
20 that child?
21 A Absolutely.
22 Q And did the postpartum depression after the second
23 pregnancy -- or strike that.
24 Was the postpartum depression after the second
25 pregnancy different from the first and third because

73

1  Q   Did you treat with Dr. Nash just while you lived in
2      Porter --
3  A   No. When I lived in Limington and Standish also.
4          MR. SCHELLING: Off the record.
5          (Colloquy off the record)
6  BY MR. SCHELLING:
7  Q   And just so I understand, the disappointment, the term
8      you used, at the care you received at Eastern Maine
9      Medical Center is basically that -- that's the result
10     of the care you were provided, correct?
11         Let me -- strike that and let me start again.
12         What you are claiming as a result of the care
13     provided at Eastern Maine Medical Center is the
14     disappointment you've described, correct; it's the
15     emotional damage and --
16 A   Did what happened at Eastern Maine cause this; is that
17     what you're --
18 Q   No. I'm sorry. I just want to make sure I've got all
19     of those kinds of damages that you're looking for. I
20     know that you're not looking for lost wages, and I
21     take it you're not looking for medical expenses.
22 A   No.
23 Q   You're looking for the emotional distress that you
24     endured as a result of the care. And that's it,
25     correct?

74

1  A   Yes. I believe so, yes.
2  Q   Yeah. Okay. In this letter it says -- I'm looking
3      towards the bottom of page 2 -- at around 2100 on July
4      1st, I had then given birth at my home.
5  A   Yeah.
6  Q   Is that -- should I understand that that's about the
7      time that you gave birth, around nine o'clock that
8      night?
9  A   Yes.
10         MR. SCHELLING: Good. I'm all set. Thank
11     you.
12         MS. FARR: No questions. Thank you.
13     She will read and sign.
14         (The deposition concluded at 11:26 a.m.)
15
16
17
18
19
20
21
22
23
24
25

75

CERTIFICATE
    I, Rebecca M. Pearson, RPR, a Notary Public in
and for the State of Maine, hereby certify that on the
24th day of November, 2009, personally appeared before
me at the offices of Gross, Minsky & Mogul, P.A., 23
Water Street, Bangor, Maine, the within-named
deponent, LORRAINE (WATSON) MORIN, who was sworn to
testify the truth, the whole truth, and nothing but
the truth in the cause of action LORRAINE WATSON v.
EASTERN MAINE MEDICAL CENTER.
    I further certify that this deposition was
stenographically reported by me and later reduced to
computerized transcription, and that the foregoing is
a full and true record of the testimony given by the
deponent.
    I further certify that I am a disinterested
person in the event or outcome of the above-named
cause of action.
    IN WITNESS WHEREOF, I subscribe my hand and affix
my seal this 8th day of December, 2009.


                    Rebecca M. Pearson
                    Rebecca M. Pearson, RPR
                    Notary Public
My commission expires:
February 22, 2016

SIGNATURE PAGE

TO BE COMPLETED BY DEPONENT:

I, LORRAINE MORIN, have read or had read to me
the foregoing pages of my deposition and have noted
any errors in my testimony, together with their
respective corrections and the reasons therefore, on
the following errata page.

(Signature): _____

(DATE): _____12/31/09_____

Name of person reading transcript to deponent if
deponent cannot read:

_____

* * * * * * * * * * * * * * * * * * * * * *

TO BE COMPLETED BY THE NOTARY PUBLIC OR ATTORNEY:

I, __Julie D Farr_____, a ~~Notary~~
~~Public~~/Attorney, hereby acknowledge that the
above-named deponent personally appeared before me and
affixed his/her true act and deed.

_____

DATED: ___12|31|09_____

My Commission Expires:_____

Title:  Lorraine Watson v. Eastern Maine Medical
Center

Jurisdiction:  United States District Court

Date of Deposition:  November 24, 2009

Errata return deadline:  January 6, 2010

Noticing party:  George C. Schelling, Esq.

Reporter:  Rebecca M. Pearson, RPR

ERRATA

Deponent's Name:  LORRAINE MORIN

PAGE/LINE        CORRECTION AND REASON FOR CORRECTION

_See attached._

**ERRATA SHEET**

**Deponent's Name:** Lorraine Morin

| PAGE | LINE | FROM: (Quote words you wish to change) | TO: (Write change you wish to make) | REASONS: (e.g. typo, wrong word, word omitted, etc.) |
|------|------|----------------------------------------|-------------------------------------|-------------------------------------------------------|
| 34 | 19 | "I don't remember" | Yes. I told Dr. Reinstein that Dr. Gilmore had told me to come in to the hospital if I had any problems due to my high risk pregnancy as a result of previous cervical cancer, a previous miscarriage and a previous comb biopsy. | I refreshed my recollection by reviewing my answers to interrogatories |
| 35 | 17-20 | "He didn't - I don't think he told us anything, that I remember. I don't think he said anything to us. He just - he said that he needed to get someone from upstairs to come down." | Yes. He told me that the baby was dead. | I refreshed my recollection by renewing my 7/16/07 letter to EMMC. |
| 36 | 13 | "I don't remember if he did or not." | At the time of my deposition, I did not remember whether he did or not. I have since refreshed my recollection and now remember that Dr. Reinstein did tell me that the baby was dead. | I refreshed my recollection by renewing my 7/16/07 letter to EMMC. |

| 37 | 7-9 | "I don't remember exactly. I really don't remember with Dr. Grover. It took me a little while to absorb everything that had just happened." | Yes. Roger asked Dr. Grover what we were to do next. Dr. Grover said the fetus was only 16 weeks along and that we were to go home and call Dr. Gilmore's office on Monday. I then discussed with Dr. Grover potential procedures that he could do in order for the baby to be delivered there at the hospital. Dr. Grover stated that there was a surgical procedure and a D&C that would normally be done but because my cervix was not dilated enough, neither of these was an option. Roger then asked to see Dr. Gilmore, and Dr. Grover said that Dr. Gilmore was not available and we needed to call her office on Monday because there was nothing that he could do. | I refreshed my recollection by renewing my 7/16/07 letter to EMMC. |

| 64-65 | 25-4 | "Yes, but I did not see them until way after the postpartum depression. This - I didn't want to speak to anyone after this happened, so it was very hard for me because every time I'd talk about it, I'd relive it. | Add: However, in addition to postpartum depression after my fourth pregnancy, I also had other emotional reactions as a result of my horrific experience with the miscarriage and the way I was treated by EMMC that continue to this day. | Completeness |
|---|---|---|---|---|
| 69 | 25 | "Yes." | Add: However, in addition to postpartum depression after my fourth pregnancy, I also had other emotional reactions as a result of my horrific experience with the miscarriage and the way I was treated by EMMC that continue to this day. | Completeness. |
| | | | | |