UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LORRAINE MORIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09-cv-00258-JAW |
| | ) | |
| EASTERN MAINE MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR ORDER GRANTING EQUITABLE RELIEF AND ON RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Faced with an adverse jury verdict in this Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, claim, Eastern Maine Medical Center (EMMC) attacks the verdict, claiming that EMTALA distinguishes between viable and non-viable pregnancies, that the Court erred in allowing a nurse to testify as an expert, and that the trial evidence did not sustain the verdict. The Court denies Eastern Maine Medical Center's post-verdict motions. After the verdict, Lorraine Morin moved for equitable relief in the form of an injunction against EMMC policies that led to Ms. Morin's discharge. The Court declines to issue such an injunction because the law does not authorize it and the facts do not support it.

## I. STATEMENT OF FACTS

### A. Procedural History

On October 20, 2010, after a three day trial, the jury issued a verdict finding that EMMC had violated EMTALA and that its EMTALA violation had directly

caused Lorraine Morin to suffer personal harm. *Verdict Form* (Docket # 118). The jury awarded compensatory damages of $50,000.00. *Id.* In addition, the jury found that Ms. Morin had proven her claim for punitive damages against EMMC by clear and convincing evidence and awarded $150,000.00 in punitive damages. *Id.* The Court reduced the verdict to Judgment on October 21, 2010. *J.* (Docket # 120).

On October 21, 2010, Ms. Morin moved for an Order granting equitable relief against the EMMC. *Pl.'s Mot. for Equitable Relief Followed by Entry of Final J. Under Rule 54(b)* (Docket # 121) (*Pl.'s Mot.*). EMMC filed its opposition on November 12, 2010. *Def. E. Me. Med. Ctr.'s Opp'n. to Pl.'s Mot. for Equitable Relief Followed by Entry of Final J. Under Rule 54(b)* (Docket # 126) (*Def.'s Opp'n.*). Ms. Morin replied on November 16, 2010. *Pl.'s Reply Mem. in Support of her Mot. for Equitable Relief* (Docket # 128) (*Pl.'s Reply*)..

On November 16, 2010, EMMC renewed its motion for judgment as a matter of law and for new trial. *Def. E. Me. Med. Ctr.'s Renewed Mot. for J. as a Matter of Law and Mot. for New Trial* (Docket # 127) (*Def.'s Mot.*). Ms. Morin filed an objection on December 7, 2010. *Pl.'s Mem. in Opp'n. to Def.'s Renewed Mot. for J. as a Matter of Law and Mot. for New Trial* (Docket # 133) (*Pl.'s Opp'n.*). EMMC replied on December 21, 2010. *Def. E. Me. Med. Ctr.'s Reply Mem. in Further Support of its Renewed Mot. for J. as a Matter of Law and Mot. for a New Trial* (Docket # 134) (*Def.'s Reply*).

### B.  The Evidence at Trial

#### 1.  The Plaintiffs' Case

### a.  Lorraine Morin's Testimony

Sixteen weeks pregnant and having contractions, Lorraine Morin, a Millinocket, Maine resident, called EMMC in the early morning hours of July 1, 2007 and asked them to page whoever was on call for Dr. Gilmore, her treating obstetrician. *Trial Tr.* 139:25; 140:1-16 (Docket # 123) (*Trial Tr. I*).  About one-half hour later, a Dr. Grover called her back.  *Id.* at 140:20-22; 141:2-5.  Ms. Morin gave the doctor a "Readers Digest" version of what was happening, including her medical history and the fact that Dr. Gilmore had told her to call the ER if anything happened.  *Id.* 141:5-14.  Dr. Grover responded that there was nothing he thought he could do right then and if she felt she needed treatment to come to the ER but he did not think it was necessary.  *Id.* 141:23-25; 142:1.  He suggested she give Dr. Gilmore a call on Monday morning.  *Id.* 142:2-5.  Ms. Morin was "shocked" at his response.  *Id.* 142:6-8.  She figured that Dr. Grover did not understand what she was trying to tell him.  *Id.* 142:9-13.

Waiting about one more hour with continuing contractions, Ms. Morin decided to go to EMMC ER.  *Id.* 143:4-9.  She and her boyfriend Roger traveled from Millinocket to Bangor, leaving at about 3:30 a.m. and arriving at 4:37 a.m.[1]  *Id.* 144:6-10.  When they arrived, they were the only ones in the waiting room.  *Id.* 144:18-20.  Ms. Morin related her symptoms and medical history to the receptionist and later with the triage nurse.  *Id.* 145:4-18.  She was quickly brought to an examining room, saw another nurse there, and she repeated her symptoms and history to that nurse.  *Id.* 146:10-19.

---

[1] Roger and Lorraine Morin were married on August 8, 2008.  *Tr. I* 127:3-4.

At this point, an EMMC ER physician, Dr. Paul Reinstein, came into the examining room. *Id.* 147:13-14. Dr. Reinstein performed an abdominal ultrasound, and he told Ms. Morin that he was unable to get a heartbeat. *Id.* 147:16-24. Ms. Morin was devastated. *Id.* 147:25; 148:1. Dr. Reinstein did not perform a pelvic examination. *Id.* 148:6-7.

At some point, Dr. Robert Grover, an obstetrician, came to the examining room. *Id.* 148:10-13. He told her that he was the doctor she had talked to earlier. *Id.* 148:16-19. Dr. Grover performed a pelvic examination and another ultrasound. *Id.* 148:24-25; 149:1-2. Dr. Grover confirmed that the baby had died.[2] *Id.* 149:10-11. Dr. Grover then told her that she was not dilated enough and he was going to send her home. *Id.* 149:14-17. Ms. Morin was "terrified." *Id.* 149:18-20. She was still feeling abdominal pain coming in waves, which were becoming more and more painful. *Id.* 150:1-6. Dr. Grover did not mention any alternatives, saying only to let

---

[2] What to call a sixteen week old fetus became an emotionally-charged side issue during trial. Plaintiff's counsel consistently referred to the fetus as the baby, child, son, or Roger, the name the Morins had been planning to give the baby. The physicians used a number of terms, including baby, child, fetus, and (after the miscarriage) fetal remains. For example, during Dr. Reinstein's cross-examination, the following colloquy occurred:

> Q. There's no question that it's contractions, though, per Dr. Grover for Ms. Morin, is that right?"
> A. Contractions means the uterus is - - is contracting in my mind, and - -
> Q. And tell the jury what the uterus is preparing to do as it contracts.
> A. Well, if it's a full-term pregnancy patient, then deliver a viable baby. If it's under 20 weeks and the baby's not viable, then it's expelling the fetal remains.
> Q. The child.
> A. Fetal remains.

*Trial Tr. II* 366:25; 367:1-10. In the ordinary case, no one would take offense at a doctor using medical terminology and referring to an arm as an upper extremity. But in the context of a pregnancy, medical terminology can seem unduly cold, a fact Plaintiff's counsel clearly exploited. For purposes of this opinion, in deference to the Plaintiffs, the Court refers to the sixteen week old fetus as baby or child.

nature take its course. *Id.* 150:13-16. He did not offer any mental health counseling, the services of a social worker, or a grieving box. *Id.* 150:19-25; 151:1-3.

After Dr. Grover left, Mr. and Ms. Morin remained in the examining room for a while and they decided to ask to see another doctor. *Id.* 153:3-12. She asked the nurse to page Dr. Gilmore, her regular obstetrician. *Id.* 153:13-16. Dr. Reinstein returned to the examining room and Ms. Morin told him that she could not do this – she could not do this at home – and that she needed to be taken care of. *Id.* 154:2-5. The gist of Dr. Reinstein's response was that EMMC was not going to do anything for her and it was at that point that Mr. Morin became upset and began to yell. *Id.* 154:6-11. Mr. Morin asked Dr. Reinstein what they were supposed to do with the baby when it was born and Dr. Reinstein told him to "just dispose of it." *Id.* 155:1-3. At this response, Mr. Morin became very upset and Dr. Reinstein told him that if he did not settle down and if they did not leave, he would call security. *Id.* 155:4-13.Ms. Morin testified that she felt "worthless" at that point. *Id.* 155:14-15. A nurse came in and prepared her for discharge. *Id.* 155:16-19. By the time they left, they had been at EMMC for about one to one and one-half hours. *Id.* 156:6-8.

Mr. and Ms. Morin drove the one hour and fifteen minutes back to their home in Millinocket. *Id.* 157:3-4. Ms. Morin spent the rest of the day in a "living nightmare." *Id.* 158:2-4. She spent most of the day pacing between the kitchen, the bedroom, and the bathroom. *Id.* 158:6. Later that evening, she went into the bathroom and locked the door so that her husband could not come in. *Id.* 158:21-23. She went on her hands and knees on the bathroom floor and finally delivered her

dead baby.  *Id.* 158:23-25.  She stayed in the bathroom for a while and held him, observing that he was not much bigger than her hand.  *Id.* 158:24-25; 159:1-2.  She wrapped him in a cloth and placed him in a box.  *Id.* 159:2-7.

Following the delivery, Ms. Morin continued to bleed the rest of the night and she spent the night pacing and holding the box containing her son.  *Id.* 159:8-16.  She called Dr. Gilmore's office Monday morning and they told her to come immediately and bring her son.  *Id.* 159:17-22.  Mr. and Ms. Morin returned to Bangor and she saw Dr. Gilmore.  *Id.* 160:2-5.  When Ms. Morin told Dr. Gilmore what had happened, Dr. Gilmore broke out crying.  *Id.* 160:8-9.  She admitted Ms. Morin immediately to the hospital and performed an operation.  *Id.* 160:10-13.  According to Ms. Morin, Dr. Gilmore was very upset and she wrote down the names of certain people for Ms. Morin to contact so that this type of thing would never happen again.  *Id.* 160:14-19.

Ms. Morin testified that after the incident, she began having nightmares.  *Id.* 166:13-18.  During her last pregnancy in 2009-10, Ms. Morin relived her 2007 experience in nightly nightmares, often with dreams of starting out on the bathroom floor and ending up holding her dead son.  *Id.* 166:24-25; 167:1-25; 168:1.  After her daughter was born on May 5, 2010, the nightmares subsided to perhaps a couple of times per week.  *Id.* 166:18-19; 168:13-15.

In 2007 when this incident took place, Ms. Morin was working as a Certified Nurses' Aide at Millinocket Regional Hospital.  *Id.* 127:14-18.  She was attending nursing school at the University of Maine at Augusta, having entered the program

in 2004.  *Id.* 127:24-25; 128:1-8.  She was graduated in the spring of 2008 and, after sitting for the state boards, received her nursing license in June 2008.  *Id.* 128:9-17. Ms. Morin worked for a while at EMMC's cardiopulmonary care unit in 2008 but decided that the hospital was "not a good fit."  *Id.* 136:1-12.  She took a nursing job at St. Joseph Hospital in Bangor in November 2008 and has continued working there ever since.  *Id.* 136:13-20.  She currently works in the St. Joseph ER.  *Id.* 169:4.  Ms. Morin said that her experience in July 2007 at EMMC "changed my outlook on how people should be treated."  *Id.* 169:3.  At the same time she has a hard time dealing with women who come into the ER in a similar situation and she will often refer those patients to other nurses.  *Id.* 169:5-8.

### b.   Roger Morin's Testimony

Roger Morin corroborated Lorraine Morin's testimony.  *Trial Tr. I* 43-59.  Mr. Morin added that after Dr. Grover told them Ms. Morin would be discharged, they both insisted on seeing Dr. Reinstein again.  *Id.* 50:16-20.  Mr. Morin asked Dr. Reinstein what to do if Lorraine gave birth in Millinocket and he said that Dr. Reinstein replied, "I should just dispose of my baby."  *Id.* 50:21-25; 51:1.  Mr. Morin admitted he had become very upset and that he probably raised his voice.  *Id.* 51:8-21.  He testified that Dr. Reinstein threatened them with security if they did not leave the hospital.  *Id.* 51:24-25; 52:1-4.  Mr. Morin confirmed that Bangor is an hour and one quarter drive from Millinocket.  *Tr.* 57:2-4.

### c.   Annette O'Brien, R.N.

Ms. Morin called Annette O'Brien, R.N., as an expert witness. Nurse O'Brien testified not as a physician, but as a nurse who is certified in inpatient obstetrics and bereavement counseling. *Trial Tr. I* 64:12-22. Nurse O'Brien testified that in her opinion as a nurse, Ms. Morin was having contractions when she arrived at the EMMC ER on July 1, 2007. *Id.* 73:3-9. She confirmed that the medical record reflected that Ms. Morin had been experiencing the cramping for twenty hours before she presented herself to a doctor and on presentation, they were ten minutes apart. *Id.* 73:14-18. Nurse O'Brien said that the location of the cramping – above the pubic area – is consistent with predelivery contractions. *Id.* 76:4-14.

She said that a patient in the sixteen week of pregnancy who was experiencing contractions at this interval was at risk was a premature delivery. *Id.* 76:18-25. The risks of a premature delivery include the death of the child. *Id.* 77:2-4. Upon discharge from the EMMC, Ms. Morin faced a risk of home delivery, which would have presented a risk of hemorrhage. *Id.* 78:1-7. In the worst case, a woman could die from excessive hemorrhaging. *Id.* 79:24-25; 80:1. There is also a risk of infection. *Id.* 80:5-7. Finally, there was a risk of emotional distress from the discharge. *Id.* 83:16-19. Nurse O'Brien said that in her view, Ms. Morin was in labor when she presented herself to the EMMC ER and upon discharge, and she said that she did not distinguish between viable and non-viable births in determining whether a woman is in labor. *Id.* 78:18-25; 79:1-3. She expressed the view that Ms. Morin was at increased risk for hemorrhaging because of her prior Caesarian section and increased risk of depression because she had earlier

8

experienced post-partum depression after an earlier delivery.   *Id.* 80:25; 81:1-5; 85:13-20.

### d.   Dr. Pamela Gilmore's Testimony

Ms. Morin's treating obstetrician, Pamela Gilmore, M.D., also testified.   *Id.* 110:16-124:8.   Dr. Gilmore is an EMMC employee.   *Id.* 110:18-23.   She has practiced obstetrics and gynecology for fifteen years and, as of October 2010, when the trial took place, she had been with EMMC for five years.   *Id.* 111:1-6.   Dr. Gilmore confirmed Ms. Morin's obstetrical history.   *Id.* 111:11-25; 112:15-25; 113:1-2.

Dr. Gilmore saw Ms. Morin on Monday, July 2, 2007.   *Id.* 114:16-18.   Dr. Gilmore said that Ms. Morin was distraught and came into her office very upset.   *Id.* 114:24-25; 115:1-3.   Dr. Gilmore admitted that as Ms. Morin described what had happened, they were both in tears.   *Id.* 115:16-19.   Dr. Gilmore urged Ms. Morin to write a complaint letter to EMMC's public relations department.   *Id.* 115:20-24.   Dr. Gilmore acknowledged that she was very upset at what had happened to Ms. Morin at the EMMC ER.   *Id.* 116:20-25.   Finally, she confirmed that she had performed a dilatation and curettage on July 2, 2007 because Ms. Morin was bleeding and it was necessary to remove any residual products of conception.   *Id.* 118:1-11.

### 2.  EMMC's Defense

### a.   Nurse Angela Burbine's Testimony

EMMC called as a witness Angela Burbine, an ER nurse, who cared for Ms. Morin on July 1, 2007.   *Trial Tr. II* 268:10-15 (Docket # 124).   Nurse Burbine had worked at EMMC ER since 2003 and has ten years experience as an ER nurse.   *Id.*

268:8-12.  On July 1, 2007, she was on the night shift and was both the charge and triage nurse.  *Id.* 268:23-25; 268:1-10.  She took a history from Ms. Morin when she arrived in the early morning of July 1 and learned that Ms. Morin was 33 years old and sixteen weeks pregnant and had complaints of abdominal pain.  *Id.* 270:9-22.  Nurse Burbine said that Ms. Morin did not tell her that she had a high risk pregnancy.  *Id.* 275:16-25; 276:1.  In terms of Ms. Morin's need for medical treatment, Nurse Burbine assessed her as being three out of a scale of five.  *Id.* 276:10-18.  She denied that she was aware of any altercations, disputes, complaints, or security issues regarding Ms. Morin.  *Id.* 276:23-25; 277:1-3.

Nurse Burbine acknowledged on cross-examination that she had no current memory of Ms. Morin.  *Id.* 279:19-21.  She also agreed that Ms. Morin was possibly in early labor that morning, and she confirmed that if she was in early labor, she was at risk for hemorrhaging and for an impact on her emotional well-being,.  *Id.* 282:13-21; 283:3-7.

On redirect, Nurse Burbine confirmed that the decision to discharge a patient is always made by a physician, not a nurse.  *Id.* 289:16-20.

### b.  Nurse Kimberly Lugdon's Testimony

Kimberly Lugdon is also an EMMC ER nurse and was the nurse who treated Ms. Morin on July 1, 2007.  *Id.* 293:8-9.  Nurse Lugdon had some memory of Ms. Morin's July 1, 2007 ER visit.  *Id.* 294:15-19.  She first saw Ms. Morin at 4:45 a.m. on July 1, 2007 and performed an evaluation.  *Id.* 295:21-25; 206:1-14.  Nurse Lugdon confirmed that if Ms. Morin had told her that she had a high risk

pregnancy, Nurse Lugdon would have noted it and the fact that there is no note in the medical chart indicates, Ms. Morin did not mention this fact. *Id.* 297:4-12. Nurse Lugdon noted that Ms. Morin said she had experienced a "very small amount" of bleeding after she voided following being placed in an examining room. *Id.* 298:1-7.

After the initial nursing examination, Nurse Lugdon was with Ms. Morin on and off until she was discharged at 6:15 that morning. *Id.* 298:22-25. Nurse Lugdon's notes state that at 5:20 a.m., the patient and her husband were tearful and emotional support was provided. *Id.* 300:22-24. Nurse Lugdon explained that this occurred after Mr. and Ms. Morin had been told that her fetus was not viable. *Id.* 301:5-6. After Dr. Grover saw Ms. Morin, Nurse Lugdon let Dr. Reinstein know that Ms. Morin was upset and that she wanted to stay at the hospital; Dr. Reinstein therefore returned to the Morin examining room. *Id.* 302:16-25; 303:1-25; 304:1-23. After Dr. Reinstein saw the Morins, it was Nurse Lugdon's job to discharge Ms. Morin. *Id.* 304:23-24. She testified that Ms. Morin was "visibly upset" upon discharge but Nurse Lugdon said that she was not disruptive and there was no threat to call security. *Id.* 305:6-21.

On cross-examination, Nurse Lugdon admitted that she did not remember actually being present during the doctors' examinations and did not have a memory of many of the specific events that morning. *Id.* 309:22-25; 310:1-17. She denied that it is standard procedure to tell a patient who is raising his or her voice to calm

down or security will be called. *Id.* 311:1-5. Nurse Lugdon said that she would call security if she felt threatened. *Id.* 311:20-23.

On redirect, she said it is not unusual to discharge patients who are having contractions with instructions to return if things change. *Id.* 321:11-18. Here, Ms. Morin was told to present back to the ER if she was having increasing pain, discomfort, or significant bleeding. *Id.* 321:24-25; 322:1-4. Nurse Lugdon said that if she was concerned about Ms. Morin's well-being, she would have let Dr. Reinstein know and here, she did not do so. *Id.* 323:10-18.

### c. Dr. Paul Reinstein's Testimony

Dr. Reinstein was the ER physician who provided care to Ms. Morin on July 1, 2007. *Id.* 325:16-18. After completing medical school and residency, Dr. Reinstein was initially a pediatrician in Maine for five years, and then transitioned to emergency room medicine. *Id.* 327:8-15. He holds three board certifications: pediatrics, emergency room medicine, and pediatric emergency medicine. *Id.* 328:5-9. He came to the ER at EMMC in 1990 on a part-time basis and full-time in 1991. *Id.* 329:14-17. Dr. Reinstein said that in addition to his medical training, he has received training in EMTALA but does not consider himself an EMTALA expert. *Id.* 330:4-10. He explained that EMTALA originated from a practice of "dumping" where hospitals would transfer uninsured patients from their ER to another hospital in order to avoid little or no reimbursement for emergency services. *Id.* 330:11-19. Dr. Reinstein added that the problem was acute in cities among private

hospitals and never really existed in Maine even before EMTALA was enacted. *Id.* 330:20-25; 331:1-3.

Dr. Reinstein confirmed he had seen Ms. Morin the morning of July 1, 2007 at the EMMC ER. *Id.* 331:4-7. The census was very low that morning. *Id.* 331:21-25. During Ms. Morin's stay at the ER, Dr. Reinstein visited her examining room four times. *Id.* 334:10-12. He initially performed an examination, then brought an ultrasound machine into the room and performed that examination, returned after Ms. Morin had seen Dr. Grover, and then returned a final time after speaking again with Dr. Grover. *Id.* 334:13-22.

Regarding his first examination, Dr. Reinstein said that he took a history from Ms. Morin and confirmed that she did not tell him that she had a high risk pregnancy. *Id.* 335:21-25; 336:1-8. Ms. Morin described having suprapubic cramps ten minutes apart; she rated her discomfort a four out of ten. *Id.* 336:11-15. Dr. Reinstein said that from his medical perspective, Ms. Morin was not in labor because "if somebody's miscarried, it's not labor." *Id.* 338:5-9. Dr. Reinstein defined "labor" as occurring when a woman is trying "to deliver a viable - - a viable fetus." *Id.* 338:13-14. Upon physical examination, Dr. Reinstein was unable to detect any fetal movement so he decided to perform an ultrasound. *Id.* 341:12-20.

Dr. Reinstein therefore brought the ultrasound machine into the examining room. *Id.* 342:4-6. When he performed the ultrasound, he could see no movement and fetal heart tone. *Id.* 342:12-13. He said that she "kind of slumped, I kind of slumped, and I felt bad and she felt bad." *Id.* 342:14-15. Dr. Reinstein told Ms.

Morin that he was not an ultrasonographer," but he was "really concerned" that "the baby's not alive." *Id.* 342:15-18.

Dr. Reinstein contacted Dr. Grover, the on-call obstetrician. *Id.* 343:21-25; 344:1. Dr. Grover responded and went in to the examining room and examined Ms. Morin. *Id.* 344:9-12. After he came out, Dr. Reinstein asked Dr. Grover what he thought and he said that "I think she's miscarried and - - and I'm going to discharge her." *Id.* 344:13-15. Dr. Reinstein testified that he did not think he would have any more contact with Ms. Morin since Dr. Grover is an obstetrician and had discharged her. *Id.* 344:21-25. However, one of the nurses came to him and told him that Ms. Morin was upset about going home and asked Dr. Reinstein to go back and talk with her. *Id.* 345:3-9.

Dr. Reinstein contacted Dr. Grover again to make sure he was aware of Ms. Morin's concerns. *Id.* 345:9-12. Upon being told of Ms. Morin's unhappiness, Dr. Grover responded that "her cervix is not dilated, and it's not effaced, and it'd be very risky to try and - - try and do a procedure to do that." *Id.* 345:13-19. Dr. Grover said that such a procedure would be "dangerous" and thought that "she wasn't ready to be delivered, and she should go home and then come back if things get worse." *Id.* 345:22-25. Dr. Reinstein confirmed that at EMMC "all of our - - just about all of our miscarriages go home unless they're actively hemorrhaging." *Id.* 346:4-6. He said that the further a woman is in her pregnancy, it becomes "the call of the obstetrician." *Id.* 346:8-9. Dr. Reinstein testified that the decision about

whether to send Ms. Morin home or keep her there was "up to Dr. Grover."  *Id.* 346:16-17.

Dr. Reinstein returned to Ms. Morin's examining room.  *Id.* 346:21.  He told Mr. and Ms. Morin what Dr. Grover had said and recommended Ms. Morin see Dr. Gilmore the next morning.  *Id.* 346:22-23.  He explained that Dr. Grover had left "clear instructions that if things get worse, if the pain gets unbearable, or if the - - if you start bleeding more than you'd expect, then come back to the emergency department."  *Id.* 346:23-25; 347:1.  He thought Dr. Grover had formulated a "reasonable plan."  *Id.* 347:1-2.  He thought she would return if she started hemorrhaging or having severe pain.  *Id.* 347:3-7.

After Dr. Reinstein explained all this to Ms. Morin, she left.  *Id.* 347:10-11. He acknowledged that she seemed upset but he observed that "all women who are miscarrying are upset."  *Id.* 347:13-14.  Dr. Reinstein talked to Mr. Morin and told him that his wife was going to have a miscarriage, that it is a loss, and that there was going to be a grieving process.  *Id.* 347:15-18.

Dr. Reinstein recalled that Ms. Morin asked him about what to do with the remains.  *Id.* 347:24-25; 348:1-2.  He told her that he was not sure what to do with the remains and he gave her three alternatives:  bring them to Dr. Gilmore's office, bring them to the emergency room, or call the funeral parlor.  *Id.* 348:5-9.  He knew Mr. and Ms. Morin were "upset and frustrated" but he thought that their response was "understandable."  *Id.* 348:11-17.

Dr. Reinstein flatly denied that he had threatened to call security. *Id.* 348:18-21. He explained that he has never in thirty years of the practice of medicine ever done so: "I don't make threats with patients." *Id.* 348:21-23. He said that if someone is threatening him or someone else and he is concerned for his safety or the patient's safety, he calls security. *Id.* 348:23-25. He does not threaten to call security because "it just agitates people more." 349:1-2.

Upon Ms. Morin's discharge, Dr. Reinstein testified that he thought she was not facing "any more threat than any other woman who's miscarrying." *Id.* 351:24-25; 352:1-6. Assuming "labor" to mean "the process of childbirth beginning with the latent or early phase of labor and continuing through the delivery of the placenta," Dr. Reinstein said that he would not use the term, "labor," to describe her miscarriage because she was not twenty weeks into her pregnancy and did not have a live fetus. *Id.* 352:17-25.

On cross-examination, Dr. Reinstein agreed that he had not referred Ms. Morin to a priest, social worker or other counselor and said he would not do so with a miscarriage unless she was suicidal or needed immediate attention. *Id.* 363:2-25. To the extent emotional support was necessary, Dr. Reinstein testified that he expected "any nurse to do that." *Id.* 364:21-25; 365:1-3. The fact Ms. Morin was upset and tearful was not unusual in an ER; Dr. Reinstein noted that about half of EMMC ER's patients are "upset and tearful." *Id.* 365:4-7.

Regarding Dr. Reinstein's definition of labor, he explained that even if they had detected the tiniest of heartbeats in the fetus, he would not have considered Ms.

Morin to have been in labor on July 1, 2007; he would have characterized her condition as a "threatened miscarriage" since the pregnancy was less than twenty weeks. *Id.* 366:13-17. If a baby has a heartbeat at twenty-one weeks and the woman is having contractions, the medical description is "fetal distress." *Id.* 366:22-24.

Dr. Reinstein also denied telling Mr. and Ms. Morin to simply dispose of the child. *Id.* 367:25; 368:1-2. He said he was not "that callous." *Id.* 368:9-10. He testified he gave Ms. Morin three reasonable alternatives. *Id.* 368:15-18. Dr. Reinstein conceded that neither he nor Dr. Grover had certified that Ms. Morin was in false labor. *Id.* 370:17-19.

### d. Dr. Robert Grover's Testimony

Dr. Robert Grover, the obstetrician-gynecologist, was EMMC's next witness. *Id.* 371:21-416:21. Dr. Grover testified that after medical school, he served in the United States Army as a general medical officer and flight surgeon. *Id.* 372:11-21. He completed his residency in obstetrics and gynecology when he was in the Army. *Id.* 373:3-7. Dr. Grover came to Bangor, Maine in 1992, began an OB-GYN practice, and has practiced his specialty in Bangor since then. *Id.* 373:8-19. He is board certified. *Id.* 375:6-7. Dr. Grover was the on-call OB-GYN physician for EMMC on July 1, 2007. *Id.* 375:12-25; 376:1-3.

Dr. Grover was the OB-GYN physician who treated Ms. Morin on July 1, 2007 and he remembered doing so. *Id.* 376:22-25; 377:1-2. Dr. Grover confirmed that Ms. Morin did not tell him that she was having a high-risk pregnancy. *Id.*

377:9-21.  Dr. Grover recited Ms. Morin's history.  *Id.* 378:6-25; 379:1-19.  He then explained that the presence of a non-viable fetus in Ms. Morin's womb would be described in the field of obstetrics as a missed abortion.  *Id.* 379:20-25; 380:1-9.  Dr. Grover recalled that he received a telephone call from Dr. Reinstein informing him that there had been no heartbeat on the ultrasound.  *Id.* 380:16-20.

When Dr. Grover came to the Morin examining room, he said they appeared "appropriately concerned" or in other words, "pretty upset."  *Id.* 381:1-12.  Dr. Grover performed his own ultrasound and detected no fetal cardiac activity, no fetal motion, no good muscle tone in the fetus, swelling around the skull, and he concluded that the fetus was dead and may have been dead for some time.  *Id.* 381:15-25; 382:1-3.  Ms. Morin described her pain as intermittent, "more of a cramping-type sensation," which Dr. Grover characterized a "mild to moderate."  *Id.* 382:9-16.

Dr. Grover found that Ms. Morin's cervix was long and closed.  *Id.* 382:4-5.  He explained that the purpose of the cramping is to help "soften and open up the cervix" so that the process of expelling the contents of the uterus can occur.  *Id.* 382:17-25; 383:1-4.  He said this softening up process "can take a considerable period of time."  *Id.* 383:3-4.

Dr. Grover described what are called Braxton-Hicks contractions.  *Id.* 383:5-20.  He said that a uterus contracts throughout a pregnancy, particularly in women who are active, and those contractions are known as Braxton-Hicks contractions or false contractions.  *Id.* 383:5-14.  Regarding Ms. Morin, Dr. Grover thought that she

was having mild irregular contractions that over time would lead to "a softening and opening of the cervix and perhaps to expulsion of the products." *Id.* 384:11-17. When asked when he thought Ms. Morin might deliver the fetal remains Dr. Grover said:

> Ah, obviously, I didn't know exactly, but I - - my suspicion, based on, you know, my clinical experience and my years of doing this, is that her contractions and her discomfort appeared to be, as I said, mild and infrequent, and her cervix was long and closed and quite firm, and I thought it would probably take a period of hours for this to happen, yes . . . Well, this was early in the morning. I suspected it would probably be later - - later that day or in the evening or perhaps even into the next day.

*Id.* 385:3-16.

Dr. Grover further explained his examination findings and why she was not ready to deliver at that time. *Id.* 385:23-25; 306:1-19. He described the cervix, which is the opening to the uterus, as usually fairly firm, feeling a bit like one's nose. *Id.* 386:7-10. Before a woman can deliver, the cervix has to thin and soften out, a process called effacement, and at that point, it will start to dilate. *Id.* 386:12-15. For a term pregnancy, the cervix will expand from 3 to 4 millimeters in diameter to 10 centimeters or more. *Id.* 386:15-17. Ms. Morin's cervix had not yet started to soften, thin or open, when Dr. Grover examined her on July 1, 2007. *Id.* 386:17-19. This process is no different for a miscarriage than for a full-term birth. *Id.* 386:20-22.

When Dr. Grover informed that news that the fetus was not viable, he thought the Morins' response was "appropriate." *Id.* 387:2-3. They were "distraught and bereaved that the pregnancy wasn't going to survive." *Id.* 387:3-4.

19

He said that he recommended they go home and that way, "they could be in the comfort of their various family members, friends, and whatever, and then return as need be." *Id.* 387:11-12.

Dr. Grover also explained the terminology in the medical chart. He said that she had a "missed abortion", which implies that the fetus is deceased; a "threatened abortion", means that the fetus may be alive but there has been a suggestion of harm to the intrauterine environment. *Id.* 387:25; 387:1-14. Dr. Grover thought Ms. Morin was a "missed abortion." *Id.* 387:17.

Dr. Grover also testified about what he had told Ms. Morin that morning. He said that the pregnancy was not viable, that he recommended against active intervention, and the best thing to do was "go home, rest, see how things progress through the day, and when or if her condition worsened, her pain got worse, or she started to bleed or had other issues, she should either return to the ER or call, and we could see her." *Id.* 389:15-25; 390:1-2. He suggested that she see Dr. Gilmore the next day if she remained the same or stable throughout the day. *Id.* 390:2-4. He prescribed Tylenol with codeine for the cramping. *Id.* 390:5. While Dr. Grover was in the examining room, he said that neither Ms. Morin nor Mr. Morin expressed any concern. *Id.* 390:13-20.

Later, Dr. Reinstein called Dr. Grover and told him that the Morins had misgivings about going home. *Id.* 390:21-25; 391:1-3. Dr. Grover responded that "there's really nothing else we're going to do at this point in time, and I would recommend - - my recommendations were the same, go home and see how things

go." *Id.* 391:3-6. Dr. Grover did not think her cervix had reached the point where he could "force a D&E or anything on her" and he thought the better alternative was to let things "progress naturally as much as they could and to the point where the - - where if later on she needed to have a procedure or something done, we could do that more safely for her." *Id.* 391:7-13.

Dr. Grover distinguished a D&E, dilatation and evacuation, and a D&C, dilatation and curettage. A D&C is usually done in the first semester and a D&E is commonly done in the second semester. *Id.* 391:18-25; 392:1. He said a D&E, which is what would have been required for Ms. Morin, is a "more significant procedure in that the uterus is bigger, it's softer. There is more bleeding." *Id.* 392:2-3. The doctor has to "forcibly dilate the cervix, unless it's open on its own and softer, and if you have to dilate the cervix, that could lead to issues and complications in future pregnancy with an incompetent cervix that could lead to laceration and tearing of the cervix." *Id.* 392:3-8. Other complications include perforation of the uterus with "potential injury to the bowel or the bladder or the large blood vessels" and "incomplete evacuation of the uterus." *Id.* 392:15-20. Dr. Grover said that in his judgment, it was not in Ms. Morin's best interest to attempt a D&E at that time. *Id.* 393:1-3.

Contrary to Nurse O'Brien's concern, Dr. Grover discounted the view that Ms. Morin's prior Caesarian section was a factor in her medical situation on July 1, 2007. *Id.* 393:23-25; 394:1-6. He pointed out that Ms. Morin had already delivered a large baby vaginally and this means she had "documented integrity of the uterus."

*Id.* 394:11-14.  He also explained that for anatomic reasons, the increased risk of uterine rupture affects a woman only in the later stages of pregnancy.  *Id.* 394:12-15; 325:1-25; 396:1-4.

Dr. Grover said that he did not believe there was "any significant, immediate concern or threat to her health or safety by discharging her home."  *Id.* 396:24-25; 397:1-4.  He testified that he would not have been surprised if she had either called or returned to the EMMC ER.  *Id.* 397:5-8.  If she had returned, EMMC would have provided medical care and would have supplied a bereavement package to her.  *Id.* 397:9-25; 398:1-3.  Dr. Grover expected Ms. Morin "to be emotionally distraught and to grieve" but he did not think the discharge represented a "threat to her emotional health and safety."  *Id.* 398:6-12.  Dr. Grover said that the Morins were not unruly or disruptive while he was there and he did not have to warn them about calling security.  *Id.* 399:14-20.

Dr. Grover testified that a pregnancy less than 20 weeks is traditionally not admitted to labor and delivery because the delivery is "not considered to be a, quote, birth process."  *Id.* 400:22:25; 401:1-4.  Pregnancies under 20 weeks are typically admitted not to the obstetrics floor but to the gynecology floor.  *Id.* 401:4-7.

On cross-examination, Dr. Grover acknowledged that he had not offered Ms. Morin any bereavement services on July 1, 2007 and he did not offer Ms. Morin admission to the gynecology floor.  *Id.* 403:13-21.  Dr. Grover denied that he had spoken by telephone to Ms. Morin earlier in the morning of July 1.  *Id.* 406:8-10.  Dr. Grover was asked about laminaria, which he said were objects that can be

22

placed in the cervix "to help osmotically dilate and soften the cervix to make it easier to further mechanically dilate at the time of a D&E or perhaps to ripen for labor processes." *Id.* 407:21-25; 408:1.  He agreed he did not offer Ms. Morin the use of laminaria.  *Id.* 408:7-9.  Dr. Glover explained that typically laminaria are placed on the cervix in an office setting and the patient is sent home overnight; the laminaria are then removed the next day in an operating room before the D&E is performed.  *Id.* 408:19-25; 409:1-4.  However, he did not investigate whether laminaria were available.  *Id.* 409:23-25; 410:1-25; 411:1.

Dr. Glover was questioned about whether a substance called Prostaglandin E (also called Cervidil) could have been used on Ms. Morin.  *Id.* 411:2-12.  He said that the substance can be used to soften the cervix for preinduction for labor.  *Id.* 411:4-7.  Dr. Grover said it could be used in the second semester usually in more than one application, and it takes six to twelve hours to effect dilatation.  *Id.* 411:8-12.  He did not discuss Prostaglandin E with Ms. Morin.  *Id.* 411:17-21.

Dr. Grover was asked about Pitocin.  *Id.* 411:22-25; 412:1-6.  He said that it is a substance produced by the brain, which may be used to soften the cervix and evacuate the uterus.  *Id.* 412:2-3.  He testified that it is used in second trimester in very very high doses and it takes a fairly long time to work.  *Id.* 412:4-6.  He did not offer Pitocin to Ms. Morin.  *Id.* 412:7-8.

Dr. Grover acknowledged that Ms. Morin could have delivered within a couple of hours.  *Id.* 412:12-18.  Dr. Grover said he knew that Ms. Morin lived in Millinocket, which is one hour and fifteen minutes from Bangor.  *Id.* 413:3-5.  Even

so, Dr. Grover thought the correct course of action was not to intervene but to let nature take its course. *Id.* 413:12-23. Each of the alternatives, laminaria, Prostaglandin E, and Pitocin carries a risk and Dr. Grover thought "[i]f we can do something naturally, that's usually considered the best option." *Id.* 414:4-14. Finally, Dr. Grover disagreed with the notion of simply letting Ms. Morin remain in the ER, saying that he did not think it would have been "an appropriate use of facilities or time or anything." *Id.* 414:24-25; 415:1.

On redirect examination, Dr. Grover said that he thought the most likely time-span for delivery would have been "eight to ten to twelve hours." *Id.* 415:6-12. Dr. Grover concluded that he had been practicing obstetrics for twenty-five years and that he is very good at taking care of losses and bereavements, but "there was no need to do this." *Id.* 416:5-11.

### e. Dr. Gregory Gimbel's Testimony

The last witness was Dr. Gregory Gimbel, a Brunswick, Maine obstetrician-gynecologist. *Trial Tr. III* 469-543 (Docket # 125). Dr. Gimbel is Board Certified in obstetrics and gynecology. 470:10-14. He has practiced his specialty in Maine since 1983. *Id.* 471:8-9.

Dr. Gimbel had reviewed EMMC ER records on Ms. Morin. *Id.* 473:8-10. First, Dr. Gimbel did not believe that Ms. Morin was in a high risk pregnancy. *Id.* 480:19-21. Dr. Gimbel explained that physicians do not classify someone as being in a high or low risk pregnancy. *Id.* 480:22-25. Instead, the doctor would look at the individual and decide what specific conditions present risks. *Id.* 481:1-4.

Dr. Gimbel opined that EMMC's discharge was appropriate. *Id.* 482:10-15. Dr. Gimbel listed a number of factors for determining whether to discharge: acuity, symptoms, laboratory and physical findings, the patient's level of comprehension, and their unique life situation. *Id.* 482:21-25; 483:1-7. Dr. Gimbel discounted Ms. Morin's risks, including her prior C-section. *Id.* 483:22-25; 484:1-25; 485:1-11.

When asked about how long he thought it would be after discharge for Ms. Morin to deliver, Dr. Gimbel said that it could be "hours or days." *Id.* 488:15-25; 489:1-6. He went on to say that sometimes the symptoms disappear and it could be weeks or other interventions are necessary. *Id.* 489:6-7. He thought that no interventions were required at the time of discharge because waiting "would be helpful and safer." *Id.* 489:9-17. Dr. Gimbel agreed that from a medical viewpoint, Ms. Morin was not "in labor"; instead, the medical profession would say that she was having a "miscarriage." *Id.* 490:25; 491:1-12. After reviewing Ms. Morin's documented condition upon discharge, Dr. Gimbel opined that there was not a threat to her physical health or safety from the discharge. *Id.* 491:22-25; 492:1-25; 493:1-25; 494:1-25; 495:1-25; 496:1-21. Regarding her emotional health and safety, he said that the emotional health of the patient is something that physicians try to evaluate but it is not a major part of the focus of the examination; he noted she "appeared calm." *Id.* 496:22-25; 497:1-6. He acknowledged that she was "tearful and upset" at the news of her baby's death and said that it would have been a "red flag" if she had not had an emotional response. *Id.* 497:7-22. About fifteen percent of all pregnancies end in miscarriages. *Id.* 497:23-25; 498:1-7. A miscarriage

before twenty weeks is medically termed an abortion but if the miscarriage took place in the second trimester, the modern trend is to call it simply a second trimester miscarriage. *Id.* 499:4-16.

When a woman in the second trimester appears at a hospital with signs of an impending miscarriage, Dr. Gimbel said that they do not all get admitted into the hospital. *Id.* 499:17-22. If the woman's cervix is thinned out and she is bleeding heavily, the treatment is different than for someone who is in the early stages of the miscarriage. *Id.* 499:24-25; 500:1-9. Dr. Gimbel agreed that a home delivery presents a risk or possible threat of bleeding and that Ms. Morin did bleed after she miscarried. *Id.* 526:14-21. He further agreed that there is a possibility of hemorrhage or excessive bleeding with a delivery at home. *Id.* 529:6-10. He also concurred that Ms. Morin was experiencing contractions while she was at the EMMC ER. *Id.* 529:17-25. Dr. Gimbel said he saw "nothing in the record to indicate that the ER physicians at EMMC expected the mother to deliver at home." *Id.* 531:1-5.

### 3. Exhibits

The parties introduced into evidence relevant medical records, a letter from EMMC to Ms. Morin, and a stipulation. The medical records consisted of the EMMC records of July 1, 2007 and July 2, 2007. Ex. J-1, J-2 (Docket # 85). The EMMC letter was a response to Ms. Morin's letter complaining about what had happened. Pl.'s Ex. 2; *see Pl.'s Consolidated Ex. List*. The stipulation was that EMMC is a participating hospital covered by EMTALA and that Ms. Morin

presented herself to its emergency department on July 1. 2007, seeking medical treatment. *Stip. of the Parties*, Pl.'s Ex. 4.

## II. Ms. Morin's Motion for Equitable Relief

### A. Ms. Morin's Position

Before trial, Lorraine Morin clarified that in addition to money damages, she was requesting that the Court order equitable relief in her favor. Specifically, in her Final Pretrial Memorandum, she says that she will be "seeking a court order directing the Defendant to change its policies for women facing contractions whose discharge poses a threat of harm to themselves or their unborn children." *Pl.'s Final Pretrial Mem.* at 3 (Docket # 57). After the verdict, Ms. Morin reiterated her request. *Pl.'s Mot.* In her post-verdict motion, Ms. Morin says that it is within the Court's discretion whether any further evidentiary hearing would be needed. *Id.* at 1. However she contends that the case was fully tried and it is her view that the Court can issue an order based on the current record. *Id.*

### B. EMMC Position

EMMC objects to Ms. Morin's request for equitable relief. *Def.'s Opp'n.* First, EMMC claims that Ms. Morin failed to preserve a claim for equitable relief. *Id.* at 1-3. Second, EMMC says that EMTALA does not authorize the broad equitable relief that Ms. Morin is seeking. *Id.* at 3-5. Third, it contends that to grant equitable relief would violate separation of powers. *Id.* at 5-6. Fourth, it asserts that Ms. Morin does not have standing to make such a claim. *Id.* at 6. Fifth, EMMC argues that Ms. Morin is not entitled to injunctive relief on the merits. *Id.*

at 6-8.   Finally, to the extent the Court rules that as a matter of law, Ms. Morin cannot maintain a claim for equitable relief, EMMC demands the Court hold an evidentiary hearing before issuing such an order.   *Id.* at 8-9.

### C.  Lorraine Morin's Reply

On November 16, 2010, Ms. Morin replied, countering each of EMMC's arguments.   *Pl.'s Reply Mem. in Support of her Mot. for Equitable Relief* (Docket # 128) (*Pl.'s Reply*).

### D.  Discussion

The Court easily concludes it has no basis to order EMMC to "change its policies for women facing contractions whose discharge poses a threat of harm to themselves or their unborn children."   *Pl.'s Mot.* at 3.   First, it is questionable whether the Court is statutorily authorized to order generalized relief to individuals who are not parties to the lawsuit.   Section 1395dd(d)(2)(A) of title 42 provides:

> Personal harm.  Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action, against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A).   In the EMTALA context, especially for pregnant women, courts have generally rejected the defense argument that the statute does not authorize injunctive relief for a person who seeks treatment sporadically, including specifically for women who are no longer pregnant by the time the court is able to act.   *See City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (stating that the "capable-of-repetition doctrine applies only in exceptional situations, and

28

generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality"); *Owens v. Nacogdoches Cnty. Hosp. Dist.*, 741 F. Supp. 1269, 1280 (E.D. Tx. 1990) ("Given that the wrongs sought to be addressed by the Anti-Dumping Act are precisely not continuing but episodic, since that is the nature of emergency medical conditions and of childbirth, it simply does not make sense to assert that Rebecca Owens ceased to have standing for equitable relief when she gave birth.  To so hold would render the inclusion of equitable relief in the statute mere surplusage"); *Maziarka v. St. Elizabeth Hosp.*, No. 88 C 6658, 1989 U.S. Dist. LEXIS 1536 (N.D. Ill. Feb. 16, 1989).  Thus, if Ms. Morin were requesting injunctive relief for herself against EMMC, the Court could entertain her request.

But she is not.  She is requesting injunctive relief "for women facing contractions whose discharge poses a threat of harm to themselves or their unborn children."  *Pl.'s Mot.* at 3.  Unlike federal environmental statutes that empower private litigants to act as "private attorneys general" to enforce compliance,[3] EMTALA's language limits equitable relief to remedy the personal harm the plaintiff herself sustained as a consequence of a violation.   42 U.S.C. § 1395dd(d)(2)(A).  Other courts have reached the same conclusion.  *Hart v. Riverside Hosp.*, 899 F. Supp. 264, 267-68 (E.D. Va. 1995) (concluding that EMTALA's equitable relief provision must be tailored to the individual plaintiff); *Owens*, 741 F. Supp. at 1281 (issuing injunction "from refusing plaintiff Rebecca Owens delivery in

---

[3] *See* 33 U.S.C. § 1365(a)(1987 & Supp. 1995) (Clean Water Act); 42 U.S.C. § 9659 (1989) (CERCLA); 42 U.S.C. § 6972 (RCRA).

any future pregnancy in violation of 42 U.S.C. § 1395dd, for so long as she remains indigent").[4]

Assuming *arguendo* that EMTALA authorizes generalized equitable relief, Ms. Morin's request fails as a matter of proof. She did not begin to provide the Court with an evidentiary basis to impose such a sweeping judicial directive against EMMCs medical policies. The dearth of evidence is in some ways understandable since Ms. Morin's case is not a medical malpractice case and at trial, the parties focused on whether the statute had been violated, not the proper standard of care for pregnant women experiencing contractions. Although the parties produced some evidence on the edges of this issue, the Court is unable based on this record to make any reasonable judgment as to what policies would be appropriate for EMMC. Absent extraordinary circumstances not present here, it is not sensible for a judge to arrogate for himself the authority of highly trained and licensed physicians to act in the best medical interest of their patients. If there is a case where a court should intervene in such an invasion fashion into the practice of medicine, this is not it.

The Court denies Ms. Morin's claim for equitable relief.

## III.   EMMC's Motion for Judgment as a Matter of Law and for New Trial

### A.  EMMC's Position

EMMC moves for judgment as a matter of law on the ground that Ms. Morin failed to prove that she had an "emergency medical condition" under the meaning of

---

[4] Ms. Morin relies heavily on *Owens* for support and it is true that there is some language in *Owens* that suggests EMTALA gives the Court broader injunctive authority. But when it came to remedy, the Court in *Owens* ordered injunctive relief only for the plaintiff herself and not for other women.

EMTALA, specifically "Plaintiff's evidence that her discharge posed a threat to her health or safety was, as a matter of law, insufficient for her to prevail on this claim." *Def.'s Mot.* at 2. First, EMMC says that EMTALA's definition of "emergency medical condition" in 42 U.S.C. § 1395dd(e)(1)(B) does not apply to the facts in this case. *Id.* EMMC reiterates its earlier earnestly pressed contention that EMTALA does not cover women who are carrying non-viable fetuses since delivery of a dead fetus is not "labor". *Id.* 2-3. It stresses that "[a]s EMMC's witnesses testified at trial, <u>physicians</u>-- those charged with diagnosing and treating such conditions-- do not consider the process of miscarriage at sixteen weeks to be part of the process of "labor." *Id.* at 3 (emphasis in original). Having carved Ms. Morin out of EMTALA protections because she was experiencing a "missed abortion" and was not in "labor", EMMC contends that none of the other provisions of EMTALA applies and therefore EMMC is entitled to judgment as a matter of law. *Id.*

Second, assuming *arguendo* that § 1395dd(e)(1)(B) applies, citing *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.,* 613 F.3d 54 (1st Cir. 2010), EMMC says that the Plaintiff's case must fail because she failed to produce competent expert testimony in support of her claim. *Id.* at 3-4. EMMC rankles at the Court's decision to allow Nurse Annette O'Brien to testify as an expert, saying that she can neither admit nor discharge patients, cannot diagnose, and cannot override a doctor's medical judgment. *Id.* at 4. It maintains that it was error to allow her to testify at all. *Id.*

Once Nurse O'Brien's testimony is, in EMMC's view, properly jettisoned, EMMC contends Ms. Morin's case must fall of its own weight since there is no essential expert guidance as to whether she had an "emergency medical condition" as EMTALA requires. *Id.* at 4-5. EMMC says that "some amount of bleeding, even hemorrhaging without the presence of specific risk factors, is not necessarily a threat to a pregnant woman's health or safety." *Id.* at 5. EMMC claims that each doctor testified that her July 1, 2007 discharge "did not pose a threat to her physical or emotional health or safety." *Id.* EMMC asserts that it is its own subjective determination as to whether Ms. Morin's discharge constituted a risk, which must control as a matter of law. *Id.*

Assuming *arguendo* that § 1395dd(e)(1)(B) applies and that Nurse O'Brien's testimony is allowed, EMMC still insists it is entitled to judgment as a matter of law "because of the lack of record evidence that Plaintiff had (and that EMMC determined that she had) an emergency medical condition." *Id.* at 5-6. Relying again on the diagnosis of "missed abortion", EMMC says that Ms. Morin presented only with mild pain and it prescribed an analgesic, thus fulfilling its statutory obligation to stabilize her symptoms before discharge. *Id.* at 6. Because there is in EMMC's view no evidence that it "subjectively determined that Plaintiff had an emergency medical condition", it contends it is entitled to judgment as a matter of law. *Id.* Even if Ms. Morin was at risk for emotional distress upon discharge, EMMC argues that "being upset, crying and experiencing stress" were insufficient threats to her health and safety to bring her within the applicable definition of

emergency medical condition and that in any event, there is no evidence EMMC was aware of these threats upon discharge. *Id.* at 7-8. The only evidence, EMMC says, that Ms. Morin was at physical risk was Nurse O'Brien's testimony that Ms. Morin was at risk for hemorrhaging, but her testimony was eclipsed in EMMC's view by the physician testimony that she was not at risk of hemorrhaging. *Id.* at 8-9. Based on the physician testimony, EMMC discounts any enhanced risk that Ms. Morin presented due to her previous Caesarian section and it says there is no evidence that EMMC was even aware she had had a prior C-section. *Id.* at 9. EMMC applies the same argument to Ms. Morin's previous cone biopsy. *Id.* at 9-10. From EMMC's viewpoint, the only risk Ms. Morin faced was bleeding and pain from a missed abortion, which cannot be construed as a threat to Ms. Morin's health and safety. *Id.* at 10.

Finally, EMMC says that there is no evidence that its violation of EMTALA caused Ms. Morin any personal harm. *Id.* at 10-11. EMMC notes that the courts require expert testimony to establish causation, and since in its view there was none, EMMC contends it is entitled to judgment as a matter of law. *Id.* at 11.

Turning to the punitive damages award, EMMC claims it is entitled to judgment as a matter of law because Ms. Morin failed to meet the evidentiary burden to establish express or implied malice by clear and convincing evidence as required by Maine law. *Id.* at 11-16 (citing *Tuttle v. Raymond*, 494 A.2d 1353, 1359 (Me. 1985); *Batchelder v. Realty Res. Hosp.*, 2007 ME 17 ¶ 24, 914 A.2d 1116, 1124).

EMMC next turns to its motion for a new trial.  *Id.* at 16.  It contends it is entitled to a new trial for three reasons: 1) the Court erred in its jury instructions; 2) the Court erred in allowing Nurse O'Brien to testify; and 3) the jury verdict is so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice.  *Id.* at 16-17.  EMMC reiterates its contention that EMTALA does not cover women who have non-viable pregnancies and that the Court's instructions to the contrary were erroneous.  Further, even if § 1395dd(e)(1)(B) applies, EMMC says that the Court erred because it failed to instruct the jury that the "may pose a threat" language "depends on whether the woman in labor has any medical condition that could interfere with the normal, natural delivery of her healthy child" or alternatively, it "depends on whether the woman in labor has any medical condition that could interfere with delivery."  *Id.* at 17.  Saying that these instructions accurately state the law, EMMC argues it was error not to give them. *Id.*  EMMC again presses its distress with the admission of Nurse O'Brien's testimony and says that the Court's decision to allow her to testify entitles it to a new trial.  *Id.* at 18.  Finally, it contends the jury verdict was against the weight of the evidence.  *Id.* at 19.

### B.  Lorraine Morin's Response

Ms. Morin takes issue with EMMC's premise that because her fetus had died, she was not covered by EMTALA.  *Pl.'s Opp'n.* at 1-2.  She argues that she was not required to prove that she was "in labor" to establish a violation of EMTALA; she was only required to prove that she was pregnant and having contractions, and that

her discharge might pose a threat to her health or safety. *Id.* at 1. She says the language of the statute and regulation supports her position and that the evidence at trial is sufficient to support a jury finding that EMMC violated EMTALA. *Id.* at 2-3. Turning to the requirement of expert testimony, Ms. Morin claims that the testimony of the physicians supports the verdict. *Id.* at 3-4. Ms. Morin disputes EMMC's position that expert testimony is mandatory to prove causation since her case did not involve complex questions of medical causation. *Id.* at 5-6. Regarding punitive damages, Ms. Morin observes that EMMC does not claim that the Court erred in its jury instructions, only that the evidence is insufficient as a matter of law to support the award. *Id.* at 7-11. Ms. Morin counters that the evidence is sufficient for an award of punitive damages and maintains that the properly-instructed jury's determination should be upheld. *Id.*

Addressing EMMC's motion for new trial, Ms. Morin dismisses EMMC's reiterated claim that EMTALA does not protect women with non-viable fetuses. *Id.* at 11. Regarding the supposedly erroneous jury instruction on the "may pose a threat" issue, Ms. Morin points out that EMMC relies on a circuit court decision that addressed an older version of EMTALA, that EMMC's position is contrary to the plain language of the current statute, and that EMMC's requested instruction would have been misleading because Ms. Morin's fetus was dead and she was not going to deliver a healthy child. *Id.* at 11-12. Ms. Morin repeats her position that Nurse O'Brien's testimony was properly admissible. *Id.* at 12. Finally, she says that the evidence supports the verdict. *Id.*

### C.  Discussion

#### 1.  Legal Standard:  Judgment as a Matter of Law

EMMC moves for judgment as a matter of law pursuant to Rule 50(b).  Fed. R. Civ. P. 50(b).  To succeed EMMC must demonstrate that as a matter of law "the facts and inferences are such that no reasonable factfinder could have reached a verdict against the movant."  *Webber v. Int'l Paper Co.*, 326 F. Supp. 2d 160, 165 (D. Me. 2004) (citing *Santos v. Sunrise Med., Inc.*, 351 F.3d 587, 590 (1st Cir. 2003)). The Court must not "consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence."  *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 50 (1st Cir. 2003).  The standard of review for motions for judgment as a matter of law requires the Court "to view the evidence 'in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.'" *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 299 (1st Cir. 1998) (quoting *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 (1st Cir. 1997)).  A jury verdict should not be set aside as a matter of law "unless there was only one conclusion the jury could have reached."  *Id.* (citing *Conway v. Electro Switch Corp.*, 825 F.2d 593, 598 (1st Cir. 1987)).  Specifically, the Court's review "is weighted toward preservation of the jury verdict"; the Court will uphold the jury verdict "unless the evidence was so strongly and overwhelmingly inconsistent with the verdict[] that no reasonable jury could have returned [it]."  *Rodowicz v. Mass. Mut. Life Ins. Co.*, 279 F.3d 36, 41-42 (1st Cir. 2002) (internal quotation omitted).

#### 2.  EMTALA

The Court extensively addressed the provisions of EMTALA as they apply to pregnant women in its order on EMMC's motion for summary judgment and the Court adopts its Order for purposes of this motion.  *Order on Mot. for Summ. J. and Mot. to Exclude or Limit the Proposed Expert Test. of Pl.'s Expert Witness Annette O'Brien* (Docket # 50) (*Order*).  The Court instructed the jury on what Ms. Morin was required to demonstrate to prove her EMTALA claim:[5]

> Ms. Morin must prove each of the following three elements by a preponderance of the evidence:
>
> 1) That Ms. Morin had an emergency medical condition when she presented to the EMMC Emergency Department on July 1, 2007;
> 2) That EMMC then, having determined that Ms. Morin had an emergency medical condition, discharged her before the emergency medical condition was stabilized; and,
> 3) That as a direct result of EMMC's conduct, Ms. Morin suffered personal harm.

*Trial Tr. III* 557:4-13.  The Court gave more specific instructions regarding EMTALA and pregnant women:

> For pregnant women, EMTALA defines "emergency medical condition" in the following way:  For a pregnant woman having contractions, the term "emergency medical condition" means that transfer from the Emergency Department (including discharge) may pose a threat to the health or safety of the woman.  Under this definition, Ms. Morin must prove by a preponderance of the evidence that EMMC determined that Ms. Morin was suffering from such an emergency medical condition.  If the pregnant woman is having contractions, the obligation to stabilize means to deliver (including the placenta).  EMTALA provides that a pregnant woman experiencing contractions is in true labor unless a medical professional certifies that, after a reasonable time of observation, the woman is in false labor.  EMTALA does not distinguish between women with a viable as opposed to a non-viable pregnancy.

---

[5] The Court instructed the jury on three of the six elements of an EMTALA claim since the parties had stipulated to three of the elements.

> Therefore, if you find that Ms. Morin has proven the following three elements: 1) that EMMC determined she was pregnant and having contractions, 2) that EMMC determined that her discharge may have posed a threat to her health or safety; and, 3) that EMMC discharged her before delivery, including the placenta, then EMMC has violated EMTALA.  In deciding whether EMMC determined that Ms. Morin's discharge posed such a threat, you need not find that Ms. Morin proved that any threat would come to fruition or actually happen.  Ms. Morin only need prove that EMMC determined she faced a possible threat to her health or safety.

*Id.* 557:14-25; 558:1-15.  The Court's interpretation of EMTALA has been consistent since its summary judgment order, and the jury was thoroughly instructed on that interpretation.

### 3.  Viable v. Non-viable Pregnancies

Throughout this litigation, EMMC has taken the untenable position that EMTALA entitles it to treat pregnant women carrying dead fetuses with less care than it treats women carrying viable fetuses.  The Court extensively addressed EMMC's argument in its July 28, 2010 Order on EMMC's motion for summary judgment, and it adopts that opinion in response to EMMC's reiterated position.  (*Order*).  From the Court's perspective, EMMC's position is legally wrong and morally questionable:

> The Court is nonplussed at EMMC's disquieting notion that EMTALA and its regulations authorize hospital emergency rooms to treat woman who do not deliver a live infant differently than women who do.  EMMC's contention is not justified by the language of the statute or its implementing regulations and has disturbing policy implications.  There is simply no suggestion that Congress ever intended such a harsh and callous result for women who, like Ms. Morin, are carrying a non-viable fetus.

*Id.* at 21.

### 4.  Nurse Annette O'Brien's Expert Testimony

The Court also previously addressed EMMC's contention that the Court erred in allowing Nurse Annette O'Brien to testify as an expert.  *Id*. at 5-11.  The Court stands by its earlier ruling.

During trial, the Court gave EMMC free rein to cross-examine Nurse O'Brien, an opportunity EMMC took full advantage of.  *Trial Tr. I* 92:1-96:18. During cross-examination, Nurse O'Brien admitted she did not go to college, she cannot make a medical diagnosis, cannot write prescriptions, cannot bill separately for nursing services, cannot admit or discharge patients, may not take action inconsistent with a doctor's orders, and must work under physician supervision.  *Id*. Furthermore, EMMC called three physician witnesses and was allowed to develop their extensive education, training, and experience.  *Trial Tr. I-III*.

Throughout her testimony, Nurse O'Brien readily acknowledged the limitations of her expertise, but this does not mean her testimony was inadmissible. Nurse O'Brien had been a registered nurse for thirty-six years and is certified in inpatient obstetrics and is a bereavement counselor.  *Trial Tr*. 65:12-22.  She has spent all but one of her thirty-six years in obstetrics.  *Id*. 68:10-11.  As a nurse, she said she makes assessments of patients and the risks they face.  *Id*. 70:3-6.  She testified that since Ms. Morin was having contractions, she was at risk for delivering.  *Id*. 76:24-25.  Nurse O'Brien said that upon discharge, Ms. Morin faced a risk of home delivery and that risk included hemorrhaging at home.  *Id*. 78:1-7. She thought the risk of hemorrhaging increased at home because she would not be

delivering under medical supervision and would have no means to stop bleeding. *Id.* 79:17-23.  She said Ms. Morin was emotionally distraught when she left EMMC. *Id.* 78:9-10.  She thought Ms. Morin was in labor both when she arrived at EMMC and when she was discharged.  *Id.* 78:18-25.  EMMC called three physicians who disagreed with some but not all of Nurse O'Brien's testimony.  *Trial Tr. I-III.*

It was a jury question whether Nurse O'Brien was less or more persuasive than the EMMC's three physician experts.  During final instructions, the Court gave the jury the standard instruction regarding expert testimony, informing them that they were entitled to judge expert testimony "like any other testimony", that they could "accept it or reject it", and could "give it as much weight as [they] think it deserves considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case."  *Trial Tr. III* 553:24-25; 554:1-8. Consistent with First Circuit authority, the Court allowed EMMC to probe "any flaws in [her] opinion . . . through cross-examination" and to call its own "competing expert testimony."  *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002).

In sum, the Court rejects EMMC's blanket contention that nurses are not experts.  They are.  Nurses are nursing experts, not physician experts, but this limitation goes to weight, not admissibility.

### 5.   A Threat to Ms. Morin's Health and Safety

Although the Court rejects EMMC's attack on the credentials of a nurse to testify as an expert, it disagrees with EMMC's contention that absent Nurse O'Brien's testimony, there is no medical evidence that Ms. Morin "faced any threat

to her physical health or safety as a result of her discharge, and no medical testimony that EMMC determined that Plaintiff faced any such threats." *Def.'s Mot.* at 5.

First, EMMC's own nursing witness, Angela Burbine, who was the nurse in charge of the ER on July 1, 2007, agreed that EMMC had trained her to assess possible threats to a patient's well being. *Trial Tr. II* 281:10-13. She also agreed that if a woman is having contractions with a 16-week old child, she could be in early labor, and that her early labor would create a potential threat of hemorrhage as well as a threat to her emotional well-being. *Id.* 282:16-21; 282:25; 283:1-7.

A second EMMC nurse Kimberly Lugdon, the nurse who was present during much of Ms. Morin's care, testified that she was trained to assess patients and whether there are any possible threats to their physical and mental health. *Id.* 309:1-8. She agreed with Dr. Grover that Ms. Morin was having contractions when she was leaving the hospital. *Id.* 316:7-25; 317:1.

Thirdly, the physician testimony, when combined and analyzed, presents sufficient expert testimony to allow the jury to draw a commonsense determination that upon discharge, Ms. Morin faced a threat to her health or safety. All the doctors agreed that Ms. Morin was in the process of miscarrying her dead fetus. Dr. Reinstein minimized the risk by testifying that upon discharge, Ms. Morin was not facing "any more threat than any other woman who's miscarrying." *Id.* 351:24-25; 352:1-6. But according to the doctors themselves, there are some risks associated with a miscarriage. In particular, Ms. Morin's miscarriage contained a risk of

41

bleeding, which Dr. Grover himself acknowledged by telling Ms. Morin to contact the EMMC ER, if she "started to bleed or had other issues." *Id.* 389:15-24:390:1-3. Dr. Gimbel confirmed that "delivery at home generally would have that possibility of - - hemorrhage at home or excessive bleeding." *Trial Tr. III* 529:6-10. Dr. Gimbel conceded that hemorrhaging was harm or at least "it can be", and is generally "not a good thing." *Id.*

When asked whether there were any threats to Ms. Morin at discharge, Dr. Grover replied "[t]hat's kind of a broad term. I didn't think that there was any significant, immediate concern or threat to her health or safety by discharging her home." *Trial Tr. I* 396:24-25; 397:1-4. Significantly, Dr. Grover testified that when she was discharged, she could have delivered the fetus within a couple of hours or more likely from eight to then to twelve hours later. *Id.* 412:12-18; 415:6-10.

Dr. Gimbel defended the discharge by saying that he saw "nothing in the record to indicate that the ER physicians at EMMC expected the mother to deliver at home." *Trial Tr. III* 531:1-5. In essence, Dr. Gimbel contended that neither Dr. Grover nor Dr. Reinstein consciously directed Ms. Morin back to her home with the intention of forcing her to miscarry her sixteen week old fetus on the bathroom floor. But by discharging her back to Millinocket, this is exactly what they did.

The flaw in the EMMC defense is time and distance. The Morins live in Millinocket, approximately one hour and fifteen minutes from EMMC. If Dr. Grover's own estimate of the time that Ms. Morin was at risk for miscarrying is accepted, she could have miscarried within two hours of being discharged, and

simple math compels the conclusion that, if she miscarried within two hours of discharge, there was not enough time to return to Millinocket and get back to EMMC. Dr. Grover directly instructed Ms. Morin to "go home, rest, and see how things progress through the day, and when or if her condition worsened, her pain got worse, or she started to bleed or had other issues, she should either return to the ER or call, and we could see her." *Trial Tr. II* 389:15-25; 390:1-2. He testified that he "would not have been surprised for her to either call or to return at some point in time." *Id.* 397:5-8. He thought it was appropriate for her to go home and "to return as need be." *Id.* 413:20-23.

But by the time Ms. Morin returned home as directed, she was an hour and fifteen minutes away from EMMC. She could not easily "return as need be." She knew from her earlier experience at EMMC ER that having contractions alone would not be a sufficient basis to return since she was discharged while having contractions. So, before she took the risk of getting in the car and heading to Bangor, she would have to wait until the contractions became serious, her pain worsened, or she started to bleed. Heading south for an hour and fifteen minutes back to EMMC would have been a trip fraught with the danger that she would miscarry in the car as her husband frantically sped to the EMMC.

The jury was fully capable of applying the time frames of the doctors' testimony to the time-distance from EMMC to Ms. Morin's home in Millinocket and back to EMMC. It was also capable of finding that EMMC had discharged Ms. Morin while she was still having contractions, before she had delivered the fetus,

and with a risk to her health and safety. Based on these factors, the jury was justified in concluding that EMMC had violated EMTALA on July 1, 2007.[6]  This view of the evidence obviates EMMC's *Cruz-Vasquez* contention that the jury verdict must fail because it is not supported by expert testimony. The expert predicate was supplied by the physician experts called by EMMC itself and the remaining necessary calculation for liability fell well within the ambit of the jury. This view also defeats EMMC's contention that Ms. Morin did not have an "emergency medical condition" under EMTALA since EMMC's physician experts agreed that she had a risk of bleeding and hemorrhaging if she gave birth at home.

There was another risk, which the EMMC perpetrated by its discharge: a risk of emotional damage. EMMC dismisses the emotional injury claim as merely "being upset, crying and experiencing stress" and it denies that these symptoms "were sufficient threats to her health and safety to bring her within the applicable definition of emergency medical condition." *Def.'s Mot.* at 7. But here EMMC misses the point about the additional emotional damage it had done to Ms. Morin by turning her away. Ms. Morin came to EMMC's ER seeking help, and after EMMC told her to leave, she spent the day worrying about her condition and impending miscarriage. Then, that evening she shut her husband out of the bathroom and miscarried alone on the floor. The doctors testified that women who suffer

---

[6] One question is how the EMMC physicians could have made such a mistake. Dr. Grover made the decision to discharge Ms. Morin. Although Dr. Grover testified at trial that he knew Ms. Morin lived in Millinocket, Dr. Grover recorded in the medical record that she was from "the local area." Ex. J-1 at EMMC 009. It is questionable whether Millinocket, an hour and fifteen minute drive from Bangor, would be considered within the local area of Bangor. Dr. Grover's insistence that Ms. Morin be discharged makes sense if she lived in the local area and could easily return, but because she lived one hour and fifteen minutes away and was being discharged home, the discharge threatened her health and safety.

miscarriages are subject to post-partum depression, and by discharging Ms. Morin in this fashion, EMMC created and enhanced the threat to Ms. Morin's emotional well-being and health.

### 6. Damages Expert

EMMC argues that Ms. Morin failed to present expert testimony on the issue of damages. EMMC cites *Torres Otero v. Hosp. Gen. Menonita*, 115 F. Supp. 2d 253, 260 (D.P.R. 2000) for the proposition that a plaintiff must produce expert testimony on causation in order to succeed on an EMTALA cause of action. The Court does not read that case so broadly. In *Torres Otero*, the plaintiff arrived at the hospital with chest pains consistent with a myocardial infarction and claimed that the hospital's failure to screen necessitated heart surgery. *Id.* at 256. Whether the failure to screen, not the natural progression of his condition, caused the need for heart surgery was a technical medical question requiring expert testimony. Here, the claim was for the personal harm Ms. Morin suffered as a result of being discharged and having to miscarry at home. A jury could make the causal link by applying its commonsense and experience to the evidence.

EMMC's supplemental citation of *Lyman v. Huber*, 2010 ME 139, 10 A.3d 707, is not on point. In *Lyman*, the Maine Supreme Judicial Court addressed the fourth element of an intentional infliction of emotional distress claim, which "imposes an objective standard of proof." *Id.* 2010 ME ¶ 21, 10 A.3d at 712. To meet this standard, a plaintiff "must prove that her emotional distress was so severe as to have manifested objective symptoms demonstrating shock, illness, or

other bodily harm." *Id.* 2010 ME ¶ 23, 10 A.3d at 713.   The Law Court wrote that "We do not preclude the possibility that this can be achieved without the corroborating testimony of an expert medical or psychological witness. That possibility is, however, remote." *Id.*   By contrast, an EMTALA plaintiff must only prove that she "suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section."   42 U.S.C. § 1395dd(d)(2)(A).

The causation between EMMC's discharge of Ms. Morin and her claimed personal harm is not determined by the higher standards of an intentional infliction of emotional distress claim as in *Lyman* nor did it involve esoteric questions of medical causation as in *Torres Otero*.   The jury was acting well within its permissible authority in assessing emotional damages in this case.

### 7.  Punitive Damages

Lastly, the Court turns to the punitive damages issue.  As Ms. Morin has pointed out, EMMC makes no claim that the Court improperly instructed the jury on the correct legal standard for punitive damages.  *Pl.'s Opp'n.* at 7-8.  Instead, EMMC asserts that the trial evidence was insufficient to establish implied malice. Having carefully reviewed the evidence, the Court disagrees with EMMC.  The EMMC doctors not only sent Ms. Morin away in violation of the law and but it also thereby consigned her to a humiliating, risky and solitary home delivery.  The trial evidence was sufficient to establish by clear and convincing evidence that "although motivated by something other than ill will toward any particular party," EMMC's

actions were "so outrageous that malice toward a person injured as a result of that conduct can be implied." *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985).

### 8.  Legal Standard:  Motion for New Trial

Under Rule 59, a court may grant a new trial on some or all of the issues submitted to the jury "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FED. R. CIV. P. 59(a)(1)(A).  When assessing a motion for a new trial, a trial judge has limited discretion:

> A trial judge may not grant a motion for a new trial merely because he or she might have reached a conclusion contrary to that of the jurors, rather, the trial judge may set aside a jury's verdict only if he or she believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.

*Conway*, 825 F.2d at 598-99.  An erroneous instruction of law to the jury may be grounds for a new trial; however, the instruction cannot have been harmless and must have influenced the jury verdict.  *Muniz-Olivari v. Steifel Labs., Inc.*, 496 F.3d 29, 37-38 (1st Cir. 2007).  The erroneous admission of evidence may justify a new trial as well but only if the movant meets the "miscarriage of justice" standard. *Guerrero v. Ryan*, No. 07-1243, 2007 U.S. App. LEXIS 23684, 5-6 (1st Cir. Oct. 5. 2007).

### 9.  New Trial Analysis

EMMC first claims that the Court erroneously instructed the jury that EMTALA does not distinguish between viable and non-viable pregnancies.  *Def.'s Mot.* at 17.  The Court has rejected this argument.  *See supra* Section III(C)(3).

EMMC next claims that it is entitled to a new trial because the Court did not instruct the jury that the "may pose a threat" language in EMTALA "depends on whether the woman in labor has any medical condition that could interfere with the normal, natural delivery of her healthy child, or, alternatively, it depends on whether the woman in labor has any medical condition that could interfere with delivery." *Def.'s Mot.* at 17.  Here, EMMC is referring to language in EMTALA:

> The term "emergency medical condition" means with respect to a pregnant woman who is having contractions that the transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1)(B)(ii).  In support, EMMC quotes *Burditt v. U.S. Dep't of Health and Human Servs.*, 934 F.2d 1362, 1370 (5th Cir. 1991):

> Because better medical care is available in a hospital than in an ambulance, whether a transfer "may pose a threat" under 42 U.S.C. § 1395dd(e)(2)(C)[7] depends on whether the woman in labor has any medical condition that could interfere with the normal, natural delivery of her healthy child.

To the extent EMMC is now claiming error because the Court did not instruct the jury on the need to deliver a "healthy child," the Court rejects this contention because Ms. Morin's fetus was dead.  At trial EMMC softened this request and asked for an instruction that the jury consider whether Ms. Morin had a "medical condition that could have interfered with normal, natural delivery."  *See Def.'s Suggested Revisions to the Ct's Draft Jury Instructions* at 2 (Docket # 114).

*Burditt* addressed language in EMTALA, which defined "active labor" as:

> Labor at a time when

---

[7] The applicable section for "pose a threat" in EMTALA has changed to § 1395dd(e)(1)(B)(ii) since *Burditt.*

(B) there is inadequate time to effect safe transfer to another hospital prior to delivery, or

(C) a transfer may pose a threat [to] the health and safety of the patient or the unborn child.

934 F.2d at 1369 (citing 42 U.S.C. § 1395dd(e)(2)(B)-(C) (Supp. IV 1987), *amended by* 42 U.S.C. 1395dd(e)(1)(B) (West Supp. 1991)).  The *Burditt* Court was addressing a transfer of a pregnant woman to another hospital under Clause B.  It struggled with the meaning of Clause B, since the language suggests that some transfers to other hospitals are permitted under EMTALA, so long as there is adequate time to effect a safe transfer.  *Burditt* concluded the Clause B language must refer to "women in uncomplicated labor who, within reasonable medical probability, will arrive at another hospital before they deliver their babies."  *Id.*.  Based on this construction, *Burditt* infused a question into the EMTALA statute as to whether the woman had a complicated or uncomplicated labor as she was about to be transferred to another hospital under Clause B.

The Court concluded that the *Burditt* language was inapplicable to the facts in this case.  Clause B (now § 1395dd(e)(1)(B)(i)) addresses transfer "to another hospital" and Ms. Morin was not being transferred to another hospital.  She was discharged home.  The Court declined to give the requested instruction since it did not apply to Ms. Morin's situation.  The Court did instruct the jury that Ms. Morin had to demonstrate that EMMC had "determined that her discharge may have posed a threat to her health and safety", which is the part of § 1395dd(e)(1)(B)(ii)

that is applicable to Ms. Morin's case.   The Court rejects EMMC's claim of instructional error.

The Court has already rejected EMMC's claimed error in Nurse O'Brien's testimony.  *See supra* Part III(C)(4).

As to EMMC's final assertion that the verdict is not supported by the weight of the evidence, the Court has described in detail the evidence in this case and rejects EMMC's contention that the trial evidence is inadequate to sustain the verdict.

## IV. CONCLUSION

The Court DENIES Lorraine Morin's Motion for Equitable Relief Followed by Entry of Final Judgment Under Rule 54(b) (Docket # 121) and the Court DENIES Eastern Maine Medical Center's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial (Docket # 127).   The Court ORDERS that a final judgment shall issue in favor of Plaintiff Lorraine Morin consistent with the verdict and against Lorraine Morin's claim for equitable relief.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th Day of March, 2011